**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re Abbott Laboratories Infant Formula Shareholder Derivative Litigation | Case No. 22 CV 05513 |
| | Honorable Sunil R. Harjani |

**MEMORANDUM OPINION AND ORDER**

In this lawsuit, Plaintiffs International Brotherhood of Teamsters Local No. 710 Pension Fund (Teamsters Pension Fund) and Southeastern Pennsylvania Transportation Authority (SEPTA) bring this action derivatively, on behalf of nominal defendant Abbott Laboratories (Abbott), against certain current and former members of Abbott's Board of Directors and Executive Officers (collectively, the Defendants). Plaintiffs seek to remedy violations of the federal securities laws, breaches of fiduciary duties, and insider trading, corporate waste, and unjust enrichment. Compl. [92]. The case stems from the shutdown of Abbott's Sturgis Plant as a result of the discovery of tainted infant formula, which ultimately contributed to a nationwide shortage of baby formula in 2022. Defendants have moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6). For the reasons stated below, Defendants' motion [111] is granted in part and denied in part.

**Background**

For purposes of the instant motion, the Court accepts as true the well-pleaded facts of Plaintiffs' complaint. *In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003). On February 15, 2022, Abbott closed its infant formula manufacturing facility in Sturgis, Michigan due to the contamination and sale of tainted infant formula.[1] Compl. [92] ¶ 1. Two days later, on February 17, 2022, Abbott announced a recall of contaminated infant formula produced at the

---

[1] The Consolidated Amended Complaint and Motion to Dismiss briefing and exhibits were all filed under seal with the Parties also providing redacted versions. If the Court refers to a sealed document, it attempts to do so without revealing any information that could be reasonably deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

Sturgis Plant. *Id.* The shutdown and recall were a result of the Food and Drug Administration's inspections that found multiple regulatory violations and the deaths of several infants who had consumed formula produced at the Sturgis Plant. The Sturgis Plant remained closed until June 4, 2022. *Id.* ¶ 2. Before the recall, Abbott produced 40% of all infant formula products consumed in the U.S., with between half and two-thirds of that supplied by the Sturgis Plant. *Id.* ¶¶ 6–7.

### 1. Parties

Plaintiffs, Teamsters Pension Fund and SEPTA owned Abbott common stock and have, at all times relevant to the claims, been shareholders. The nominal defendant, Abbott Laboratories, is an international biotechnology and manufacturing firm that makes medical devices and nutritional products and is one of the main suppliers of infant formula in the United States. In 2022, the Company reported $43.7 billion in revenue.

Defendants are current or former officers and directors of Abbott, all of whom held those positions during the time of the alleged wrongdoing. Defendant Robert B. Ford has served as the Company's President and Chief Executive Officer since March 2020. From 2018 to 2020, Ford served as Abbott's President and Chief Operating Officer. Defendant Ford along with Robert J. Alpern, Roxanne S. Austin, Claire Babineaux-Fontenot, Sally E. Blount, Paola Gonzalez, Michelle A. Kumbier, Edward M. Liddy, Darren W. McDew, Nancy McKinstry, Phebe N. Novakovic, William A. Osborn, Michael F. Roman, Daniel J. Starks, John G. Stratton, Glenn F. Tilton, and Miles D. White have served on the Abbott Board and are referred to as the Director Defendants.[2] The Officer Defendants, in addition to Ford, are Hubert Allen, Erica Battaglia, Christopher J. Calamari, Robert E. Funck, J. Scott House, Joseph Manning, Lori J. Randall, Daniel Salvadori, and James E. Young.

### 2. Abbott's Board of Directors and Committees

Abbott's bylaws state that the Company shall be managed under the direction of the Board of Directors. *Id.* ¶ 274. The bylaws also establish Board subcommittees including, as relevant here, the Public Policy Committee and Audit Committee. *Id.* ¶ 276.

The Public Policy Committee assists the Board in fulfilling its oversight responsibility with respect to Abbott's public policy, certain areas of legal and regulatory compliance, governmental affairs, and healthcare and other compliance issues. *Id.* ¶ 286. The Board's Audit Committee assists the Board with its oversight responsibilities over the quality and integrity of Abbott's financial statements, legal and regulatory compliance as it relates to financial matters, and Abbott's enterprise risk management, including major financial, information security, and enterprise cybersecurity risk exposures. *Id.* ¶ 288.

---

[2] See the Appendix for additional information on the named Defendants.

### 3. Abbott's Proxy Statements

During the relevant period, the Director Defendants caused Abbott to issue a proxy statement each year in connection with the annual shareholders meeting.[3] These proxies asked shareholders to: (1) re-elect the Board, (2) approve executive compensation, and (3) decide whether to adopt a policy requiring an independent Chair of the Board. In support of these requests, each proxy listed the responsibilities for the Audit and Public Policy Committees and made the representation that the "Board spends significant time with Abbott's senior management to understand the dynamics, issues, and opportunities for Abbott, and also regularly monitors leading practices in governance and adopts measures that it determines are in the best interest of Abbott and its shareholders." *Id.* ¶¶ 296, 303, 304, 318, 325, 326, 340, 345, 346.

### 4. Abbott's Repurchase of Common Stock in 2019 and 2021

The Board periodically authorizes the Company to repurchase its own shares of common stock. Compl. *Id.* ¶ 361. Two stock repurchase authorizations are relevant to the allegations here. First, Director Defendants Alpern, Austin, Blount, Kumbier, Liddy, McDew, McKinstry, Osborn, Starks, Stratton, Tilton, and White approved a $3 billion repurchase program announced on October 15, 2019. *Id.* Second, Director Defendants Alpern, Austin, Blount, Ford, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Starks, Stratton, and White approved a $5 billion repurchase program announced on December 10, 2021. *Id.*

### 5. Product Safety Issues at the Sturgis Plant

The production and sale of infant formula in the United States is highly regulated, with compliance enforced by the FDA. *Id.* ¶¶ 3, 82. Plaintiffs allege that, except for the year 2020, the FDA conducted annual inspections of the Sturgis Plant. In September 2019, FDA inspectors found violations of federal food safety laws at the Sturgis Plant and issued a Form 483 and Establishment Inspection Report (EIR). *Id.* ¶ 9, 151. A Form 483 is used by FDA investigators to record significant deviations from the Food Drug and Cosmetic Act (FDCA) and should be sent to top management. *Id.* ¶¶ 92–93. An EIR accompanies a Form 483 and contains more detail and may list additional objectionable conditions. *Id.* ¶ 94. A company must respond to the FDA's observations within fifteen business days with a root cause analysis, impact assessment, and a set of corrective and preventative actions. *Id.*

---

[3] On March 12, 2021, Director Defendants Alpern, Austin, Blount, Ford, Kumbier, Liddy, McDew, McKinstry, Novakovic, Osborn, Starks, Stratton, Tilton, and White caused Abbott to file the 2021 Proxy Statement in connection with the 2021 annual shareholders meeting. *Id.* ¶ 295. On March 18, 2022, Director Defendants Alpern, Blount, Ford, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Starks, Stratton, and Tilton caused Abbott to file the 2022 Proxy Statement in connection with the 2022 annual shareholders meeting. *Id.* ¶ 317. On March 17, 2023, Director Defendants Alpern, Babineaux-Fontenot, Blount, Ford, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Starks, and Stratton caused Abbott to file the 2023 Proxy Statement in connection with the 2023 annual shareholders meeting. *Id.* ¶ 339.

The Complaint explains that the violations identified in 2019 were not fully corrected, and other more serious violations were uncovered in September 2021. In both 2019 and 2021, the FDA found Cronobacter sakazakii (Cronobacter), a bacteria that can contaminate infant formula products and be potentially deadly, at the Sturgis Plant. *Id.* ¶¶ 9, 151. On September 24, 2021, the FDA issued another Form 483 and related EIR to Abbott after its September 2021 inspection, which stated that Abbott did not maintain the building in clean and sanitary condition and that an instrument used in the process was not maintained properly. *Id.* ¶ 188. The FDA also found that personnel working directly with infant formula were not thoroughly washing their hands. At the end of 2021, the FDA demanded Abbott allow a "for-cause" inspection of the Sturgis Plant.

During this same period, Plaintiffs contend that certain whistleblowers reported that the culture at Sturgis was focused on speed and meeting metrics at the expense of safety. *Id.* ¶ 103. They reported lax cleaning practices and leaks presenting contamination risks. *Id.* ¶¶ 111–13. Defendant Allen was sent a whistleblower's Occupational Safety and Health Administration (OSHA) complaint detailing illegal activity at the Sturgis Plant in February 2021. *Id.* ¶ 179. In April 2021, Abbott responded to the whistleblower's OSHA complaint and Plaintiffs allege that Officer Defendants Allen, Randall, and Calamari would have had direct oversight over the Sturgis Plant or been involved in the response. *Id.* ¶ 182.

From January 31, 2022, through February 2, 2022, the FDA conducted a "for-cause" inspection at the Sturgis Plant. *Id.* ¶ 201. The FDA's testing detected Cronobacter in multiple environmental sites, including on the "scoop hopper" used to "feed scoops, which are placed directly inside the infant formula containers and contact product." *Id.* ¶ 202. The FDA instructed Abbott to conduct additional testing between February 6 and February 20, 2022, which resulted in findings of Cronobacter on twenty occasions in low, medium, and high care areas of powdered infant formula production at the Sturgis Plant. The FDA found the conditions at the Sturgis Plant to be "unsanitary." *Id.* ¶ 10. There were also reports of several infant deaths purportedly linked to the formula produced at the Sturgis Plant that were allegedly contaminated with Cronobacter. As a result of these reports, a related whistleblower complaint filed in October 2021 with the FDA detailing dangerous conditions at the Sturgis Plant, and the FDA's for-cause inspection that revealed additional violations of federal food safety laws, the FDA urged Abbott to conduct a voluntary recall of certain infant formula products manufactured at the Sturgis Plant. The FDA repeatedly made recommendations that Abbott recall certain infant formula products on February 15, 16, and 17 and submitted a report to its government partners on the potential recall and resulting supply chain impacts. *Id.* ¶¶ 208–10. Abbott ceased production at the Sturgis Plant on February 15, 2022, and issued a recall on February 17, 2022. *Id.* ¶¶ 208, 210.

On February 17, 2022, at a previously scheduled Board meeting, management informed the Board about the federal food safety violations at the Sturgis Plant, the Plant shutdown, and the product recall. *Id.* ¶¶ 11, 214. The Board meeting minutes reflect that "Ford began with an update on the voluntary recall of powder formulas manufactured at the Sturgis, Michigan facility" and note that the "recall would not impact the Corporation's adjusted guidance forecast." *Id.* ¶ 214. However, the Board meeting minutes do not indicate that there was a discussion about the safety issues related to the formula. *Id.* ¶ 11. The Public Policy Committee's meeting the next day also

did not include a discussion on the safety risks. *Id.* ¶¶ 12, 215. The Board did not receive a report about the prior investigations, incidents, and issues related to Cronobacter at the Sturgis Plant until the next Board meeting on April 29, 2022. *Id.* ¶¶ 234–35, 237, 240–42.

On February 28, 2022, Abbott expanded its recall, and the FDA explained the expanded recall by announcing "one additional illness of Cronobacter sakazakii with exposure to powdered infant formula produced at Abbott Nutrition's Sturgis, Michigan facility." *Id.* ¶ 223.

On May 25, 2022, the FDA Commissioner testified at a Congressional hearing about the "egregiously unsanitary" conditions at the Sturgis Plant, that Abbott's "inspection results were shocking," and that the FDA had "lost confidence that Abbott Nutrition had the appropriate safety and quality culture and commitment to fix these problems quickly." *Id.* ¶¶ 16, 249. Abbott has disputed both publicly and in its briefs before the Court the claims that the Sturgis Plant was the source of reported infant illnesses. *Id.* ¶ 388; Doc. [112] 11–13. However, the former FDA Deputy Commissioner, Food Policy & Response in testimony before the U.S. House of Representatives Oversight Committee's Subcommittee on Health Care and Financial Services pushed back against claims that the Sturgis Plant was not the source of the reported illnesses. Compl. [92] ¶ 388.

### 6. Financial Impact of the Plant Shut Down and Formula Recall on Abbott

Prior to the recall, one in five babies in the U.S. relied on formula produced at the Sturgis Plant. *Id.* ¶ 386. The Company reported a 60% decrease in operating earnings for its Nutritional Products segment and recorded $176 million in charges related to the 2022 infant formula recall. Between February 17, 2022, the day the recall was announced, and June 8, 2022, when investors learned that Abbott was aware of the whistleblower's complaint months earlier than previously reported, Abbott's stock price declined $8.30, or 6.7%, for a total market capitalization loss of more than $13 billion. *Id.* ¶ 401. Abbott faced a 31.75% decline in net earnings in its third quarter 2022 financial results. *Id.* ¶ 15. On October 19, 2022, the Form 8-K filed by Abbott attributed this decline in part to the Sturgis Plant shutdown, entry into a DOJ Consent Decree requiring significant remediation efforts, and numerous lawsuits, including personal injury lawsuits *In re Recalled Abbott Infant Formula Prods. Liability Litig.*, No. 22-cv-02148, MDL No. 3037, related to the wrongful deaths and related damages allegedly caused by Abbott's contaminated infant formula products produced at the Sturgis Plant.

### Discussion

Defendants move to dismiss the Complaint pursuant to Federal Rules of Civil Procedure Rule 23.1 and Rule 12(b)(6). The Defendants raise three primary issues with the Complaint. First, Defendants argue that the Plaintiffs failed to adequately allege that making a demand on the Board prior to instituting this action would have been futile. This requires a count-by-count review of the allegations. Second, Defendants argue that it is not in the best interest of the shareholders to

allow Plaintiffs to bring these claims against Abbott. Third, a subset of Officer Defendants claim that Plaintiffs do not sufficiently allege a claim a under Rule 12(b)(6).[4]

For purposes of the instant motion, the Court accepts as true the well-pleaded facts of Plaintiffs' complaint and generally a court must stay within the four corners of the Complaint. *In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003). With their motion and reply brief, Defendants offered 85 exhibits totaling 1,155 pages for the Court to consider. Defendants assert that these exhibits are properly before the Court as part of the pre-suit books and records production and that they are incorporated by reference in the Complaint. Doc. [132] at 7– 8. In some instances and for specific purposes, the Court may consider documents incorporated by reference in the Complaint. *Williamson v. Curra*n, 714 F.3d 432, 436 (7th Cir. 2013); *In re Gen. Motors (Hughes) S'holder Litig*., 897 A.2d 162, 169 (Del. 2006). In a derivative suit, the incorporation-by-reference doctrine permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inferences the plaintiff seeks are reasonable. *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020). This limits the ability of a plaintiff to cherry-pick statements and take language out of context. To the extent there are factual conflicts or circumstances requiring inferences arising out of the documents, the Plaintiffs' well-pled allegations will be credited. *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002). Plaintiffs also remain entitled to "all reasonable inferences." *Id.* at 897. Therefore, if a document could support multiple inferences and the inference Plaintiffs seek is reasonable, the Plaintiffs receive that inference. The incorporation by reference doctrine does not allow for the court to weigh the evidence. *Voigt*, 2020 WL 614999, at *9. So the Court cannot—as the Defendants often request—rely on these documents to draw inferences in Defendants favor and in effect rewrite the Plaintiffs' Complaint. *Id.*; *In re CBS Corp. S'holder Class Action & Derivative Litig.*, 2021 WL 268779, at *18 (Del. Ch. Jan. 27, 2021), as corrected (Feb. 4, 2021).

## 1. Demand Futility

Plaintiffs did not make a pre-suit demand on the Board and thus the key issue here is whether the lawsuit can proceed without this demand. But first, some context is in order. In a derivative suit, individual shareholders seek to enforce a right that belongs to the corporation. *In re Abbott Lab'ys Derivative S'holders Litig.*, 325 F.3d 795, 803 (7th Cir. 2003). Given "the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders," most jurisdictions require plaintiffs to make a pre-suit demand on the board of directors. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991). "This allows the directors to exercise their business judgment and determine whether litigation is in the best interest of the corporation." *Abbott*, 325 F.3d at 803. Thus, prior to initiating a derivative suit, plaintiffs must either "(1) make a demand on the company's board of directors, or (2) show that demand would be futile." *In re Kraft Heinz S'holder Derivative Litig.*, 2023 WL 2745118, at *4 (N.D. Ill. Mar. 31, 2023).

---

[4] The Court need not reach this third argument as the claims against these Officer Defendants are dismissed on other grounds.

A shareholder derivative action must satisfy Rule 23.1(b)(3), which requires a complaint to state with particularity "any effort by the plaintiff to obtain the desired action from the directors" and, if applicable, "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1. "However, the requirement of a shareholder demand is more than a pleading requirement, it is a substantive right of the shareholder and the directors." *Abbott*, 325 F.3d at 804. The law of the state of the company's incorporation controls these substantive rights and governs what excuses are adequate for failure to make a demand. *Id.* Abbott was incorporated under the laws of Illinois, so Illinois law applies in determining whether a demand may be excused when shareholders file a derivative complaint on behalf of the company. *See id.* at 803 (citing *Kamen*, 500 U.S. at 98–99). Illinois case law follows Delaware law in establishing demand futility requirements. *Id.*

Because Plaintiffs did not make a pre-suit demand on the Board, they must allege with particularity that demand is excused as futile to proceed. In evaluating whether demand was futile, courts should ask the following three questions on a director-by-director basis:

1. whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
2. whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
3. whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.*

Plaintiffs only rely on the second prong of *Zuckerberg* and argue that they have adequately alleged that a majority of the Director Defendants faced a substantial likelihood of liability for each count. This assertion, by count, is further examined below.

### a. Count I: Violation of § 14(a) of the Exchange Act

Plaintiffs allege the Proxy Defendants[5] violated § 14(a) of the Exchange Act when they issued or caused to be issued materially false and misleading statements to stockholders in the

---

[5] The 2021 Proxy Defendants are Director Defendants Alpern, Austin, Blount, Ford, Kumbier, Liddy, McDew, McKinstry, Novakovic, Osborn, Starks, Stratton, Tilton, and White. The 2022 Proxy Defendants are Alpern, Blount, Ford, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Starks, Stratton, and Tilton. The 2023 Proxy Defendants are Alpern, Babineaux-Fontenot, Blount, Ford, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Starks, and Stratton. The Court will use "Proxy Defendants" when referring to this entire group of defendants.

2021, 2022, and 2023 Proxy Statements, which urged stockholders to re-elect members of the Board and approve executive compensation. Compl. [92] ¶ 452.

Proxy Defendants argue that Plaintiffs do not plead facts establishing that a majority of the Board faces a substantial likelihood of liability under § 14(a). More specifically, Proxy Defendants contend that Plaintiffs failed to identify specific statements in the proxies that were false or misleading and instead merely quoted large sections of the proxy statements and simply made broad conclusions that information was false or misleading.

To state a claim under Section 14(a), a plaintiff must allege: (1) that the proxy statement contained a material misstatement or omission, (2) that caused the plaintiff's injury, and (3) the proxy solicitation was an essential link in accomplishing the transaction. *Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021). In the Seventh Circuit, "there is no required state of mind for a violation of section 14(a); a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials." *Smykla v. Molinaroli*, 85 F.4th 1228, 1235 (7th Cir. 2023) (quoting *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009)). To determine whether an omitted fact is material, courts ask whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 1235–36 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1236 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)). "While materiality is normally a question of fact reserved for the trier of fact, we can resolve materiality as a matter of law when the information at issue is so obviously unimportant that reasonable minds could not differ[.]" *Id.* (citing *TSC Industries, Inc.*, 426 U.S. at 450; *Kuebler*, 13 F.4th at 638).

Here, Plaintiffs failed to sufficiently plead that the statements were false and misleading to properly allege that the Proxy Defendants face a substantial likelihood of liability as to those statements. In broad strokes, Plaintiffs contend that the Proxy Defendants misleadingly portrayed Abbott's safety, compliance, and oversight functions to investors through statements and omissions in the proxies. Plaintiffs further assert that Proxy Defendants' omissions are material because they create a misleading image of Abbott's safety, compliance, and competency of leadership, which goes to the core of Abbott's value. Doc. [125] at 43. However, Plaintiffs do not allege that any specific statement is false. Instead, Plaintiffs point to what was omitted from these statements, specifically Abbott's failure to address or report the Form 483s, EIRs, and whistleblower complaints. Plaintiffs equate these omissions to the misleading statements in *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223 (S.D.N.Y. 2012), and *Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490 (S.D. Ohio May 11, 2021) ("*First Energy*"), which the courts found were sufficient to state a § 14(a) claim. However, the statements in *Bricklayers* and *First Energy* are distinguishable from the statements identified by the Plaintiffs in Abbott's proxies.

8

In *Bricklayers*, the plaintiffs alleged that the defendants' proxies represented that the defendant had conducted "extensive" training and safety programs; however, in reality the defendant "failed to provide its employees with the training and resources necessary to safely operate its rigs, in violation of numerous federal regulations." *Bricklayers*, 866 F. Supp. 2d at 233. The complaint alleged that several of defendant's employees lacked the training and qualifications necessary for their roles and that complaints about the shortage of skilled employees were ignored by upper management. *Id.* The court found that the complaint alleged facts such that a reasonable investor would assume the extensive training and safety measures were "adequate, when, in fact, the measures were insufficient to address applicable legal requirements and created a high risk of legal exposure." *Id.* at 243. Here, Plaintiffs failed to allege a specific statement in Abbott's proxies that was similarly misleading because of the omitted information. While the Complaint discusses at length the information Plaintiffs contend was omitted from the proxies, it does not identify what particular statements were false or misleading as a result of the omissions. Instead, Plaintiffs refer generally to how Abbott "boasted" about safety and regulatory compliance, but that is not sufficient.

Likewise, the allegations in *First Energy* are distinguishable from the statements identified in the Complaint. In *First Energy*, the defendants argued that plaintiffs failed to state a claim because they did not identify the law or regulation governing lobbying activities and expenditures that the defendants violated. *First Energy*, 2021 WL 1890490, at *8. The defendants in *First Energy* argued that statements regarding legal compliance are generally not actionable because companies do not have a duty to opine on the legality of their own actions. *Id.* However, the court found that the plaintiffs alleged numerous specific statements made by the defendants about their legal compliance and risk management actions with respect to lobbying and political spending. *Id.* at *9. The *First Energy* plaintiffs alleged, among other things, that the proxies represented that the "Board further strengthened its oversight of your Company's lobbying activities and... maintains an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." *Id.* at *7. The plaintiffs also alleged that the proxies assured shareholders that the company had "decision-making and oversight processes in place for political contributions and expenditures," which the company said included a periodic review of "this policy and related practices as well as dues and/or contributions to industry groups and trade associations" by "your Board's Corporate Governance and Corporate Responsibility Committee." *Id.* at *8. The plaintiffs alleged that these statements about the company's purported compliance with federal and state lobbying requirements and the board's oversight of lobbying expenditures were designed to influence how shareholders voted. *Id.* The court held that those statements were actionable.

In this case, Plaintiffs have not identified where in the proxies Abbott makes similar specific statements about its manufacturing and product safety. Plaintiffs allege that the proxy statements misstated or failed to disclose:

(i) Abbott's ineffective internal controls, including Abbott's legal, regulatory and healthcare compliance; (ii) the existence of the 2019 Form 483, the 2021 Form 483, the 2022 Form 483, and related EIRs detailing violations of federal food safety

regulations at the Sturgis Plant, resulting in the shut-down of that plant for many months and a massive related recall of Abbott's infant formula products in the U.S., leading to a national baby food shortage in 2022; (iii) the 2022 DOJ Consent Decree, which was required to restart production of infant formula products at the Sturgis Plant; (iv) Abbott's inadequate controls related to ensuring that its manufacture and sale of infant formula products in the U.S. complied with federal food safety regulations and the Company's corporate policies; (v) the existence and failure to address Whistleblower #1's OSHA Complaint, along with Abbott's retaliatory practices against its employees reporting safety and regulatory violations related to the Company's production and sale of infant formula products in the U.S.; and (vi) the Board-approved compensation programs which incentivized Defendants to conceal the Company's unlawful manufacture and sale of infant formula products in the U.S.

Compl. [92] ¶ 452.

This on its own is insufficient. Plaintiffs must allege what specific statements these omissions rendered materially false or misleading. In this area, Plaintiffs fall short. For example, Plaintiffs alleged that the 2021 and 2022 proxy statements with respect to executive compensation state that: "Our leadership covenant includes commitments to multiple environmental, social and governance efforts. Examples include: A sustainable infrastructure to drive quality, environmental, health and safety performance; . . . and Abbott's Code of Conduct to ensure adequate internal controls for financial reporting and compliance with applicable laws and regulations." *Id.* ¶¶ 307, 311, 329. Plaintiffs also allege that proxies represent that the "Public Policy Committee assists the Board of Directors in fulfilling its oversight responsibility with respect to: Certain areas of legal and regulatory compliance, including evaluating Abbott's compliance policies and practices and reviewing Abbott's compliance program, . . . [and] Governmental affairs and healthcare compliance issues that affect Abbott[.]" *Id.* ¶¶ 304, 326. The 2021 proxy also included a stockholder proposal to adopt a policy to require an independent Chairman, which the Board recommended stockholders vote against for a series of reasons including that "every year, the Board reviews its leadership structure to ensure the appropriate level of oversight, independence, and responsibility." *Id.* ¶ 314.

Contrary to Plaintiffs' assertions, all of this is insufficient to state a § 14(a) claim. These are not statements that specifically reference Abbott's commitment to product safety or the Board's oversight over that function. Instead, these are generic statements about the Board's responsibilities for general regulatory and legal compliance. Generic claims in proxies about complying "with the law without providing *any* specifics and generally" refusing to discuss the topic are insufficient to state a claim. *First Energy*, 2021 WL 1890490, at *9 (quoting *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 947 (6th Cir. 2009)). Unlike the cases Plaintiffs rely on, Plaintiffs did not identify statements in Abbott's proxies about conducting extensive training and safety programs on the manufacturing process or specific references to the Board's actions regarding manufacturing and product safety. The general references to commitments to sustainable infrastructure and regulatory compliance

are not actionable as they are not made with specific reference to products being manufactured safely. Without those statements, it is not apparent that Abbott's proxies were misleading by omitting information regarding its alleged ineffective internal controls, the exclusions of Form 483s and EIRs detailing violations of federal food safety regulations, or the 2022 DOJ Consent Decree.

Thus, Plaintiffs have failed to sufficiently allege that the Proxy Defendants face a substantial likelihood of liability for the § 14(a) claim and, as such, demand is not excused for Count I.

### b. Count II: Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

Plaintiffs allege that the Abbott Board periodically authorizes the Company to repurchase its own shares of common stock. Compl. [92] ¶ 361. The Complaint sets out that Director Defendants Alpern, Austin, Blount, Kumbier, Liddy, McDew, McKinstry, Osborn, Starks, Stratton, Tilton and White approved a $3 billion stock repurchase program announced on October 15, 2019. *Id.* Director Defendants Alpern, Austin, Blount, Ford, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Starks, Stratton, and White approved a $5 billion stock repurchase program announced on December 10, 2021.[6] *Id.*

Plaintiffs allege the Section 10(b) Defendants[7] disseminated or caused to be issued false or misleading statements about Abbott which they knew or recklessly disregarded were false or misleading with an intent to deceive, manipulate or default. In the Complaint, Plaintiffs identify false and misleading statements in Abbott's 2019 Form 10-K, Abbott's Code of Business Conduct, Abbott's Global Sustainability Report, and the 2020 Sustainability Report Summary about Abbott's manufacturing processes, adherence to regulations, and failure to address illicit conduct. *Id.* ¶¶ 364–76. Plaintiffs also point to a press release issued February 17, 2022, and a Form 8-K filed with the SEC on February 18, 2022, as being false and misleading about the recall, because they omitted references to the FDA pushing Abbott to initiate the recall and the FDA's ongoing investigation. *Id.* ¶¶ 378–80. Finally, Plaintiffs allege that Defendant Calamari made false statements during his testimony to a U.S. House of Representatives Subcommittee about when and how the whistleblower complaint was made. *Id.* ¶¶ 381–82. According to Plaintiffs, these statements and the Defendants' course of conduct were designed to artificially inflate the price of Abbott's stock. Then, while the stock was artificially inflated, the Defendants caused Abbott to repurchase millions of shares of stock.

"In order to state a claim for a private cause of action under Rule 10b–5, a plaintiff must allege: (1) the defendant made a false statement or omission (2) of material fact (3) with scienter

---

[6] Although named in this Count, Officer Defendants Calamari and Funck were never alleged to be Board members.

[7] The Section 10(b) Defendants are Alpern, Austin, Blount, Calamari, Ford, Funck, Gonzalez, Kumbier, Liddy, McDew, McKinstry, Novakovic, Osborn, Starks, Stratton, Tilton, and White.

(4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (internal quotation omitted). Defendants only dispute whether Plaintiffs sufficiently alleged the reliance element.[8]

The Section 10(b) Defendants claim that Plaintiffs allege that the Board members who authorized Abbott to repurchase the stock are the same people who knowingly made the false statements, and that someone cannot both make a false statement and then reasonably rely on that statement. At first blush, there is some surface level appeal to the Section 10(b) Defendants argument. After all, a person cannot be deceived by their own lie. Upon further examination, this argument lacks merit. Defendants' argument erroneously hinges on the idea that the Board members are standing in on behalf of the corporation for the purpose of whether Abbott justifiably relied on the misstatements. In essence, the Section 10(b) Defendants argue, incorrectly, that they are Abbott; therefore, Abbott knew what they knew and could not have been misled by the Section 10(b) Defendants' own misstatements.

Turning first to binding precedent, the right of a shareholder to sue derivatively under Rule 10b–5 on behalf of the corporation is firmly established in the Seventh Circuit. *Ray v. Karris*, 780 F.2d 636, 641 (7th Cir. 1985) (citing *Dasho v. Susquehanna Corp.*, 380 F.2d 262 (7th Cir.), *cert. denied*, 389 U.S. 977 (1967)). If the challenged transaction "did not require shareholder approval, the directors would normally speak for the corporation[.]" *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 24 (7th Cir. 1972). This creates a dilemma in cases where, as here, it is the directors themselves that are alleged to have deceived the corporation. *Id.* In *Ray v. Karris*, the Seventh Circuit considered "under what circumstances may the board of directors acting on behalf of the corporation be deemed to have 'deceived' the corporation itself[.]" 780 F.2d at 641. "The central inquiry in such cases has turned on the esoteric issue of when the legal fiction that is a corporation is deemed to 'know' of the fraudulent and self-interested schemes of the" board of directors. *Id.* (citing *Wright v. Heizer Corp.*, 560 F.2d 236, 248–50 (7th Cir. 1977)). If a director participated in the alleged scheme or had a stake in the outcome of the transaction, then they are interested. Meanwhile, a disinterested director does not have any involvement in the alleged scheme. The general rule is that the knowledge of the majority of disinterested directors is imputed to the corporation because they are able to competently and without a conflict of interest make decisions on behalf of the corporation. *Id.*; *Dasho*, 461 F.2d at 24–25. If the entire board of directors is interested, the corporation is only deemed to know of the scheme when full disclosure is made to the shareholders because the board is unable to fairly and competently evaluate what is in the best interest of the corporation. *Ray*, 780 F.2d at 641. Full disclosure requires that shareholders are made aware of all relevant material facts such that they can intelligently evaluate the transaction.[9]

---

[8] As the Section 10(b) Defendants only dispute the reliance element, the Court only reviews whether Plaintiffs sufficiently pled reliance when determining the likelihood of liability for demand futility.

[9] *See* James D. Cox and Thomas Lee Hazen, Treatise on the Law of Corporations § 10:17 (3d).

A court in this district applying the principles from *Ray* found that when the directors were alleged to have done nothing to stop the underlying scheme and were therefore themselves violating their state law fiduciary duties, they were interested directors; thus, their knowledge was not imputed to the corporation. *In re Whitehall Jewellers, Inc. S'holder Derivative Litig.*, 2006 WL 468012, at *12 (N.D. Ill. Feb. 27, 2006). In *Whitehall*, plaintiffs alleged the director defendants deceived the company in connection with the issuance of stock and stock options as part of the officers' compensation packages. *Id.* at *9. The court found that even the directors not charged with the Rule 10b-5 violation certainly knew that the named defendants had misstated the financial statements to induce the company to issue them more shares at an artificially inflated price. *Id.* at *12. The directors could not have protected the company because they themselves had violated state law fiduciary duties by doing nothing to stop the scheme. *Id.*

In the Complaint, Plaintiffs alleged that the Section 10(b) Defendants knew or recklessly disregarded that the statements were false or misleading. Compl. [92] ¶ 458. Defendants do not argue that Plaintiffs insufficiently alleged that the Section 10(b) Defendants were not independent or disinterested. Doc. [112] at 30–31. Thus, as alleged, the Section 10(b) Defendants knew of the false and misleading statements. Since the Section 10(b) Defendants knew about the false statements and did nothing to stop them, they violated their own fiduciary duties and were not independent or disinterested. *Whitehall*, 2006 WL 468012, at *12. Since the Section 10(b) Defendants are alleged to be interested, then their knowledge is not imputed onto Abbott. *Ray*, 780 F.2d at 641.

Defendants rely on *In re Verisign, Inc. Deriv. Litig.*, where the court held that plaintiffs could not plead reliance because the corporate decision-maker for the repurchase of shares had knowledge of the alleged fraud and intentionally caused the misstatements. 531 F. Supp. 2d 1173, 1209 (N.D. Cal. 2007). In *Verisign*, the plaintiffs alleged that directors improperly granted stock options to employees and then backdated the option grants to make them appear as though they were granted on a date when the stock price was lower. *Id.* at 1181. This caused the company's Form 10-K reports to be misleading and artificially inflated the stock prices; then the company repurchased its own stock at an inflated value. *Id.* at 1203. The court found that plaintiffs failed to allege reliance because they asserted that all of the board and senior managers knew about the alleged backdating, so they could not have been misled by misstatements in the financial statements. *Id.* at 1209.

The Court finds more persuasive *In re Finisar Corp. Derivative Litig.*, where the court was asked by the defendants to accept the same argument the Section 10(b) Defendants make here, that the defendant board members are the company. 2012 WL 2873844, at *17 (N.D. Cal. July 12, 2012). The court questioned *Verisign*'s holding insofar as it requires dismissal of a fraud claim where all of the directors are in on the scheme, but remarkably allows the claim to proceed if the corruption is less widespread. *Id.* The court also found that the case *Verisign* relied on, the Ninth Circuit's decision in *Atari*, had little relevance to an action being brought by shareholders on behalf of the company against the directors. *Id.* (citing *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992)). The court found that "the *Verisign* court 'extended too far the legal fiction that the company is the same as its leadership.'" *Id.* (quoting *In re Fossil, Inc.*, 713 F.Supp.2d 644,

653 (N.D. Tex. 2010) (denying a motion to dismiss a § 10(b) claim and rejecting the reasoning in *Verisign*)).  In a case where plaintiffs allege the fraud was committed by the board members against the company, the company "is a puppet whose strings are pulled by the very directors and officers responsible for the fraud." *Id.*  The court declined to follow *Verisign* and found that the plaintiffs sufficiently pled causation and reliance under § 10(b). *Id.*

Similarly instructive is *Shaev v. Baker*, where the defendants, relying on *Verisign*, argued that the director defendants and the company were one and the same, and therefore the company could not possibly rely on misstatements that the director defendants knowingly made. 2017 WL 1735573, at *17 (N.D. Cal. May 4, 2017).  The court rejected the reasoning in *Verisign* "because it 'exalts form over substance' and 'restricts the application of 10(b) liability in a way which is at odds with its basic purpose.'" *Id.* at *18 (quoting *Pappas v. Moss*, 393 F.2d 865, 869 (3d Cir. 1968)).  Instead, in finding that the plaintiffs sufficiently alleged that the director defendants faced a substantial likelihood of liability, the court relied on the Second Circuit's explanation that "to deny relief solely because a fraud was committed by a director rather than by an outsider ... would surely undercut the congressional determination to prevent the public distribution of worthless securities." *Id.* (quoting *Goldberg v. Meridor*, 567 F.2d 209, 215 (2d Cir. 1977)).

Likewise, here the Section 10(b) Defendants' argument that they are Abbott and therefore cannot be misled by their own false statements extends the legal fiction of the corporation too far. In this derivative lawsuit, Abbott is the legal entity standing in for the rights of the shareholders. To bar those shareholders from suing the directors for allegedly deceiving the company is contrary to the purpose of federal securities laws. *Ray*, 780 F.2d at 643.  Because Plaintiffs have sufficiently alleged that the directors are not disinterested or independent, the precedent in *Ray* requires that the directors make a full disclosure to the shareholders, or their knowledge cannot be imputed on the corporation. *Id.* at 641.  According to the Plaintiffs' Complaint, no disclosure was made to the shareholders.  Thus, the knowledge of the interested directors cannot be imputed on Abbott.  This means that the Plaintiffs have sufficiently pled reliance under Section 10(b).

Accordingly, the Court denies the motion to dismiss Plaintiffs' Section 10(b) claim based on demand futility as to the Section 10(b) Defendants.

### c. Count III: Breach of Fiduciary Duty Against the Director Defendants

Plaintiffs allege that the Director Defendants[10] breached their fiduciary duties of loyalty, good faith, candor, trust and care to the shareholders by failing to oversee whether Abbott complied with federal food safety regulations while producing and selling the Company's infant formula products in the U.S.[11]  The Director Defendants argue that Plaintiffs failed to allege that the

---

[10] The "Director Defendants" are Defendants Ford, Alpern, Austin, Babineaux-Fontenot, Blount, Gonzalez, Kumbier, Liddy, McDew, McKinstry, Novakovic, Osborn, Roman, Starks, Stratton, Tilton, and White. Compl. [92] ¶ 44.

[11] Defendants contend, and Plaintiffs do not dispute, that the *Caremark* claim against the Director Defendants is limited by the exculpatory clause of Abbott's Articles of Incorporation which shields the

Director Defendants face a substantial likelihood of liability for this count and therefore demand was not excused. The standards for deciding whether the Director Defendants face a substantial likelihood of liability for failing to fulfill their oversight responsibilities is set forth in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996). A plaintiff can make a *Caremark* claim by alleging particularized facts that either: (1) "the directors utterly failed to implement any reporting or information system or controls" or (2) "having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). A plaintiff can bring a *Caremark* claim under either or both prongs. Plaintiffs assert that the Director Defendants failed under both *Caremark* prongs.

In their Complaint, Plaintiffs allege that the Director Defendants repeatedly failed to implement and actively monitor and oversee a compliance and safety program related to Abbott's manufacture and sale of infant formula products in the U.S., disregarded their duty to investigate red flags, and covered up safety and compliance risks. Compl. [92] ¶ 472. In support of dismissal, Defendants argue that their books and records show, despite Plaintiffs' allegations to the contrary, that the Board conducted multi-faceted oversight of Abbott's most significant risks, which included manufacturing compliance.

A prong one Caremark claim requires that the plaintiffs allege the directors utterly failed to implement any reporting or information system or controls. "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007). Instead, "the plaintiff must plead with particularity a sufficient connection between the corporate trauma and the board." *In re Boeing Co. Derivative Litig.*, 2021 WL 4059934, at *24 (Del. Ch. Sept. 7, 2021) (internal quotation omitted). While "directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources ... *Caremark* does have a bottom-line requirement that is important: the board must make a good faith effort—i.e., try—to put in place a reasonable board-level system of monitoring and reporting." *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019). "[T]o prevail on a Caremark claim, the plaintiff must show that a fiduciary acted in bad faith—'the state of mind traditionally used to define the mindset of a disloyal director.'" *Id.* at 820–21 (quoting *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007). When plaintiffs are unable to plead that the board failed to make the required good faith effort to put a reasonable compliance and reporting system in place, the "case law gives deference to boards and has dismissed Caremark cases even when illegal or harmful company activities escaped detection[.]" *Id.* at 821. The focus is not on the effectiveness of the board-level compliance and reporting system but "whether the complaint pleads facts supporting a reasonable inference that the board did not undertake good faith efforts to put a board-level system of monitoring and reporting in place." *Id.* A director may be held liable if they "made no good faith effort to ensure that the company had in place any 'system of controls.'" *Id.* at 822

---

directors from liability for breaches of the duty of care. Doc. [112] at 31–33. However, the Director Defendants are not protected from liability for breaches of loyalty or good faith. *Abbott*, 325 F.3d at 810.

(quoting *Stone*, 911 A.2d at 370). "When a plaintiff can plead an inference that a board has undertaken no efforts to make sure it is informed of a compliance issue intrinsically critical to the company's business operation, then that supports an inference that the board has not made the good faith effort that Caremark requires." *Id.*

Initially, the Court declines Defendants' attempts to introduce their version of events and draw inferences in their favor based on exhibits attached to Defendants' motion. While the Court will consider documents as allowable under the Federal Rules, the Court will not accept as true the Defendants' assertions about what the documents indicate. Defendants ask the Court to infer from the voluminous exhibits attached to their motion that the Board was appropriately fulfilling its oversight obligations. *See discussion infra.* However, contrary to the Director Defendants' arguments, the presentations attached as exhibits do not firmly establish that the Board discussed infant formula manufacturing or product safety. Also, on a motion to dismiss, the Court must construe allegations in the light most favorable to the Plaintiff. As the presentations and the minutes do not contradict the Plaintiffs' allegations, the Court will accept the allegations as true.

Turning to the merits of the argument, the Delaware Supreme Court decision in *Marchand*, is instructive on how to address a *Caremark* prong one claim when dealing with a compliance risk that is "essential and mission critical" to a company's operations. 212 A.3d at 824. In *Marchand* the court addressed the failure of the board to manage the regulatory compliance risk of food safety, which allegedly allowed the company to distribute mass quantities of ice cream tainted by listeria and led to the deaths of three people. The Delaware Supreme Court found that the plaintiff pled sufficient facts to support the inference that no "reasonable compliance system and protocols were established as to the obviously most central consumer safety and legal compliance issue facing the company" and that the board's lack of efforts resulted in it not receiving official notices for years about food safety deficiency which led to the death and injury of the company's customers. *Id.* The court found that the complaint fairly alleged the following deficiencies:

- no board committee that addressed food safety existed;
- no regular process or protocols that required management to keep the board apprised of food safety compliance practices, risks, or reports existed;
- no schedule for the board to consider on a regular basis, such as quarterly or biannually, any key food safety risks existed;
- during a key period leading up to the deaths of three customers, management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board;
- the board was given certain favorable information about food safety by management, but was not given important reports that presented a much different picture; and
- the board meetings are devoid of any suggestion that there was any regular discussion of food safety issues.

*Id.* at 822. These findings were based on the plaintiff's allegations that the company's management ignored red flags about troubling compliance failures at the manufacturing facility in the years leading up to the listeria outbreak and the issues were never reported to the board. *Id.* at 811. Then after multiple positive tests for listeria at the company's plants, the board was finally informed two days after the recall was announced. *Id.* at 813. Even after being informed, the company's board left the company's response to management instead of holding more frequent emergency meetings to discuss how to respond. *Id.* at 814. The allegations in the complaint were supported by the absence of any discussion of listeria in the board meeting minutes. *Id.* at 812–13.

More recently, a Delaware Chancery court applied the considerations in *Marchand* when evaluating whether the Boeing board of directors failed to exercise its oversight functions with respect to the safety of its airplanes. *Boeing*, 2021 WL 4059934, at *26. Like food safety in *Marchand* and airplane safety in *Boeing*, product safety is externally regulated and "essential and mission critical" to Abbott's business. *Marchand*, 212 A.3d at 824; *Boeing*, 2021 WL 4059934, at *26. While these items are not a prescriptive list of all possible deficiencies, the court in *Boeing* relied on them because of the similarities between the fact allegations in both cases. *Boeing*, 2021 WL 4059934, at *26. Likewise, here, Plaintiffs allege that the Director Defendants failed to exercise their oversight function over a critical safety compliance function which allegedly led to the death of several customers. As with *Boeing*, many of the *Marchand* factors are also applicable here, as further discussed below.

### 1. The Board had no committee charged with direct responsibility to monitor manufacturing or product safety.

The first deficiency both *Marchand* and *Boeing* considered was the fact that no board committee existed to directly address the safety concern at issue. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *27. In *Boeing*, the audit committee was charged with "risk oversight" but this was directed primarily at financial risks and did not address safety concerns. *Boeing*, 2021 WL 4059934, at *27. Although the defendants pressed that the audit committee was responsible for risks broadly by "pointing to one-off instances like when it responded to FAA questions about the Dreamliner battery incident, or when it referred to 'quality' or 'safety' in passing," the court held that this failed to dislodge the plaintiffs' allegations that the board of directors did not specifically charge the audit committee with monitoring airplane safety. *Id.* Further, the court found that "to the extent Defendants point to risk analysis mechanisms and reports, like the [Enterprise Risk Visibility] process and the Corporate Audit group, in the absence of any allegation or indication that they were devoted to airplane safety, the reasonable inference is that they fall within the Audit Committee's financial and regulatory risk mandate." *Id.* The court held that "at the pleading stage, the existence of the Audit Committee, Corporate Audit group, and [Enterprise Risk Visibility] process cannot support the conclusion that the Board established any committee or process charged with direct responsibility to monitor airplane safety." *Id.*

Plaintiffs allege in their Complaint that none of Abbott's Board Committees had direct responsibility for manufacturing or product safety for infant formula. Plaintiffs allege that the purpose of the Public Policy Committee is to assist the Board's oversight "over public policy,

regulatory (including regulation by the Federal Food and Drug Administration (FDA), as well as other domestic, foreign and international regulatory bodies) and government affairs" and "healthcare and other compliance issues (recognizing that other Board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance)." Compl. [92] ¶ 286. This included among other things, requiring the Committee to "Review and discuss with management healthcare and regulatory compliance matters, including product cybersecurity and data privacy" and "Review annually Abbott's compliance program with respect to legal and regulatory requirements, including FDA regulations, and receive a report from the corporate officer responsible for quality assurance as needed, but at least two (2) times a year, regarding any FDA warning letters and Abbott's responses, as well as any upcoming compliance initiatives." *Id.* However, the pleading stage record does not reflect that the Public Policy Committee had any discussions about Abbott's production or oversight of Abbott's infant formula products. *Id.* ¶¶ 161, 171, 175–76, 195, 215. Further, the duties listed in the charter do not include oversight over maintaining product safety, much less infant formula safety. Moreover, the Public Policy Committee's meetings lasted for no more than an hour and between 2017 and 2022, none of the "Quality and Regulatory Update" presentations reflected consideration of safety, Cronobacter, or the Sturgis Plant in connection with the manufacture of infant formula. *Id.* ¶ 130.

It is likewise important to note that merely complying with FDA regulations does not imply that the Board implemented a system to monitor product safety at the board level. As the Delaware Supreme Court discussed in *Marchand*, the fact that a company nominally complied with a government regulator in a highly regulated industry "does not foreclose any pleading-stage inference that the directors' lack of attentiveness rose to the level of bad faith indifference required to state a Caremark claim." 212 A.3d at 823. These regulatory requirements and inspections, although required to operate in that industry, are not actions directed by the board and do "not rationally suggest that the board implemented a reporting system to monitor food safety or [the company's] operational performance." *Id.* Similarly, when producing infant formula, Abbott is operating in a highly regulated industry, so mere references to FDA inspections and receiving FDA Warning Letters do not defeat the inference that the Director Defendants lacked attentiveness and failed to direct or implement a system to monitor infant formula safety. "[U]nder *Marchand*, minimal regulatory compliance and oversight do not equate to a *per se* indicator of a reasonable reporting system." *Boeing*, 2021 WL 4059934, at *28. Thus, the fact that Abbott had systems intended to minimally comply with the FDA oversight does not indicate that Abbott's Board implemented a reasonable reporting system.

These allegations are similar to the allegations about the audit committee in *Boeing* as the reference to regulatory compliance is devoid of any reference to product safety. Once again, Abbott operates in a highly regulated industry, so a reference to regulatory compliance cannot immediately be interpreted as referring to product safety. The Public Policy Committee's meetings do not reflect discussions of Abbott's production or oversight of Abbott's infant formula products. Compl [92] ¶¶ 161, 171, 175–76, 195, 215. Therefore, at the pleading stage the mere existence of the committee does not establish that the Board was monitoring for mission critical safety risks. *Boeing*, 2021 WL 4059934, at *27.

18

Defendants press that the Public Policy Committee was responsible for FDA compliance and therefore the underlying risks to product safety. To support this, Defendants submitted numerous exhibits and requested that the Court infer from the Board and Public Policy Committee's meeting minutes and presentations that Plaintiffs' allegations that the Director Defendants failed to address the safety concerns are incorrect. However, after reviewing the exhibits, the Court cannot make the inferences the Defendants request. For example, Defendants argue that the Public Policy committee met with the "Senior Vice President for Quality Assurance, Regulatory, and Engineering Services to review the status of Abbott's regulatory compliance twice a year (in June and December)" and during those meetings they reviewed reports from external inspections of Abbott facilities. Doc. [112] at 18–19. In particular, Defendants' claim that in December 2017, the senior vice president reported to the Public Policy Committee about the deficiencies cited in an April 2017 FDA Warning Letter. However, the exhibit provided by Defendants does not describe what was actually discussed at that meeting. Doc. [113-22] at 3. The meeting minutes included with the exhibit, which have a different date than the agenda and presentation, do not demonstrate that the Senior Vice President of Quality Assurance was in attendance, let alone that she gave a presentation. *Id.* In fact, each of the Public Policy Committee reports the Defendants identified in their motion to dismiss do not include the meeting minutes from that meeting, so the Court cannot make an inference about what was discussed at those meetings. Docs. [113-22], [113-23], [113-25], [113-27], [113-28], [113-30]. In the meeting minutes that the Director Defendants provided, almost everything is redacted which indicates that nothing relevant to this case was discussed. Compl. [92] ¶ 147. As alleged, the meeting minutes from the Public Policy Committee meetings do not reflect discussions of Abbott's production or oversight of Abbott's infant formula products. *Id.* ¶¶ 161, 171, 175–76, 195, 215.

In their motion, Defendants also ask that the Court infer from a few slides in Public Policy Committee presentations to mean that the Board was fulfilling its oversight responsibilities. Doc. [112] at 19. However, a review of the unredacted portions of the presentations provided by the Defendants showed that the Public Policy Committee was discussing "Metrics" and comparing Abbott to its peers in the healthcare industry on its number of recalls. Doc. [113-22] at 9–13. Even when discussing its own recalls, the Board presentations are framed as how Abbott compared to its peers in the industry. Doc [113-30] at 13–22. This does not dislodge the Plaintiffs' allegation that the Board was not discussing the safety of Abbott's products or manufacturing, and instead reasonably supports the inference that its focus was on Abbott's business and how it compared to its competitors and not the safety of its own products. Further, Abbott points to two reports of quality events on Public Policy Committee presentations as evidence of the Board's oversight responsibilities. Doc. [112] at 21 (citing Docs. [113-24] & [113-29]). However, as with the reported incidents in *Boeing*, while this may indicate that the Board received intermittent, management-initiated communications that mentioned safety, it does not on its own demonstrate that the Board asked any questions or pressed management for any more details.

Plaintiffs similarly allege that the Audit Committee was not responsible for product safety oversight. They assert that the purpose of the Audit Committee was to assist with oversight with respect to "legal and regulatory compliance as it relates to financial matters, including accounting,

auditing, financial reporting, and securities law issues; and Abbott's enterprise risk management, including major financial, information security, and enterprise cybersecurity risk exposures." Compl. [92] ¶ 288. These responsibilities do not include oversight over product safety, despite specifically calling out other types of risks like cybersecurity. Plaintiffs allege that the Audit Committee reviewed annual Enterprise Risk Management presentations, that provided examples of Abbott's "Key Risk Themes" and "Risk Universe" but failed to address product or food safety manufacturing risks. *Id.* ¶¶ 170, 181. The court in *Boeing* rejected the argument that an audit committee charged with broad risk oversight, but not specific oversight for the mission critical risk, was sufficient to dislodge allegations that the committee did not oversee that risk. *Boeing*, 2021 WL 4059934, at *27. Likewise, here, as alleged, the Audit Committee did not have responsibility for monitoring product safety. Further, there is no evidence of a discussion about safety issues or risks in the Audit Committee meeting minutes. Compl. [92] ¶¶ 144–45. Absent any indication that the Audit Committee was tasked with evaluating product safety risks, the reasonable inference from the allegations is that these responsibilities do not fall within the scope of the Audit Committee.

In contesting this inference, the Defendants point to how the Risk Assessment Survey included "Product Quality" and "Patient Safety" as enterprise risks and "Supply Chain Resilience" as a "Risk Theme." Doc. [112] at 17; Doc [113-15] at 10–11. However, on the slide discussing "Supply Chain Resilience," there is no mention of product safety or risks. Doc. [113-15] at 13. Instead, the slide is focused on the inability to meet market demand because of failures in the manufacturing process. As with *Boeing*, an audit committee conducting an overall risk assessment—absent an allegation that they devoted time to manufacturing product safety—does not defeat the inference that the audit committee, whose roles do not include manufacturing or safety, is restricted to financial aspects of corporate governance. Further, one-off instances where the presentations passively refer to items like quality and safety are insufficient. *See Boeing*, 2021 WL 4059934, at *27. Here, there is no indication that the Audit Committee discussed or had responsibility over products being manufactured safely or the associated risks. So the fact that the committee would get updates on the generalized enterprise risk management assessment does not show that the Audit Committee exercised oversight over the critical risk area of product safety.

## 2. The Board did not monitor, discuss, or address manufacturing or product safety on a regular schedule.

Next, the courts in both *Marchand* and *Boeing* expanded the scope of their review and looked at whether the broader board, as opposed to a subgroup of the directors on a committee, monitored, discussed, or addressed key safety risks on a regular basis. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *27. In *Boeing*, the court found it significant that the board did not regularly allocate meeting time or discussions to airplane safety or quality control. Even after the plane crash, the focus of the board meetings was on restoring profitability and efficiency, not on safety. *Boeing*, 2021 WL 4059934, at *28. The defendants in *Boeing* argued that the board regularly discussed safety as part of its strategic initiatives with references on various slide decks. In rejecting this argument, the court determined that the safety invocations must be considered within the broader context that the plaintiffs pled, which was that the focus of the discussion was

on the 737 MAX's production and revenue generations and not on safety. According to the *Boeing* court, "[t]he Board and management's passive invocations of quality and safety, and use of safety taglines, fall short of the rigorous oversight *Marchand* contemplates." *Id.*

Plaintiffs' Complaint alleges the following about the Board's involvement before and at the beginning of the formula recall: The Board did not receive any information that could allow it to oversee the safety of Abbott's manufacturing of infant formula. Compl. [92] ¶ 130. The Board meeting minutes make no reference to infant formula safety or product safety in general. *Id.* ¶¶ 148, 157, 162, 172, 177, 180, 184, 195. The Board did not discuss the Sturgis Plant until its regularly scheduled meeting, which happened to coincide with the day the recall was announced. *Id.* ¶ 214. The Board meeting minutes do not indicate that there was a discussion about the safety issues related to the formula or that any of the directors asked any questions. *Id.* ¶¶ 11, 214. The only reported discussion was on management's conclusion that the recall would not impact Abbott's adjusted guidance forecast. *Id.* At its June 2022 meeting, the Board's focus was on Abbott's financial performance and how Abbott's nutrition business was impacted by the Sturgis Plant closure and recall, and what its financial status would be assuming the plant restarts production. *Id.* ¶ 254. The Board reviewed the impact on Abbott's share of the infant formula market versus its competitors and then discussed the business implications of the recall, the process changes, and the status of resuming manufacturing. *Id.*

Like the allegations in *Boeing*, these allegations support the inference that the Board writ large did not monitor, discuss, or address manufacturing or product safety on a regular basis. The Plaintiffs alleged that the Board did not regularly discuss, and therefore did not allocate time to, product safety. Likewise, Plaintiffs alleged that the Board discussions were focused on revenue generation and not product safety. This is sufficient to support an inference that the broader Board was not monitoring for product safety.

In their motion, the Defendant Directors' arguments regarding the Board's conduct prior to the recall rely on reporting from the Public Policy and Audit Committees. Doc. [112] at 17, 20, 23. As the Court already found the actions identified by Defendants regarding those Committees to be insufficient to indicate a reasonable reporting structure, the fact that those Committees later reported to the Board is also insufficient.

### 3. The Board had no regular process or protocols requiring management to apprise the Board of manufacturing or product safety and instead, only received *ad hoc* management reports.

A third factor the courts in *Marchand* and *Boeing* considered was that the board did not have a regular process or protocol requiring management to apprise the board about the specific safety risk and that the board meetings were devoid of any suggestion that there was a regular discussion of product or manufacturing safety issues. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *29. In *Boeing*, the Board received intermittent, management-initiated communications that mentioned safety, but they "were not safety-centric and instead focused on the Company's production and revenue strategy." *Boeing*, 2021 WL 4059934, at *29. Even when

safety was mentioned in one of these presentations, the board did not ask questions or press for more information. The court held that for "mission-critical safety" areas "discretionary management reports that mention safety as part of the Company's overall operations are insufficient to support the inference that the Board expected and received regular reports on product safety." *Id.* The court found it was insufficient for the Boeing board to get communications about the plane crashes at the discretion of management rather than by their own request and that the updates focused on Boeing's image and its production and delivery schedule, not on product safety.

Here, Plaintiffs allege that Abbott's books and records showed that the Board paid little or no attention to safety issues at the Sturgis Plant. Compl. [92] ¶ 267. Rather, the board appeared to be primarily concerned with the revenue generated from that business. To the extent the Board or subcommittees received reports related to infant formula products, it was on an *ad hoc* basis.

Moreover, according to Plaintiffs there was no system to elevate whistleblower reports, consumer complaints, or concerns from the medical community to the Board. *Id.* ¶¶ 131, 132, 182. To support this claim, Plaintiffs include several examples of warnings about or evidence of product safety issues that were not elevated to the Board. For example, Abbott's policy and procedure documents show that safety issues are only reported up to the Abbott Nutrition management and that the Board and officers are not made aware of potential safety issues. *Id.* ¶ 436. Plaintiffs allege that Abbott has received inspection reports from the FDA since at least 2019 that show the presence of listeria, salmonella, or Cronobacter in the Sturgis Plant, but there is no indication that these reports were raised to the officers or the directors. *Id.* ¶ 440. Further, Plaintiffs point to the fact that the 2019 recall of Calcilo XD powder cans was never discussed at Board or Committee meetings. *Id.* ¶¶ 149–50. In 2019, the FDA issued a Form 483 and followed up with an EIR, and there were communications with the FDA about Abbott's conduct at the Sturgis Plant, findings of Cronobacter and Listeria at the plant, and complaints of Cronobacter or other bacteria infections in infants who consumed Similac formula, which were not discussed at any Board or Committee meetings. *Id.* ¶¶ 151, 153–59, 161–62, 164, 166–72. 175–77. There was also no report to any Committee or the Board about the Form 483 or the resulting communication with the FDA about widespread quality problems that created risks of contamination at the Sturgis Plant. *Id.* ¶¶ 187–90, 195. Further, to the extent the Director Defendants rely on the reports to the Audit and Public Policy Committees, nothing in the Amended Complaint or documents submitted supports the inference that the Director Defendants requested those reports or expected those reports to contain product safety information.

The Complaint's allegations support a pleading-stage inference that the board never established its own system of monitoring and reporting, choosing instead to rely entirely on management. Plaintiffs' allegations are sufficient because there is no indication that the Board had a regular process or protocols in place to require management to keep them apprised of issues and risks facing Abbott. Nothing in the Complaint suggests that the Board requested or expected to receive anything besides *ad hoc* reports from management regarding product safety. This is insufficient under *Caremark* to establish regular process or protocols over a critical risk to the company.

22

In support of their argument, Director Defendants attempt to equate Plaintiffs' allegations to cases where plaintiffs only alleged that the Board failed to consider specific types of information. In the cases Defendants cite, the boards discussed the pertinent issue just not to the degree or using the type of information plaintiffs would have preferred. For example, the Director Defendants rely on *In re Novavax Inc. S'holder Derivative Litig.*, where the court dismissed the prong one *Caremark* claim because "the presentations to the Board and the Board's meeting minutes" reflected that "the full Board of Directors regularly received substantial updates from management on the manufacturing and development of the Vaccine." 2023 WL 5353171, at *11 (D. Md. Aug. 21, 2023). Similarly, the Director Defendants rely on *In re Gen. Motors Co. Derivative Litig.*, where the plaintiffs alleged that GM had a reporting system but that it should have transmitted certain pieces of information, namely, specific safety issues and reports from outside counsel regarding potential punitive damages. 2015 WL 3958724, at *14 (Del. Ch. June 26, 2015), *aff'd sub nom. In re Gen. Motors Co. Derivative Litig.*, 133 A.3d 971 (Del. 2016). The court found that mere "[c]ontentions that the Board did not receive specific types of information [did] not establish that the Board utterly failed" to implement any reporting or information system or controls. *Id.* Defendants also advance *Constr. Indus. Laborers Pension Fund v. Bingle* to support their argument that "the lack of a system of controls with respect to a *particular* incarnation of risk does not itself demonstrate bad faith[.]" 2022 WL 4102492, at *9 (Del. Ch. Sept. 6, 2022), aff'd, 297 A.3d 1083 (Del. 2023) (emphasis in original). However, the court found that there were "affirmative facts pled in the Complaint indicating that the committee not only met, but that it met and discussed the pertinent issue, cybersecurity, both via receipt of a management presentation and then again in discussion following the presentation." *Id.* at *12.

While Plaintiffs allege specific items that they think the Board should have reviewed, such as the Form 483s, that is not the sole basis of Plaintiffs' claim. Unlike *Novavax*, *General Motors*, and *Bingle*, here there is no indication that Abbott's Committees or Board received any reporting on product safety issues and risks. The meeting minutes from the Public Policy Committee meetings do not reflect discussions of Abbott's production or oversight of Abbott's infant formula products. Compl. [92] ¶¶ 161, 171, 175–76, 195, 215. Also, the Board meeting minutes make no reference to infant formula safety or product safety in general. *Id.* ¶¶ 148, 157, 162, 172, 177, 180, 184, 195. The handful of references the Director Defendants identify are generalized risk reporting and do not directly deal with the critical issue of product safety. As the Delaware Supreme Court said in *Marchand*, accepting such an argument would make *Caremark* "a chimera." *Marchand*, 212 A.3d at 824. The Board must "make a good faith effort to put in place a reasonable system of monitoring and reporting about the corporation's central compliance risks." *Id.* The facts alleged in the Complaint indicate that the Board did not make a good faith effort to implement a reasonable reporting and monitoring system as the Board was not notified of and did not discuss the product safety risks until after the Sturgis Plant was already shut down at the request of the FDA.

### 4. Management saw red, or at least yellow, flags, but that information never reached the Board.

Another deficiency recognized by the Delaware Supreme Court is if management received reports of red or yellow flags but there was no evidence that these were disclosed to the board.

*Marchand*, 212 A.3d at 822. In *Marchand*, the complaint listed numerous red flags that were waived in front of management by regulators and its own internal testing about food safety issues at its plants, but the board was not aware of them because of its failure to implement a monitoring system. *Id.* at 811. Similarly, in *Boeing*, the court found that management received formal complaints from employees questioning the safety of the 737 MAX and that Boeing's internal safety analysis found that if a pilot took more than 10 seconds to take corrective action the results would be catastrophic. 2021 WL 4059934, at *31. But there was no evidence that management apprised the board of the malfunctions or the probability of catastrophic failure. The court held that the safety concerns known to management but failing to make their way to the board was evidence that the board failed to establish a reporting system. *Id.* at *32.

In support of their oversight claim, the Complaint sets out a series of worsening violations known to management that were not shared with the Board over the course of several years. Plaintiffs pled that the FDA inspectors found violations of federal food safety laws dating back to September 2019. Compl. [92] ¶ 9. Then, in 2021, the violations escalated. In February 2021, Plaintiffs allege that Defendant Allen was sent a whistleblower's OSHA complaint detailing illegal activity at the Sturgis Plant. *Id.* ¶ 179. In April 2021, Abbott responded to the whistleblower's OSHA complaint and plaintiffs allege that Officer Defendants Allen, Randall, and Calamari would have had direct oversight over the Sturgis Plant or been involved in the response. *Id.* ¶ 182. Later in September 2021, the FDA found more serious violations, some of which related to Cronobacter. *Id.* ¶ 9. At the end of 2021, the FDA demanded Abbott allow a "for-cause" inspection of the Sturgis Plant. In early 2022, the FDA conducted its for-cause inspection and found the conditions at the Sturgis Plant were "unsanitary." As a result of these findings, whistleblower reports, and several infant deaths purportedly linked to consuming formula produced at the Sturgis Plant, the FDA encouraged Abbott to conduct a voluntary recall of certain infant formula produced at that Plant. *Id.* ¶ 10. Abbott ceased production at the Sturgis Plant on February 15, 2022. *Id.* ¶ 208.

The Plaintiffs identify the regularly scheduled Board meeting, held two days later on February 17, 2022, as the first-time management informed the Board of the violations at the Sturgis Plant and the recall, which was announced that day. At this point, Plaintiffs claim that the FDA had made three recommendations to Abbott on successive days to issue the recall and had submitted a report to its government partners on the potential recall and resulting supply chain impacts. *Id.* ¶ 210. Yet the Board meeting minutes allegedly show that management concluded that the recall would not impact Abbott's adjusted guidance forecast but do not indicate that there was any further discussion about the recall or the safety issues related to the formula. *Id.* ¶ 11. Plaintiffs also point out in the Complaint that the Public Policy Committee's meeting the next day did not include a discussion on the recall. *Id.* ¶ 12. They also identify, as evidence of the Board's lack of oversight, that the Board did not receive a report about the prior investigations, incidents, and issues related to Cronobacter at the Sturgis Plant until the next Board meeting on April 29, 2022. *Id.* ¶¶ 234–35.

Although it is not entirely clear when all members of management became aware of the safety issues at the Sturgis Plant, it is evident by the Complaint's allegations that by the Board meeting on February 17, 2022, management knew there were serious safety concerns as the Plant

had already been shut down. But at this point, the seriousness of the safety risks was not disclosed to the Board or the Public Policy Committee. Thus, as alleged, safety concerns known to management failed to make their way to the Board, supporting the conclusion that the Board failed to establish a reporting system. Further, Plaintiffs identified some of Abbott's officers that were aware of issues as early as spring 2021, yet the Board was not notified of the problems. This includes Defendant Allen who had or should have had knowledge of the whistleblower's OSHA complaints and the 2019 and 2021 Form 483s and their related EIRs when he presented a compliance update at the December 2021 Board meeting. Compl. [92] ¶ 195.

Finally, on the issue of scienter, in *Marchand*, the Delaware Supreme Court inferred scienter from the lack of any board committee focused on safety, any regular process or protocols requiring management to report on safety risks, any regular schedule for the board to address safety, any board minutes or documents suggesting that they regularly discussed safety, and any evidence that red, or at least yellow, flags were disclosed to the board. Similarly, here, Plaintiffs' well-pled complaint alleges that Abbott lacked a board committee focused on product safety, that the broader Board failed to monitor and discuss product safety on a regular schedule, the Board lacked any regular process requiring management to report product safety risks, and that there were red flags that were not disclosed to the Board. Those allegations support an inference of scienter here as well because it shows the Director Defendants acted inconsistently with their fiduciary duties. Thus, Plaintiffs have sufficiently alleged that the Director Defendants face a substantial likelihood of liability on the *Caremark* claim and that demand on the Board would have been futile and is therefore excused.

As the Plaintiffs sufficiently allege a prong one *Caremark* claim, the Court need not decide whether the Director Defendants face a substantial likelihood of liability under prong two of *Caremark*. *See Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *26 (Del. Ch. Aug. 24, 2020); *Boeing*, 2021 WL 4059934, at *34.

### d. Count IV: Breach of Fiduciary Duty Against the Officer Defendants

Plaintiffs also contend that the Officer Defendants breached their fiduciary duties.[12] Plaintiffs allege the Officer Defendants failed in their responsibilities to implement Board-level reporting about the manufacture and sale of infant formula, maintain the Sturgis Plant in a compliant manner, and ensure infant formula was manufactured and sold safely in the U.S.[13] Compl. [92] ¶¶ 479–88.

In moving to dismiss this claim, the Officer Defendants argue that Plaintiffs failed to plead with particularity that the Board would be incapable of being impartial in considering a demand

---

[12] The "Officer Defendants" are Defendants Allen, Battaglia, Calamari, Ford, Funck, House, Manning, Randall, Salvadori, and Young. Compl. [92] ¶ 59.

[13] Plaintiffs also assert specific individual conduct for some of the Officer Defendants.

claim against the Officers. Doc. [112] at 40–41. If the Board is disinterested in a claim against the Officers, then making a demand on the Board to bring the claim is not futile.

As a starting point, the question that must be addressed when analyzing a demand futility claim brought against a company's officers is not whether the officers face a substantial likelihood of liability on the claim. Instead, to bring a derivative claim, plaintiffs must allege that a majority of the *directors*: (1) received a material personal benefit from the alleged misconduct, (2) the director faces a substantial likelihood of liability, or (3) the director lacks independence from someone who received a material personal benefit from the alleged misconduct. *Zuckerberg*, 262 A.3d at 1059. In other words, Plaintiffs, in bringing this count against the *officers*, must allege with particularity that the *directors* could not have been disinterested in considering the claim. *Abbott*, 325 F.3d at 804 ("The shareholder must state with particularity why a demand would have been futile.").

The fatal flaw in Plaintiffs' argument is that their Complaint does not plead with particularity why the Board lacks independence on the claims against the Officers. Plaintiffs only argument for why the Board is not independent is that both claims rely on the same underlying facts. Despite filing a 181-page complaint containing 502 paragraphs, Plaintiffs only spend one paragraph addressing why demand is futile on this count which states in full:

> Defendant Ford as Abbott's CEO and Chairman faces a substantial likelihood of personal liability for breaching his fiduciary duties as both an officer and a director, and is thus unable to impartially consider a demand to pursue Count IV against himself or the other Officer Defendants. Many of the factual allegations and legal arguments underlying Count IV also underlie other Counts of the complaint. Proving Count IV would require pursuing allegations that would tend to put the remaining directors at increased risk of personal liability on other counts. The remaining Demand Board defendants (Alpern, Babineaux-Fontenot, Blount, Gonzalez, Kumbier, McDew, McKinstry, Roman, Stark, and Stratton) are thus incapable of impartially considering Count IV, and demand is thus excused.

Compl. [92] ¶ 445. Based on this, the Court is unable to evaluate whether a majority of Director Defendants face a substantial likelihood of liability on this claim. The three sentences about liability for the Directors other than the CEO summarily assert that the "factual allegations and legal arguments" are the same so pursuing them would necessarily increase the directors' risk of personal liability on the other counts. This does not sufficiently allege with particularity why the Directors are interested or lack independence in a claim against the Officer Defendants.

In response to the motion to dismiss, Plaintiffs argue that demand is excused on all their claims against the Officer Defendants, even though they do not implicate a majority of the Board, because the claims arise out of a common "nucleus of operative facts" as claims that implicate the Board. In support of their argument, Plaintiffs rely on cases where the similarity between the officer and director claims was not in dispute. In *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, the plaintiffs alleged that the officer defendants breached their

fiduciary duties in the same manner as the directors, in addition to also failing to inform the board of the company's regulatory compliance failures. 2023 WL 3093500, at *27 (Del. Ch. Apr. 26, 2023). The court held that demand futility determinations for the directors is dispositive for claims against the officers, since the board cannot consider whether to assert claims on those issues against the directors, it also cannot consider whether to assert them against the officers. *Id.* at *51. Similarly, in *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, the parties did not dispute that the factual allegations for the counts were the same and that a claim against the officers necessarily implicated the same facts as the claim against the directors. 2020 WL 5028065, at *26 (Del. Ch. Aug. 24, 2020). Unlike the allegations in *Chou* and *Walton*, the Complaint does not allege with particularity that the breach of fiduciary duties claim brought against the Defendant Officers is the same as the one brought against the Defendant Directors, such that the Board could not independently evaluate the claim. Therefore, Plaintiffs have not sufficiently alleged that demand was futile for Count IV.

### e. Count V: Breach of Fiduciary Duty for Insider Trading

Likewise, Plaintiffs' insider trading claim fails. Plaintiffs allege that Defendants Allen, Calamari, Ford, Funck, Manning, McKinstry, Salvadori, and Starks (together the "Insider Trading Defendants") breached their fiduciary duties by insider trading. As with Count IV, this Count is brought against less than a majority of the Board and Plaintiffs again argue that demand is excused, because the claims arise out of a common "nucleus of operative facts" as claims that implicate the Board. This argument fails for the same reasons discussed above.

Similar to the demand futility allegations in Count IV, Plaintiffs only provided one paragraph in the Complaint about why demand is futile on Count V, which states in full:

> Count V alleges breach of fiduciary duties related to insider trading claims against Defendants Allen, Calamari, Ford, Funck, Manning, McKinstry, Salvadori, and Starks, who knew about the material nonpublic information described in this Complaint regarding Abbott's business operations, and sold or otherwise disposed of Abbott's common stock on the basis of that information. For the same reasons that a majority of the Demand Board cannot impartially consider a demand to pursue Counts III and IV, neither can they consider a demand to pursue Count V.

Compl. [92] ¶ 446. This allegation lacks facts from which the Court can determine whether a majority of Board members face a substantial likelihood of liability such that they cannot be impartial on this Count. Instead, this allegation is conclusory and merely asserts that the Demand Board cannot be impartial on this Count because they are not impartial on Count III and IV. This is insufficient to show the directors are interested or lack independence. Moreover, Plaintiffs failed to allege how their claim for insider trading against a select group of officers and directors is related to the violation of fiduciary duty claim in Count III. Plaintiffs' allegations in Count III relate to the Director Defendants failing to oversee and monitor a mission critical risk to product safety. Plaintiffs do not allege how this failure of oversight relates to alleged insider trading by a select

group of mostly Officer Defendants. Therefore, Plaintiffs have not sufficiently alleged that demand was futile for Count V.

### f. Count VI: Corporate Waste Against the Director Defendants

Count VI asserts a claim for corporate waste. Plaintiffs contend that the Director Defendants[14] committed corporate waste when they caused Abbott to repurchase stock at artificially inflated prices. The Court finds that Plaintiffs failed to allege a substantial likelihood of liability for a claim of corporate waste against the Director Defendants.

"[T]o excuse demand on grounds of waste the Complaint must allege particularized facts that lead to a reasonable inference that the director defendants authorized 'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 136 (Del. Ch. 2009) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)). Corporate waste is rarely found as "the applicable test imposes such an onerous burden upon a plaintiff" to allege the "rare, unconscionable case where directors irrationally squander or give away corporate assets." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 748–49 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (internal quotations omitted). This is not one of the rare cases.

The stringent standard to establish corporate waste is not normally met by authorizing repurchases of common stock. In *Staehr v. Mack*, the board authorized the Company to repurchase up to $6 billion of its stock despite increasing signs of the mortgage markets deterioration in late 2006. 2011 WL 1330856, at *3 (S.D.N.Y. Mar. 31, 2011). The plaintiff alleged that the board members failed to discuss properly and consider the subprime mortgage lending crisis and its effect on the Company's subprime loans when making this authorization. The plaintiff argued that the directors authorized the purchase even though they were aware of the company's exposure to the subprime mortgage crisis and that the company's stock price would be negatively impacted in the future so "the repurchase authorization was a 'horrible business decision', 'wasted billions' and was 'not the product of reasonable business judgment[.]'" *Id.* at *8–9. The court found that the defendants' decision "was not so egregious or irrational that it could not have been based on a valid assessment of [the company's] best interests." *Id.* at *9. The court noted that "courts have generally held that a company's decision to repurchase shares at market price does not constitute waste." *Id.* (citing *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 137 (Del. Ch. 2009) (finding plaintiffs did not adequately allege demand futility when the complaint only alleged that there were "red flags" about the subprime lending crisis and that the stock price dropped after the repurchase). The court found that the board could have been signaling to the market that the stock was undervalued and there was no basis to infer that such a signal was not in the best interest of the company at the time it was made. *Id.*

---

[14] The "Director Defendants" are Defendants Ford, Alpern, Austin, Babineaux-Fontenot, Blount, Gonzalez, Kumbier, Liddy, McDew, McKinstry, Novakovic, Osborn, Roman, Starks, Stratton, Tilton, and White. Compl. [92] ¶ 44.

Similarly, in the Complaint Plaintiffs allege that by repurchasing the shares, Abbott was signaling to investors that the stock was trading at a discount, which caused investors to purchase shares driving the price up. Compl. [92] ¶ 360. Despite the length of the complaint, Plaintiffs do not allege a reason why this was not in the best interest of the company at the time. Nor do Plaintiffs allege facts that the purchase was so one-sided that no business person of ordinary, sound judgment could conclude that Abbott received adequate consideration. While Plaintiffs argue that Abbott paid an artificially inflated price for the stock, that is not equivalent to irrationally squandering corporate assets. As such, Plaintiff has not met the high bar of alleging that the defendants' decision was so egregious or irrational that it was not a product of valid business judgement. Thus, Plaintiffs have not established that a majority of the Board faces a substantial likelihood of liability for Count VI, so demand is not excused.

### g. Count VII: Unjust Enrichment Against Officer Defendants

Lastly, Plaintiffs allege that the Officer Defendants[15] were unjustly enriched with lavish compensation that they did not deserve because of their misconduct and their roles in fostering an environment that failed to ensure the safe production of infant formula. This claim fails as well.

Like their other derivative claims, Plaintiffs were required to allege that demand was futile. As with the demand futility allegations in Counts IV and V, Plaintiffs only have a single paragraph about demand futility:

> Defendant Ford faces a substantial likelihood of personal liability for unjust enrichment and is thus unable to impartially consider a demand to pursue Count VII against himself or the other Defendants. Many of the factual allegations and legal arguments underlying Count VII also underlie other Counts of the complaint. Proving Count VI would require pursuing allegations that would tend to put the remaining directors at increased risk of personal liability on other counts. The remaining Demand Board defendants (Alpern, Babineaux-Fontenot, Blount, Gonzalez, Kumbier, McDew, McKinstry, Roman, Stark, and Stratton) are thus incapable of impartially considering Count VII, and demand is thus excused.

Compl. [92] ¶ 449. This Count must be dismissed for the same reasons as Counts IV and V. Plaintiffs' sole allegation on demand futility summarily asserts that the Board cannot be impartial on this Count because it cannot be impartial on other counts alleged in the Complaint. This is insufficient to allege with particularity why the Directors, who are not charged on this claim, are interested or lack independence. For Plaintiffs to bring an unjust enrichment claim, they would need to plead more.

---

[15] The "Officer Defendants" are Allen, Battaglia, Calamari, Ford, Funck, House, Manning, Randall, Salvadori, and Young.

## 2. Best Interest of the Shareholders

Finally, Defendants argue the entire Complaint should be dismissed because it is not in the best interest of the shareholders to allow Plaintiffs to bring these claims against Abbott. Doc. [112] at 46. Defendants assert that the Plaintiffs cannot bring this claim on Abbott's behalf because they are alleging that Abbott acted wrongfully. Defendants further argue that it is not in Abbott's shareholders best interest to prove the facts in this case because it could help other plaintiffs in other cases brought against the Company.

As an initial matter, Defendants appear to misunderstand the allegations in the complaint, and potentially the purpose of derivative litigation more broadly. Plaintiffs, as shareholders of Abbott, are suing the Defendant Directors and Officers of Abbott on behalf of all Abbott shareholders for alleged misconduct on the part of the Defendant Directors and Officers. The Plaintiffs are not, as the Defendants suggest, arguing that Abbott, the corporation, acted wrongfully.

The dubiousness of this argument is apparent by the Defendants' inability to cite a single case where the court dismissed a derivative suit on this ground. Defendants rely on two cases purporting to support their argument, but neither involve a party asking for or the court granting a motion to dismiss. In *Brenner v. Albrecht*, the court weighed the consequences of allowing a derivative suit to continue while the company defended against a securities class action. 2012 WL 252286, at *6 (Del. Ch. Jan. 27, 2012). The court went on to grant a temporary stay, but it did not dismiss the case. Similarly, Defendants' reliance on *In re Massey Energy Co*., is misplaced. 2011 WL 2176479 (Del. Ch. May 31, 2011). In *Massey*, the stockholders who had a pending derivative claim against the corporation asked for a preliminary injunction to prevent a merger between the corporation and a third party. *Id.* at *2. The court evaluated a series of factors and determined that issuing the injunction threatened more harm on the company's stockholders than its potential benefits to them. *Id.* at *32. Defendants rely on a single *dicta* statement where the court noted that the rationale of how to handle the plaintiffs' derivative claim would be the same for the new company as it was for the old. *Id.* at *27. Neither of these cases provide any precedent to dismiss a derivative suit.

In essence Defendants are arguing that the Court should dismiss the case because if allowed to proceed, the evidence uncovered could harm Abbott in future lawsuits brought against the company because of the underlying conduct. That argument could be made in any derivative suit. The relief Defendants request would in effect nullify all derivative litigation because the directors could always argue that allowing shareholders to bring a derivative litigation that could uncover illicit conduct is not in the best interest of the company. Defendants' assertion is akin to an academic argument about the true value of derivative litigation, but that is certainly not grounds to dismiss this case under governing law.

## Conclusion

For the reasons stated above, Defendants' motion to dismiss [111] is granted in part and denied in part. Counts I, IV, V, VI, and VII are dismissed without prejudice. Counts II and III survive. Plaintiffs may refile an amended complaint if they can cure the deficiencies and such an amendment is consistent with their obligations under Federal Rule of Civil Procedure 11. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss."). Given the time associated with repleading and likely subsequent motion practice, Plaintiffs should give consideration as to whether they can really cure the deficiencies identified as a result of the Court's reasoning and decision in this matter. Any amended complaint is due by August 21, 2024. If Plaintiffs do not file an amended complaint by that date, then the dismissal will automatically convert to a dismissal with prejudice on those dismissed counts, and Defendants' answer is due by September 11, 2024 as to Counts II and III.

**SO ORDERED.**

Dated: August 7, 2024

_____
Sunil R. Harjani
United States District Judge

31

**Appendix**

| Director Defendants | |
|---|---|
| Robert B. Ford | Served on the Abbott Board since 2019. |
| Robert J. Alpern | Served on the Abbott Board since 2008. He also serves on the Public Policy Committee. |
| Roxanne S. Austin | Served on the Abbott Board from 2000 to April 2022. She served on the Audit Committee. |
| Claire Babineaux-Fontenot | Served on the Abbott Board since September 2022 and serves on the Public Policy Committee. |
| Sally E. Blount | Served on the Abbott Board since 2011. She serves on the Public Policy Committee. |
| Paola Gonzalez | Served on the Abbott Board since April 2021. She serves on the Audit and Public Policy Committees. |
| Michelle A. Kumbier | Served on the Abbott Board since 2018. She serves on the Audit Committee. |
| Edward M. Liddy | Served on the Abbott Board from 2010 to 2021, and he chaired the Audit Committee. |
| Darren W. McDew | Served on the Abbott Board since 2019. He serves on the Public Policy Committee. |
| Nancy McKinstry | Served on the Abbott Board since 2011 and she chairs the Audit Committee. |
| Phebe N. Novakovic | Abbott director from 2010 to April 2021. Novakovic served as the Chair of the Public Policy Committee in 2019 and 2020. |
| William A. Osborn | Served on the Abbott Board from 2008 to April 2023. |
| Michael F. Roman | Served on the Abbott Board since April 2021. He serves on the Audit Committee. |
| Daniel J. Starks | Served on the Abbott Board since 2017. He serves on the Audit Committee. |
| John G. Stratton | Served on the Abbott Board since 2017. He serves on the Audit and Public Policy Committees. |
| Glenn F. Tilton | Served on the Abbott Board from 2007 to April 2023. He chaired the Public Policy Committee and served on the Audit Committee. |
| Miles D. White | Joined Abbott in 1984, served as Abbott's Chairman and Chief Executive Officer from 1999 to 2020 and was Executive Chairman of the Board from 2020 to 2021. |

| Officer Defendants | |
|---|---|
| Robert B. Ford | Abbott's President and Chief Executive Officer since March 2020. From 2018 to 2020, Ford served as Abbott's President and Chief Operating Officer. |
| Hubert Allen | Abbott's Executive Vice President, General Counsel and Secretary since 2013. |
| Erica Battaglia | Abbott's Chief Ethics and Compliance Officer since June 2021 |
| Christopher J. Calamari | Senior Vice President of U.S. Nutrition which includes Abbott's portfolio of infant formula products, since 2021, and from 2017 to 2021 was Vice President of Pediatric Nutrition. |
| Robert E. Funck | Executive Vice President and Chief Financial Officer of Abbott since 2020, and from 2013 to 2020 was the Company's controller. |
| J. Scott House | Abbott's Senior Vice President of Quality Assurance, Regulatory and Engineering Services since March 2020. |
| Joseph Manning | Executive Vice President of Nutritional Products since 2021. Manning joined Abbott in 1995 and has held various positions within Abbott's Pharmaceutical and Nutrition organizations worldwide. |
| Lori J. Randall | Division Vice President of Nutrition Quality Assurance. |
| Daniel Salvadori | Executive Vice President and Group President, Established Pharmaceuticals and Nutritional Products from 2021, and from 2017 to 2021 served as the Executive Vice President of Nutritional Products. |
| James E. Young | Abbott's Chief Ethics and Compliance Officer from July 2015 to May 2021. |