**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| IN RE ABBOTT LABORATORIES | ) | Case No. 1:22-CV-05513 |
| INFANT FORMULA SHAREHOLDER | ) | Hon. Sunil R. Harjani |
| DERIVATIVE LITIGATION | ) | Hon. Laura K. McNally |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

Carol V. Gilden
COHEN MILSTEIN SELLERS
& TOLL, PLLC
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
IL Bar No. 6185530
Telephone: 312-357-0370
cgilden@cohenmilstein.com

Richard A. Speirs
Amy Miller
COHEN MILSTEIN SELLERS
& TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: 212-828-7797
rspeirs@cohenmilstein.com
amiller@cohenmilstein.com

Steven J. Toll
Molly Bowen
COHEN MILSTEIN SELLERS
& TOLL, PLLC
1100 New York Ave., NW, 5th Floor
Washington, DC 20005
Telephone: 202-208-2600
stoll@cohenmilstein.com
mbowen@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

Justin O. Reliford
Elizabeth K. Dragovich
Karen Kam
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
222 Delaware Ave., Suite 1405
Wilmington, DE 19801
Telephone: 302-578-7345
jreliford@scott-scott.com
edragovich@scott-scott.com
kkam@scott-scott.com

Maxwell R. Huffman
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
600 W. Broadway Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
mhuffman@scott-scott.com

Geoffrey M. Johnson
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
gjohnson@scott-scott.com

*Co-Lead Counsel for Plaintiffs*

*[Additional counsel on signature page.]*

**TABLE OF CONTENTS**

TABLE OF TERMS AND DEFINITIONS ........................................................................ IV

I.     PRELIMINARY STATEMENT ........................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................ 6

III.   PROCEDURAL HISTORY .............................................................................. 6

IV.   SUMMARY OF PROPOSED SETTLEMENT .............................................. 10

    A.   CAPITAL EXPENDITURES .................................................................. 10

    B.   MONITORING PLANS ........................................................................ 10

    C.   OTHER CONSENT DECREE EXTENSIONS .......................................... 11

    D.   TESTING AND REPORTING REQUIREMENTS ...................................... 11

    E.   EXECUTIVE MANAGEMENT REVIEW IMPROVEMENTS ...................... 12

    F.   OFFICE OF ETHICS AND COMPLIANCE AND COMPLAINT HANDLING REVIEW ...................... 12

    G.   PERSONNEL COMMITMENTS .............................................................. 13

    H.   REVISED PPC CHARTER .................................................................... 14

    I.   DIRECTOR QUALIFICATIONS AND EDUCATION ................................ 14

V.    PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT ................ 15

VI.   THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL ........ 16

    A.   THE STRENGTH OF THE PLAINTIFFS' CASE COMPARED TO THE AMOUNT OF THE SETTLEMENT OFFER SUPPORTS PRELIMINARY APPROVAL ...................... 17

    B.   AN ASSESSMENT OF THE LIKELY COMPLEXITY OF A TRIAL SUPPORTS PRELIMINARY APPROVAL ...................... 19

    C.   THE LIKELY LENGTH AND EXPENSE OF CONTINUED LITIGATION SUPPORTS PRELIMINARY APPROVAL ...................... 20

    D.   THE AMOUNT OF OPPOSITION TO SETTLEMENT AMONG AFFECTED PARTIES ...................... 21

    E.   THE OPINION OF COMPETENT COUNSEL SUPPORTS PRELIMINARY APPROVAL ...................... 21

    F.   THE STAGE OF THE PROCEEDINGS AND AMOUNT OF DISCOVERY COMPLETED AT THE TIME OF SETTLEMENT SUPPORTS PRELIMINARY APPROVAL ...................... 22

VII.  ATTORNEYS' FEES AND EXPENSES ............................................................ 23

VIII. THE MANNER AND FORM OF NOTICE SHOULD BE APPROVED ................ 24

IX.   CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Labs. Infant Formula S'holder Derivative Litig.*,
2024 WL 3694533 (N.D. Ill. Aug. 7, 2024) ............................................................... 6, 19, 22

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
911 A.2d 362 (Del. 2006) ..............................................................................................6, 18

*Armstrong v. Bd. of Sch. Dirs. of Milwaukee*,
616 F.2d 305 (7th Cir.1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d
873 (7th Cir. 1998) ........................................................................................................5, 16

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
270 F.R.D. 330 (N.D. Ill. 2010) .........................................................................................21

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) .................................................................................22

*In re Bromine Antitrust Litig.*,
203 F.R.D. 403 (S.D. Ind. 2001) .......................................................................................16

*Du Puy v. Dir., Off. of Workers' Comp. Programs, U. S. Dep't of Lab.*,
519 F.2d 536 (7th Cir. 1975) .............................................................................................16

*Gautreaux v. Pierce*,
690 F.2d 616 (7th Cir. 1982) .............................................................................................21

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) .............................................................................16, 17, 19, 20

*Kessler v. Am. Resorts Int'l's Holiday Network, Ltd.*,
2007 WL 4105204 (N.D. Ill. Nov. 14, 2007), *adhered to on reconsideration*, 2008 WL
687287 (N.D. Ill. Mar. 12, 2008) .......................................................................................16

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983) .............................................................................................18

*McCue v. MB Fin., Inc.*,
2015 WL 1020348 (N.D. Ill. Mar. 6, 2015) .......................................................................5, 16

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) ..........................................................................................................24

*Evans on behalf of United Dev. Funding IV v. Greenlaw*,
2018 WL 2197780 (N.D. Tex. May 14, 2018) ....................................................................24

*In re Pfizer Inc. S'holder Derivative Litig.*,
 780 F. Supp. 2d 336 (S.D.N.Y. 2011)..................................................................................24

*In re Pub. Serv. Co. of Indiana Derivative Litig.*,
 125 F.R.D. 484 (S.D. Ind. 1988) ........................................................................................16

*Schulte v. Fifth Third Bank*,
 805 F. Supp. 2d 560 (N.D. Ill. 2011)..................................................................................21

*Taifa v. Bayh*,
 846 F. Supp. 723 (N.D. Ind. 1994).....................................................................................19

*Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*,
 2023 WL 7986729 (Del. Ch. Nov. 17, 2023), *aff'd*, 327 A.3d 1060 (Del. 2024) ...........17, 18, 19, 21

*Wong v. Accretive Health, Inc.*,
 773 F.3d 859 (7th Cir. 2014)...............................................................................................22

**Statutes, Rules, and Regulations**

21 C.F.R. §106.55..........................................................................................................................12

Fed. R. Civ. P. 23.1(c)....................................................................................................................16

Ill. Comp. Stat. Ann. §5/7.75..........................................................................................................7

## TABLE OF TERMS AND DEFINITIONS

| Term | Definition |
|---|---|
| Abbott | Abbott Laboratories, Inc. |
| AQR | Abbott's Quality and Regulatory Team |
| Consolidated Complaint | Lead Plaintiffs' Consolidated Amended Complaint (ECF No. 92) |
| DOJ | U.S. Department of Justice |
| EMR | Abbott's Executive Management Review |
| External Counsel | Third-party law firm to be hired by Abbott |
| FDA | U.S. Food and Drug Administration |
| FDCA | Food Drug and Cosmetic Act |
| IEH | IEH Laboratories and Consulting Group |
| Lead Plaintiffs | International Brotherhood of Teamsters Local No. 710 Pension Fund and Southeastern Pennsylvania Transportation Authority |
| OEC | Abbott's Office of Ethics and Compliance |
| PPC | Abbott's Public Policy Committee |
| SLC | Abbott's Special Litigation Committee |
| SOP | Standard Operating Procedures |
| Sturgis | Abbott's Sturgis, Michigan facility |
| QA Officer | Abbott's Corporate Quality Assurance Officer |

## I.    PRELIMINARY STATEMENT

Lead Plaintiffs International Brotherhood of Teamsters Local No. 710 Pension Fund and Southeastern Pennsylvania Transportation Authority (together, "Lead Plaintiffs") respectfully submit this memorandum in support of their motion for preliminary approval of the proposed settlement (the "Settlement") set forth in the Stipulation and Agreement of Settlement (the "Stipulation"), filed herewith at Exhibit 1 to the Declaration of Carol V. Gilden, as fair, reasonable and adequate, and in the best interests of Abbott Laboratories ("Abbott" or the "Company") and its shareholders.[1]

As alleged in the consolidated derivative action brought on behalf of Abbott (the "Consolidated Derivative Action"), Lead Plaintiffs allege that certain members of Abbott's board of directors (the "Board") and senior management (collectively, the "Individual Defendants")[2] breached their fiduciary duties by failing to oversee Abbott's manufacture and sale of powdered infant formula produced at its Sturgis, Michigan facility ("Sturgis") and violated the federal securities laws by causing Abbott to make material misrepresentations, including in filings with the U.S. Securities and Exchange Commission (the "SEC"). Specifically, in 2022, the U.S. Food and Drug Administration (the "FDA") was investigating whether powdered infant formula produced at Sturgis may have been contaminated with *Cronobacter*, a bacteria. While the FDA's investigation was ongoing, Abbott temporarily paused powdered infant formula production at Sturgis and issued a recall, which contributed to a nationwide infant formula shortage. Abbott subsequently entered into a consent decree (the "Consent Decree") with the FDA and the U.S. Department of Justice ("DOJ") concerning operations at Sturgis, which was intended to enhance sanitation and good manufacturing practices at the facility. In the wake of

---

[1]    All capitalized terms used here, unless otherwise defined, are intended to have the same meaning as defined in the Stipulation.

[2]    The individual Defendants include Robert B. Ford, Robert J. Alpern, Roxanne S. Austin, Claire Babineaux-Fontenot, Sally E. Blount, Paola Gonzalez, Michelle A. Kumbier, Edward M. Liddy, Darren W. McDew, Nancy McKinstry, Phebe N. Novakovic, William A. Osborn, Michael F. Roman, Daniel J. Starks, John G. Stratton, Glenn F. Tilton, Miles D. White, Christopher J. Calamari, and Robert E. Funck.

these events, numerous lawsuits were filed by consumers, investors, and alleged whistleblowers. The Company also came under regulatory and Congressional scrutiny, as well as criminal and SEC investigations.

On October 16, 2023, Lead Plaintiffs filed a comprehensive 172-page amended consolidated complaint (the "Consolidated Complaint") following the Court's September 18, 2023 order appointing them, along with their counsel, Cohen Milstein Sellers & Toll PLLC and Scott+Scott Attorneys at Law, LLP (together, "Lead Plaintiffs' Counsel"), to lead the litigation. Lead Plaintiffs subsequently partially overcame Defendants' attempts to dismiss the action at the pleading stage, with the Court granting and denying in part Defendants' initial motion to dismiss, and denying Defendants' subsequent motion for reconsideration.

Lead Plaintiffs then proceeded to document discovery, building on their extensive pre-filing investigations, which included, among many other things, documents obtained through books and records demands served on the Company's Board. Lead Plaintiffs' Counsel served discovery requests on Abbott and the Individual Defendants on October 18, 2024; November 7, 2024; and May 7, 2025. In addition, Lead Plaintiffs served requests for documents from multiple state regulators, which led to the production of hundreds of documents from state regulators who had inspected Abbott's powdered infant formula facilities.

While document discovery was ongoing, the Board formed a "Special Litigation Committee" (the "SLC"), comprised of a single outside director who was not named as a defendant in the Consolidated Derivative Action. Following an approximately six-month investigation by the SLC's legal counsel, the SLC's counsel informed Lead Plaintiffs' Counsel that the SLC was nearing completion of its investigation and was prepared to recommend terminating the derivative litigation. Lead Plaintiffs' Counsel informed the SLC that they would oppose any such motion.

Discussions ensued among Defendants', the SLC's, and Lead Plaintiffs' respective counsel about engaging in settlement discussions. Ultimately, all involved agreed to submit the matter to mediation before two highly respected JAMS mediators, the Hon. Daniel Weinstein (Ret.) and Jed Melnick, Esq. Further, Lead Plaintiffs and Defendants subsequently filed a joint motion, supported by the SLC, seeking a stay of the Consolidated Derivative Action to enable settlement talks to take place. The motion was granted by this Court on May 21, 2025.

Hard-fought, arm's-length negotiations between the parties occurred over the many months that followed under the auspices of the mediators. Counsel for Lead Plaintiffs and Defendants engaged in eight formal mediation sessions over more than a six-month period with Judge Weinstein and/or Mr. Melnick, beginning with a formal in-person mediation session on July 29, 2025, which counsel for Lead Plaintiffs, Defendants and the SLC attended, along with representatives from International Brotherhood of Teamsters Local No. 710 Pension Fund and Abbott. Seven formal mediation sessions followed by Zoom on August 13, August 21, September 5, October 1, October 10, October 24, and October 31, 2025, followed by dozens of separate discussions among the parties and the mediators between November 2025 and February 2026, during which the parties discussed and negotiated a variety of issues. Counsel for the Lead Plaintiffs and Defendants did not conduct any discussions regarding the payment of attorneys' fees or expenses before reaching an agreement on the settlement terms and corporate governance provisions set forth in Exhibit A of the Stipulation.

Lead Plaintiffs' negotiations were informed by the documentary record developed before filing Lead Plaintiffs' initial and amended complaints, discovery obtained in the litigation and the confidential exchange of additional information during mediation. Further, throughout the negotiations, Lead Plaintiffs' Counsel consulted with experts in the fields of corporate governance, Food Drug and Cosmetic Act ("FDCA") compliance, and economics. The Settling Parties ultimately agreed to the proposed Settlement, which (if approved) will provide substantial and immediate

3

benefits to the Company and to its shareholders. In particular, the reforms in the Settlement are focused on strengthening processes and procedures relating to the alleged oversight and compliance failures Lead Plaintiffs contend gave rise to the recall and shut down.

Pursuant to the proposed Settlement, Abbott will adopt or enhance corporate governance and compliance policies and practices to ensure the Board's oversight of Abbott's U.S. powdered infant formula business. Specifically, the Settlement provides for the following reforms, which will commence 45 days after the Court enters Judgment and remain in place until December 31, 2028 (unless otherwise noted):

(1) funding $40 million in targeted capital expenditures at Sturgis to enhance core operations, food safety, and quality control over the next five years;

(2) extending the Consent Decree's sanitation, environmental, and product monitoring plans at Sturgis (the "Sturgis Monitoring Plans");

(3) requiring expert third-party review of any enhancements to the Sturgis Monitoring Plans;

(4) ensuring Abbott maintains sanitation and environmental monitoring programs consistent with Abbott's food safety principles across all of Abbott's U.S. powdered infant formula manufacturing facilities, including Sturgis;

(5) maintaining enhanced infant formula finished product testing for the presence of *Cronobacter* at Sturgis, which substantially exceeds federal regulations, and committing to the same procedure for finished product testing for the presence of *Cronobacter* at all of Abbott's domestic powdered infant formula facilities;

(6) requiring annual, expert third-party review and certification of the locations for routine environmental swabbing—i.e., testing—at Sturgis;

(7) revising the standard operating procedures ("SOP") for Executive Management Review ("EMR") to memorialize that such reviews shall include quality assurance and regulatory

4

compliance including, but not limited to, product quality and safety regulation by the FDA and other applicable agencies;

(8) requiring an independent, expert evaluation by an outside law firm of the Company's procedures regarding internal and external complaints handled by Abbott's Office of Ethics and Compliance and requiring annual reporting to the Public Policy Committee (the "PPC"), a committee of the Board, of all internal complaints on an aggregated basis;

(9) maintaining certain staffing levels for quality personnel at Sturgis for a period of one year;

(10) revising the PPC's Charter to further memorialize the PPC's role with respect to quality assurance and regulatory compliance, including product quality and safety regulation by the FDA, and increasing the number of periodic "Quality Assurance" presentations to the PPC from two times per year to three times per year; and

(11) strengthening Board director recruitment and education requirements to emphasize the importance of quality assurance and regulatory compliance.

The foregoing capital commitments and therapeutic reforms fall well within the range of benefits that support "possible approval" of the Settlement.[3] The Settlement is a fair, reasonable, and adequate compromise of the Consolidated Derivative Action claims. The reforms required by the Settlement directly address the alleged governance and compliance failures that Lead Plaintiffs contend gave rise to the recall, the shutdown, and this Consolidated Derivative Action. The Settlement, if approved, will make Abbott a stronger and more compliant Company, while ensuring that Abbott's fiduciaries provide greater oversight of Abbott's powdered infant formula business.

---

[3] *McCue v. MB Fin., Inc.*, 2015 WL 1020348, at *1 (N.D. Ill. Mar. 6, 2015) (citing *Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 314 (7th Cir.1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)).

While significant on their own, weighing the benefits of the proposed Settlement against the risks of continued litigation also supports approval. This includes the near-term risk that the SLC would succeed in a motion to terminate the litigation, as well as the longer-term risk that if Lead Plaintiffs survived that hurdle, they might not ultimately carry the heavy trial burden on their derivative claims.[4]

Accordingly, Lead Plaintiffs respectfully request that the Court (1) grant preliminary approval of the proposed Settlement; (2) direct that notice be given to Abbott shareholders in the proposed form and manner contemplated by the Stipulation; and (3) schedule a hearing to hear any objections and determine whether to grant final approval of the Settlement and an award of attorneys' fees and expenses, including service awards for the Lead Plaintiffs.

## II. FACTUAL BACKGROUND

The Court is familiar with the facts alleged in this action, as set out in Lead Plaintiffs' Consolidated Complaint and summarized in the Court's August 7, 2024 Memorandum Opinion and Order, *In re Abbott Labs. Infant Formula S'holder Derivative Litig.*, 2024 WL 3694533, at \*13 (N.D. Ill. Aug. 7, 2024). Lead Plaintiffs respectfully refer the Court to those filings for a recitation of the alleged facts.

## III. PROCEDURAL HISTORY

Following the temporary shutdown of infant formula manufacturing at Sturgis and the recall in February 2022, multiple Abbott stockholders served demands on Abbott to inspect internal books and records to investigate claims against the Company's officers and directors related to those events. Then, beginning in October 2022, Abbott shareholders filed six separate derivative actions in this Court alleging breach of fiduciary duty, other state claims and federal securities claims against Abbott

---

[4] *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006) ("[A] claim that directors are subject to personal liability for employee failure is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.") (citation modified).

directors and officers (half of which were filed without conducting any books and records investigation). In contrast, Lead Plaintiffs filed a 164-page complaint on June 27, 2023 after a comprehensive investigation, including pre-filing books and records investigations pursuant to 805 Ill. Comp. Stat. Ann. §5/7.75 to secure over 5,000 pages of internal Abbott documents.

On September 18, 2023, the Court consolidated all the cases and appointed Lead Plaintiffs and Lead Plaintiffs' Counsel to lead the consolidated action following contested leadership motions. On October 16, 2023, Lead Plaintiffs filed the operative Consolidated Complaint. ECF Nos. 86, 92. In addition to the actions consolidated into the Consolidated Derivative Action, six Abbott stockholders filed suit in Illinois state court, raising breach of fiduciary duty and other claims.[5] Another shareholder, Matthew Steele, subsequently filed a second derivative action in this Court on April 4, 2025, notwithstanding that Steele's original action was consolidated into the Consolidated Derivative Action. Additionally, several Abbott shareholders made "litigation demands" on the Board.[6]

The Consolidated Complaint alleged that the Individual Defendants—each a member of Abbott's Board or senior management—breached their fiduciary duties by failing to oversee Abbott's manufacturing of infant formula products at Sturgis and by causing Abbott to make material misrepresentations, including in certain statements filed with the SEC, among other claims. On August 7, 2024, the Court issued an opinion upholding Lead Plaintiffs' state law breach of fiduciary duty claims against the Director Defendants and federal law claims for violations of §10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. The Court dismissed all other causes of action. On November 12, 2024, the Court denied Defendants' Motion for Reconsideration of its August 7, 2024 Order.

---

[5]     *See* Stipulation at ¶C, Attachment A.

[6]     *See* Stipulation at ¶D, Attachment A.

Lead Plaintiffs thereafter undertook formal document discovery. Among other things, the parties negotiated and filed the parties' Agreed Confidentiality Order and electronic discovery protocol. Lead Plaintiffs also served document requests and interrogatories on Defendants; engaged in extensive negotiations concerning the scope and parameters of document production with counsel for Abbott and the Individual Defendants; received and reviewed numerous documents produced by Abbott; addressed a number of discovery disputes before Judge McNally, the Magistrate Judge assigned to the action; drafted, served, and negotiated subpoenas and FOIAs/public records requests directed to non-parties, including multiple state regulators; and reviewed hundreds of documents produced by those regulators. Lead Plaintiffs also monitored related litigation in state and federal court, as well as regulatory inquiries.

While document discovery was underway, the SLC was formed. On November 19, 2024, the SLC filed a Motion to Stay Proceedings for six months, which Lead Plaintiffs opposed. On February 14, 2025, the Court granted in part and denied in part the SLC's motion, allowing written discovery to continue, while staying depositions pending completion of the SLC's investigation. The Court set May 19, 2025 as the deadline for the SLC's report.

Beginning in or around May 2025, as the SLC neared completion of its investigation, counsel for Lead Plaintiffs and counsel for the SLC met and conferred regarding the litigation and the SLC's investigation. The SLC's counsel informed Lead Plaintiffs' Counsel that the SLC planned to seek to terminate the litigation. Lead Plaintiffs' Counsel informed the SLC that they would oppose any such motion. Soon thereafter, counsel for the SLC, the Company, the Individual Defendants, and Lead Plaintiffs began discussing potential mediation. Lead Plaintiffs and Defendants subsequently filed a joint motion seeking a stay to accommodate settlement discussions, which the SLC supported. On May 21, 2025, after a hearing, the Court granted the Joint Motion to Stay All Pending Deadlines until August 19, 2025, while the parties pursued mediation. (ECF No. 241).

8

In connection with these efforts, the parties engaged two nationally recognized mediators, the Hon. Daniel Weinstein (Ret.) and Jed Melnick, Esq. to facilitate discussions. (ECF No. 246). Both Judge Weinstein and Mr. Melnick are esteemed neutrals with strong familiarity with complex derivative litigation, having helped resolve high-profile derivative matters in courts across the country. Further discussions and arm's-length negotiations followed concerning the mediation process, during which Lead Plaintiffs received additional confidential information. Counsel for Lead Plaintiffs and the Individual Defendants exchanged detailed mediation statements before the initial, in-person mediation session on July 29, 2025, which was facilitated by Judge Weinstein and Mr. Melnick and attended by counsel for the Lead Plaintiffs, Defendants, and SLC, along with representatives from International Brotherhood of Teamsters Local No. 710 Pension Fund and Abbott. After that initial session, the parties engaged in seven additional formal Zoom mediation sessions with the mediators on August 13, August 21, September 5, October 1, October 10, October 24, and October 31, 2025, followed by numerous separate discussions among the parties and the mediators in November and December 2025, and January and February 2026. During this period, the parties engaged in vigorous and detailed negotiations on all aspects of a settlement.

During the negotiations, Lead Plaintiffs were assisted by three nationally renowned experts: (1) John Godshalk, an industry leader in Regulatory and Quality in the pharmaceutical/biologics industry and expert in FDCA compliance; (2) Professor Veronica Root Martinez, a Professor of Law at Duke University School of Law, a leading legal academic on corporate compliance; and (3) Dr. Matthew Cain, a Senior Fellow at the New York University School of Law and expert in economics.

The parties ultimately reached an agreement as to the substantive terms of the Settlement. No discussions took place regarding the payment of attorneys' fees or expenses before reaching an agreement on the substantive terms of the Settlement. Thereafter, the parties engaged in negotiations as to the amount of attorneys' fees and expenses, with the mediators ultimately issuing a mediators'

proposal for $15.85 million, which both sides accepted. The parties' months of negotiations led to the execution of a Term Sheet on February 14, 2026, and ultimately, the Stipulation before the Court.

## IV.     SUMMARY OF PROPOSED SETTLEMENT

The proposed Settlement will confer substantial benefits on Abbott by enhancing the Board's and management's oversight of the Company's infant formula manufacturing business, thereby reducing the likelihood of bacterial contamination in Abbott's infant formula products, and ensuring appropriate review of internal and external complaint handling. The therapeutic reforms are focused on strengthening processes and procedures relating to the alleged oversight and compliance failures Lead Plaintiffs contend gave rise to the recall and shut down.

### A.  Capital Expenditures

Abbott will fund $40 million in capital expenditure at Sturgis over the next five years. These expenditures will be directed at *new* projects that have not previously been approved, and all $40 million will be spent on core operations, food safety, or quality assurance.

### B.     Monitoring Plans

Abbott will extend the Sturgis Monitoring Plans called for by the Consent Decree for the settlement term, including the review and certification of any enhancements to those plans by the third-party expert hired for the Consent Decree, IEH Laboratories and Consulting Group ("IEH"). Under the Consent Decree, Abbott implemented a new Sanitation Monitoring Plan to address conditions at Sturgis and an Environmental Monitoring Plan and Product Monitoring Plan to govern environmental and product testing at Sturgis (together, the "Sturgis Monitoring Plans"). Those plans were reviewed and approved by IEH and the FDA. Under the proposed Settlement, Abbott agrees to extend the Sturgis Monitoring Plans until December 31, 2028, regardless of any intervening expiration or termination of the Consent Decree.

10

For other U.S. powdered infant formula manufacturing facilities, the Abbott corporate officer responsible for quality assurance ("QA Officer"), or their designee, will annually, after appropriate review and analysis, report to the EMR Committee that the sanitation and environmental monitoring programs in place at Abbott's other U.S. powdered infant formula manufacturing facilities are consistent with Abbott's food safety principles. In addition, the Site/Quality director, or their designee, at Abbott's other U.S. powdered infant formula manufacturing facilities will annually, after appropriate review and analysis, report to the QA Officer that it will follow the sanitation and environmental monitoring programs applicable to that site, which are periodically audited by Abbott corporate and may be audited by the FDA. These commitments are intended to ensure that all of Abbott's domestic facilities manufacturing powdered infant formula operate with consistent sanitation and environmental monitoring protocols, and that the necessary reviews, analysis, and reporting occur.

### C.     Other Consent Decree Extensions

Abbott will extend Consent Decree provisions related to its Sturgis facility until December 31, 2028. First, before distribution of each lot of formula produced at Sturgis, Abbott will ensure that a qualified individual in its quality unit reviews the batch record, the test results for in-process and finished product, and the environmental monitoring results that pertain to the product lot. That person will certify in writing that such lot is appropriate for distribution. Second, IEH will review and certify the site list that is re-evaluated annually and identifies the locations for routine environmental swabbing at Sturgis. These reviews and certifications will minimize the likelihood of occurrence of contaminated infant powdered formula product entering the market.

### D.     Testing and Reporting Requirements

Abbott will commit to enhanced infant formula testing across Abbott's factories. Consistent with the finished product testing in place at Sturgis, which already exceeds federal regulations, Abbott will commit to the same procedure for all powdered infant formula facilities in the United States.

11

Specifically, Abbott agrees to conduct *Cronobacter* testing of 180 samples of 42 grams from each batch of finished product. This is above the current guidelines, which only require testing of 30 samples of 10 grams from each batch of finished product.[7]

In addition, Abbott will ensure that any confirmed positive findings of *Cronobacter* in finished product powdered infant formula manufactured in the United States are reported to site quality and Abbott Quality and Regulatory ("AQR") teams responsible for the relevant site within 48 hours. The QA Officer will also provide a summary of any confirmed positive *Cronobacter* test results in finished product powdered infant formula manufactured in the United States at the next PPC meeting at which the QA Officer presents.

Requiring reports of confirmed positive findings to the Board directly ensures Board oversight of product safety and regulatory compliance.

### E. Executive Management Review Improvements

Abbott will revise its SOP for EMR to further memorialize that the review includes quality assurance and regulatory compliance, including, but not limited to, product quality and safety regulation by the FDA and other applicable agencies.

Abbott relies upon its EMR process, among other procedures, to ensure executive management review and oversight of quality, safety, and regulatory compliance matters. Through the SOP revisions, the Settlement ensures that these matters will be discussed between the Corporate Vice President, Regulatory and Quality and senior executive management at least three times annually.

### F. Office of Ethics and Compliance and Complaint Handling Review

Abbott will hire a third-party law firm ("External Counsel") to evaluate its policies and procedures regarding internal and external complaints handled by its Office of Ethics and Compliance

---

[7] FDA Regulations, 21 C.F.R. §106.55.

12

(the "OEC"). External Counsel selected for the OEC review must have deep expertise in ethics and compliance and will include professionals with strong experience in FDA regulatory compliance, particularly quality and safety. To ensure an impartial review, External Counsel will not be either of the law firms currently representing the Company and the Individual Defendants in connection with this litigation, nor the law firm representing the SLC in connection with this litigation.

External Counsel will review Abbott's policies and procedures regarding internal and external complaints handled by OEC, including those involving AQR's investigation and escalation of such complaints, including but not limited to: (1) OEC program policies and procedures; (2) Speak Up program policies/procedures; (3) Abbott Code of Business Conduct; (4) Third-Party Guidelines; and (5) additional policies and procedures identified by External Counsel.

External Counsel's findings and recommendations will be presented to the General Counsel and to the Chief Compliance Officer, both of whom are corporate officers and have direct access to the Board. In addition, for the duration of the settlement term, the PPC will receive an aggregate analysis of all internal complaints on an annual basis. All of which will help ensure appropriate handling and internal escalation of internal and external compliance complaints, including appropriate executive management and Board oversight of compliance issues.

### G. Personnel Commitments

For one year after the Settlement becomes final, Abbott will commit to maintaining the overall quality headcount at Sturgis at no less than 25% of the total headcount, which was increased following entry of the Consent Decree. To fully implement good manufacturing processes and faithfully adhere to the requirements of the Sturgis Monitoring Plans, maintaining appropriate facility-level staffing of quality-related employees is critical. This headcount commitment will ensure that Abott maintains an appropriate number of employees responsible for the quality and safety of Abbott's infant powdered formula products at Sturgis.

### H. Revised PPC Charter

Abbott will commit to Board governance reforms to ensure PPC and Board oversight of the quality and safety of Abbott's infant powdered formula products. Specifically, Abbott will implement a revised charter for the PPC to further memorialize the PPC's role with respect to quality assurance and regulatory compliance including, but not limited to, product quality and safety regulation by the FDA and other applicable agencies, and the PPC will continue to report to the Board on matters within its oversight responsibility on a regular basis.

In addition, as reflected in the revised PPC Charter, Abbott will increase the number of presentations given by the QA Officer, or their designee, to the PPC from two to three times per year; subject to any additional meetings or reports that may be scheduled as the PPC determines are necessary and appropriate.

### I. Director Qualifications and Education

For the next two Board vacancies (whenever they occur), Abbott will: (1) add regulatory compliance to the list of qualifications desirable for Board members; (2) use the services of a nationally recognized director search firm to identify for consideration candidates with the qualifications desirable to serve on Abbott's Board; and (3) incorporate a presentation on quality assurance and regulatory compliance as part of the director on-boarding process. Abbott's directors will also be allowed to participate in continuing education programs relevant to their oversight, which will be at Abbott's expense. Seeking new directors with compliance experience and providing enhanced compliance-related education for all directors will ensure the Board's (and each of its members') ability to respond to, and proactively address, quality and compliance concerns impacting the Company.

*     *     *

The foregoing enhancements to Abbott's internal governance, quality assurance, and regulatory compliance practices are focused on strengthening processes and procedures relating to the

14

alleged oversight and compliance failures that Lead Plaintiffs allege gave rise to the recall and shut down. The requirements extend the Consent Decree in numerous respects and will lessen the likelihood of a *Cronobacter*-related recall at Abbott's domestic powdered infant formula manufacturing facilities. In addition, the governance provisions enhance Board oversight, specifically through the PPC, regarding quality assurance and regulatory compliance. These governance improvements were achieved through the consultation and advice of experts in corporate governance and FDCA compliance.

## V.    PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT

Lead Plaintiffs respectfully request that the Court enter the [Proposed] Order Preliminarily Approving Proposed Settlement, Directing the Issuance of Notice, and Setting a Final Settlement Hearing (the "Preliminary Approval Order"), in the manner and form submitted herein as Exhibit C to the Stipulation. The Preliminary Approval Order, if approved by the Court, will:

(1)  preliminarily approve the proposed Settlement as set forth in the Stipulation;

(2)  establish a procedure for Abbott shareholders to follow should they wish to object to the proposed Settlement, including setting a date by which any such objections must be made;

(3)  allow notice of the Settlement by Abbott: (a) filing a Form 8-K regarding the settlement with the SEC, (b) posting a link to the notice on the Investor Relations page of Abbott's website, and (c) publishing a short-form notice in *Investor's Business Daily* or a similar online publication;

(4)  schedule a hearing for the Court to consider final approval of the Settlement and Lead Plaintiffs' counsel's application for an award of attorneys' fees and expenses, including service awards for the Lead Plaintiffs (the "Settlement Hearing"); and

(5)  require that, at or prior to the Settlement Hearing, Abbott shall file with the Court an affidavit indicating compliance with the notice requirements of this paragraph.

15

## VI.  THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

Under Rule 23.1(c) of the Federal Rules of Civil Procedure, "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." "[G]eneral policy is in favor of settlement of litigation by compromise and settlement procedures." *Du Puy v. Dir., Off. of Workers' Comp. Programs, U. S. Dep't of Lab.*, 519 F.2d 536, 541 (7th Cir. 1975); *see also In re Pub. Serv. Co. of Indiana Derivative Litig.*, 125 F.R.D. 484, 485 (S.D. Ind. 1988) ("settlements are in general strongly encouraged as a matter of sound public policy"); *Armstrong*, 616 F.2d at 312 ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement.")

Lead Plaintiffs seek preliminary approval of the proposed Settlement and the Court's permission to notify Abbott's shareholders of the Settlement's terms. The threshold for preliminary approval is "low." *In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 416 (S.D. Ind. 2001). At this stage, the Court need only assess "'whether the proposed settlement is within the range of possible approval[.]'" *McCue*, 2015 WL 1020348, at *1 (citing *Armstrong*, 616 F.2d at 314). "[A] more summary version of the [] inquiry [of whether a Settlement is 'fair, reasonable, and adequate'] takes place at the preliminary phase." *Kessler v. Am. Resorts Int'l's Holiday Network, Ltd.*, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007), *adhered to on reconsideration*, 2008 WL 687287 (N.D. Ill. Mar. 12, 2008).

In deciding whether to preliminarily approve a settlement, a court must consider: "(1) the strength of the plaintiffs' case compared to the amount of the settlement offer; (2) an assessment of the likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery completed at the time of settlement." *Id.* at *5. Moreover, courts "do not focus on individual components of the settlement[ ], but rather view them in their entirety in evaluating their fairness." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (citation modified).

The Settlement here meets this standard and warrants notice to other Abbott stockholders.

16

### A. The Strength of the Plaintiffs' Case Compared to the Amount of the Settlement Offer Supports Preliminary Approval

In deciding the fairness of a settlement, the "most important consideration" is the "relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of settlement." *Isby*, 75 F.3d at 1199. Here, the Consolidated Derivative Action withstood the Motion to Dismiss phase and Lead Plaintiffs gathered further supporting evidence through extensive discovery. Following discovery and confidential information exchanges during the mediation process, Lead Plaintiffs continued to believe that the evidentiary record supported their claims that the Individual Defendants breached their fiduciary duties by failing to oversee Abbott's manufacturing of infant formula products at Sturgis and by causing Abbott to make material misrepresentations related to the same in connection with the share repurchases.

That said, there were considerable risks to continued litigation given the procedural posture here. The SLC conducted a six-month investigation and concluded that Lead Plaintiffs' claims lacked merit and would otherwise not serve the Company's best interests to pursue those claims. While Lead Plaintiffs have arguments regarding the purported independence of the single-member SLC and strong substantive disagreements with the conclusions reached by the SLC and its counsel, it would be a hard-fought motion and potentially a steep battle to overcome, where an adverse ruling would mean no recovery at all for Abbott.

For example, in *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2023 WL 7986729 (Del. Ch. Nov. 17, 2023), *aff'd*, 327 A.3d 1060 (Del. 2024), the stockholder plaintiff alleged that the directors and officers of AmerisourceBergen Corporation "allowed a division of the Company to act as, in effect a criminal enterprise" by packaging cancer drugs "in a manner that was illegal and unsanitary." *Id.* at *1. Indeed, the company pled guilty to criminal charges concerning the same misconduct. *Id.* at *31. Notwithstanding the severity of the allegations, or the Chancery Court's prior determination that directors were substantially likely to be liable for utterly failing to implement a reasonable reporting

17

system, the special litigation committee determined that "pursuing th[e] action any further is not in the best interests of the Company in light of 'all relevant factors—including the factual findings and applicable legal standards, potential costs to the Company, public relations, and distractions to the Board, management, and other ABC employees.'" *Id.* at *25 (citation modified). Finding that the special litigation committee member was independent, conducted a reasonable investigation, and reached a reasonable conclusion regarding the good faith of the defendant directors, the Chancery Court dismissed the action entirely. *Id.* at *33. Doing so, the Chancery Court expressly acknowledged the significant monetary harms that had been suffered by the company, and plaintiff's assertion that the derivative action may be "the only opportunity for the Company's stockholders to have a meaningful role in addressing the Company's compliance and oversight deficiencies through governance reforms." *Id.* Nonetheless, the case was dismissed with no recovery or change to the status quo whatsoever.

Here, even if Lead Plaintiffs defeated any potential SLC motion to terminate, there is continued risk. Lead Plaintiffs would still need to survive summary judgment, prove their claims at trial, and defend a judgment through inevitable appeals. As one Circuit Court recognized, settlements of shareholder derivative actions are particularly favored because such litigation is "notoriously difficult and unpredictable." *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) (citation modified). Oversight claims are a particularly difficult species of derivative litigation to prove at trial. *Ritter*, 911 A.2d at 362 ("[A] claim that directors are subject to personal liability for employee failures is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.") (citation modified).

Additionally, Lead Plaintiffs' derivative Section 10(b) claims would likewise be difficult to prosecute successfully. The SLC indicated that it would recommend the dismissal of these claims, too. Beyond an SLC motion to terminate, establishing damages and loss causation on Lead Plaintiffs'

18

federal claims would be unpredictable and involve a battle of experts. Defendants would also likely continue litigating, potentially through appeal, an issue they raised at motion to dismiss as to the basic ability to litigate Section 10(b) claims on a derivative basis. *See Abbott Labs*, 2024 WL 3694533, at \*11 (noting Defendants' reliance on a district court case outside of the Seventh Circuit holding that "plaintiffs could not plead reliance" under these circumstances). Accordingly, these claims likewise carried great risk.

In all events, by crafting a proposed Settlement that addresses alleged plant-level quality issues and regulatory compliance, better handling of internal and external complaints through a review of Abbott's internal processes by an outside firm, increased oversight of quality and compliance-related issues, and increased transparency to the Board, the proposed Settlement will provide significant value to Abbott and its stockholders, while avoiding the risks of continued litigation. Accordingly, the proposed Settlement warrants preliminary approval.

## B. An Assessment of the Likely Complexity of a Trial Supports Preliminary Approval

Lead Plaintiffs recognize that the Individual Defendants would vigorously dispute the claims asserted and that continued litigation would require the Court to resolve numerous "difficult and complex issues." *Isby*, 75 F.3d at 1199-200 ("[C]ontinuation of the litigation 'would require the resolution of many difficult and complex issues,' would 'entail considerable additional expense,' and would 'likely involve weeks, perhaps months, of trial time.'"), quoting *Taifa v. Bayh*, 846 F. Supp. 723, 727 (N.D. Ind. 1994). Lead Plaintiffs also are mindful of the inherent evidentiary challenges and possible defenses associated with proving the Individual Defendants' liability here.

Indeed, Lead Plaintiffs' oversight claims require a finding of bad faith. *Chou*, 2023 WL 7986729, at \*33. Accordingly, Lead Plaintiffs would need to establish that the defendant fiduciaries "utterly fail[ed]" to implement any reasonable reporting system or consciously disregarded red flags that came to their attention. *Id.* at \*26. This would require testimony from each of the defendant

19

directors, as well as numerous officers and Company employees regarding the manner in which the Board provided or failed to provide oversight of Abbott's infant formula operations. Trial would likely involve a battle of experts on matters related to corporate governance and FDCA compliance, in addition to economic experts addressing damages and loss causation on the federal securities claims.

### C. The Likely Length and Expense of Continued Litigation Supports Preliminary Approval

As previously mentioned in *Isby v. Bayh*, the Seventh Circuit has approved settlements where continued litigation would be costly and require a lengthy trial. 75 F.3d at 1199. Here, continuation of the litigation will prove to be very costly and create significant delay before improvements could be achieved at Abbott when considering summary judgment briefing and trial, as well as judicial resources. The Settlement here represents "an outcome at least comparable, if not far superior, to that which plaintiffs might achieve by proceeding to trial." *Id.* (citation modified).

Should the Court reject the proposed Settlement, Lead Plaintiffs and their counsel are committed to prosecuting this matter. This would include discovery into the SLC process and any report that would be issued, plus a contested motion to terminate. Such discovery and motion practice would likely take months to complete, before the motion to terminate was ripe for resolution. Assuming Lead Plaintiffs survived any motion to terminate, merits discovery would re-commence thereafter. Lead Plaintiffs would seek to depose current and former employees, complainants and alleged whistleblowers, and third parties, including each of the named Individual Defendants. Extensive, costly, and complex expert discovery would be required. Following discovery, one or more parties would likely move for summary judgment, with Defendants seeking again to terminate the entire litigation.

A trial would be next. Trials of similar oversight claims are extremely rare in any court. Of the two in recent history, one (litigated by certain of the undersigned counsel) settled before the second day of trial and the other awaits decision, with an uncertain outcome. The proposed Settlement, on

20

the other hand, eliminates the burden and expense of additional litigation on the Company, while providing stockholders "a meaningful role in addressing the Company's compliance and oversight deficiencies through governance reforms." *Chou*, 2023 WL 7986729, at *33. Thus, the proposed Settlement is the preferrable path to the litigation's resolution.

### D. The Amount of Opposition to Settlement Among Affected Parties

Notice has not yet been provided to Abbott's shareholders, so it is too early to evaluate any opposition to the Settlement. *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010). If any objections are filed, the Court will have an opportunity to consider such objections during the Settlement Hearing.

### E. The Opinion of Competent Counsel Supports Preliminary Approval

Courts in the Seventh Circuit are "entitled to rely heavily on the opinion of competent counsel" when evaluating the fairness of a proposed settlement. *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982) (citation modified). Here, Lead Plaintiffs' Counsel possess extensive experience litigating complex derivative and securities class actions and negotiating settlements. As in *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011), "there is no indication that the Settlement Agreement is the victim of collusion."

Lead Plaintiffs' Counsel evaluated the merits of the Settlement based on a substantial factual record developed through investigation and formal discovery, as well as extensive mediation briefing and negotiations. In doing so, counsel carefully considered the factual and legal questions that are in dispute and assessed the strengths and weaknesses of the claims and defenses asserted in the action.

The proposed Settlement was reached only after more than six months of hard-fought, arm's-length negotiations conducted over no fewer than eight formal mediation sessions, followed by numerous discussions between the parties, all conducted with the assistance of two, well-known, highly regarded mediators. The participation of experienced mediators and the extensive negotiations

21

leading to the Settlement further support a finding that the proposed resolution is not the result of collusion, and falls well within the range of possible approval. *See Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014).

### F. The Stage of the Proceedings and Amount of Discovery Completed at the Time of Settlement Supports Preliminary Approval

The final factor is whether the Settlement is "fair, reasonable, and adequate concerns the stage of the proceedings and the amount of discovery completed." *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 966 (N.D. Ill. 2011). This factor is relevant because it reflects "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Id.* (citation modified).

Here, Lead Plaintiffs successfully opposed Defendants' Motion to Dismiss and Defendants' subsequent Motion for Reconsideration. Those motions, in turn, provided the Court with two opportunities to review the extensive pleading-stage record. *See Abbott Labs*, 2024 WL 3694533, at *5 ("With their motion and reply brief, Defendants offered 85 exhibits totaling 1,155 pages for the Court to consider."). As a result, the Court is already familiar with the core Board-level materials on which Lead Plaintiffs relied to plead their derivative claims. The Court also addressed the SLC's motion to stay discovery and therefore is familiar with Lead Plaintiffs' challenges to the composition and independence of the one-member committee.

Lead Plaintiffs' Counsel also is likewise well-informed and possesses a well-developed understanding of the claims through both their extensive pre-litigation investigation and formal document discovery. As noted above, prior to filing suit, Lead Plaintiffs received and reviewed numerous documents pursuant to their pre-litigation books and records demand. Thereafter, through formal discovery, Lead Plaintiffs' Counsel reviewed: (a) numerous documents produced by Abbott; (b) hundreds of documents produced by state regulators; (c) Abbott's public filings with the SEC, press releases, announcements, transcripts of investor conference calls, and news articles; (d) analyst,

22

business, and financial media reports, scholarly literature, and publications about Abbott; and (e) dockets and reports of related litigation and regulatory inquiries. In addition, Lead Plaintiffs received additional confidential information during the mediation process.

As such, this Settlement was reached after Lead Plaintiffs' Counsel had developed a thorough understanding of the strengths and weaknesses of Lead Plaintiffs' claims and the complexities of continued litigation, including the potential implications of the SLC's decision to seek termination. In addition, Lead Plaintiffs' Counsel consulted with leading experts in corporate governance, FDCA compliance, and economics throughout this process to evaluate the claims and structure a high value Settlement for Abbott.

In light of the extensive investigation, discovery, motion practice, and mediation that preceded the Settlement, both Lead Plaintiffs' Counsel and the Court are well-informed and well-positioned to evaluate the potential merit of the claims at issue, and the complexities the parties would face litigating the matter to judgment. Accordingly, this factor supports preliminary approval of the Settlement.

## VII.     ATTORNEYS' FEES AND EXPENSES

Lead Plaintiffs' counsel devoted substantial time, effort, and expense to securing the Settlement benefits for Abbott and its shareholders on a wholly contingent basis. The parties have agreed that Lead Plaintiffs may seek an award of attorneys' fees and expenses of $15.85 million in connection with Lead Plaintiffs' Counsel's work on the Consolidated Derivative Action and in light of the benefits provided to Abbott and Abbott's shareholders associated with the Settlement.

Importantly, discussions regarding the payment of attorneys' fees or expenses occurred only after reaching an agreement on the substantive terms of the Settlement. The final negotiated fee amount resulted from a double-blind mediator's proposal, which both sides accepted. The involvement of experienced mediators and the use of a double-blind mediator's proposal further

23

confirm that the fee negotiations were arm's-length and not the product of collusion. Moreover, the Settlement is not contingent in any way on the Court's approval of attorneys' fees.

Lead Plaintiffs' Counsel's fee and expense request will also include modest service awards for the Lead Plaintiffs not to exceed $15,000 each and to be paid exclusively from any attorneys' fees awarded by the Court. In connection with final Settlement approval, and assuming preliminary approval is granted, Lead Plaintiffs will provide this Court with a detailed submission setting forth the legal and factual basis for the requested fee and expense application.

## VIII.   THE MANNER AND FORM OF NOTICE SHOULD BE APPROVED

The contents of the Settlement notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). If the Court grants preliminary approval, Abbott will notify current Abbott shareholders as follows: (a) filing a Form 8-K regarding the Settlement with the SEC, (b) posting a link to the notice on the Investor Relations page of Abbott's website, and (c) publishing a short-form notice in *Investor's Business Daily* or a similar online publication.

The Settlement Notice complies with Fed. R. Civ. P. 23.1 and due process and is similar to those approved in other shareholder derivative cases. *See Evans on behalf of United Dev. Funding IV v. Greenlaw*, 2018 WL 2197780, at *4 (N.D. Tex. May 14, 2018) (notice of the settlement to be filed with the SEC together with a Form 8-K and to be published in *Investor's Business Daily*); *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 344 (S.D.N.Y. 2011) (final approval of pharmaceutical industry derivative settlement where notice entailed filing of Form 8-K, posting of notice and copy of stipulation on company website, and publication of a summary notice).

The Settlement Notice weighs in favor of preliminary approval as the form and manner of the proposed notice constitute the best notice practicable under the circumstances and satisfy the

24

requirements of Fed. R. Civ. P. 23.1, due process, and all applicable governing law.

## IX.   CONCLUSION

Lead Plaintiffs and their counsel submit that the Settlement falls well within the range of possible approval. Accordingly, Lead Plaintiffs respectfully request that the Court grant preliminary approval of the Settlement for the purpose of providing notice, approve the form and manner of the parties' proposed notice to Abbott shareholders, and schedule a Settlement Hearing to consider final approval of the Settlement and Lead Plaintiffs' Counsel's application for an award of attorneys' fees and expenses, including service awards for the Lead Plaintiffs.

**DATED:** March 17, 2026

Respectfully submitted,

_/s/ Carol V. Gilden_
Carol V. Gilden
COHEN MILSTEIN SELLERS
& TOLL, PLLC
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
IL Bar No. 6185530
Telephone: 312-357-0370
cgilden@cohenmilstein.com

Richard A. Speirs
Amy Miller
COHEN MILSTEIN SELLERS
& TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: 212-828-7797
rspeirs@cohenmilstein.com
amiller@cohenmilstein.com

Steven J. Toll
Molly Bowen
COHEN MILSTEIN SELLERS
& TOLL, PLLC
1100 New York Ave., NW, 5th Floor
Washington, DC 20005
Telephone: 202-208-2600
stoll@cohenmilstein.com
mbowen@cohenmilstein.com

_/s/ Justin O. Reliford_
Justin O. Reliford
Elizabeth K. Dragovich
Karen Kam
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
222 Delaware Ave., Suite 1405
Wilmington, DE 19801
Telephone: 302-578-7345
jreliford@scott-scott.com
edragovich@scott-scott.com
kkam@scott-scott.com

Maxwell R. Huffman
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
600 W. Broadway Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
mhuffman@scott-scott.com

Geoffrey M. Johnson
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
gjohnson@scott-scott.com

*Co-Lead Counsel for Plaintiffs*

Jing-Li Yu
Melissa May
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
jyu@scott-scott.com
mmay@scott-scott.com

*Co-Lead Counsel for Plaintiffs*

John A. Kehoe
KEHOE LAW FIRM, P.C.
2001 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: 215-792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Plaintiff SEPTA*