EXHIBIT D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE ABBOTT LABORATORIES INFANT FORMULA SHAREHOLDER DERIVATIVE LITIGATION | ) Case No. 1:22-cv-05513 <br> ) Hon. Sunil R. Harjani, U.S.D.J. <br> ) Hon. Laura K. McNally <br> ) |

**DECLARATION OF PROFESSOR VERONICA ROOT MARTINEZ**

I, Veronica Root Martinez, declare as follows:

**Assignment**

1.      I was retained by Cohen Milstein Sellers & Toll PLLC and Scott+Scott Attorneys at Law, LLP ("Lead Plaintiffs' Counsel") who represent plaintiffs International Brotherhood of Teamsters Local No. 710 Pension Fund and Southeastern Pennsylvania Transportation Authority ("Lead Plaintiffs") ("Lead Plaintiffs") in the action captioned *In re Abbott Laboratories Infant Formula Shareholder Derivative Litigation*, Case No. 1:22-cv-5513 (the "Consolidated Derivative Action") to opine on corporate governance and compliance issues implicated by the action.

2.      During the course of the parties' mediation, I advised Lead Plaintiffs' Counsel regarding potential governance and compliance reforms that could address the underlying oversight and regulatory deficiencies at issue in the Consolidated Derivative Action. I have been asked to provide expert analysis regarding corporate compliance and governance reforms implemented at Abbott Laboratories ("Abbott") in connection with the proposed settlement (the "Settlement") in this action. Specifically, I have been asked to assess whether the governance and compliance reforms reflected in the Settlement—including board-level oversight changes, revisions to Executive Management Review ("EMR") processes, and extensions of compliance-related obligations—are likely to improve corporate oversight, enhance Abbott's board of directors' (the "Board") familiarity

1

with compliance risks, and promote a sustained culture of regulatory compliance across the organization.

3.  My time is billed at a rate of $850 per hour for my work on this matter. My compensation is not contingent on the outcome of this case, including Lead Plaintiffs' Motion for Settlement Approval or Motion for Attorneys' Fees and Expenses.

**Qualifications**

4.  I am a Professor of Law at Duke University School of Law, where I teach and write in a number of areas, including in the areas of corporate compliance, corporate governance, and organizational ethics. Prior to joining Duke, I served as a Professor of Law at the University of Notre Dame Law School, where I founded and directed the Program on Ethics, Compliance, and Inclusion. I am widely recognized as a leading academic in the field of corporate compliance. I have authored numerous articles on compliance program design and effectiveness. I have also held appointments with institutions such as the Financial Industry Regulatory Authority and the American Bar Association. I have affiliations with the American Law Institute and the European Corporate Governance Institute.

5.  A copy of my curriculum vitae is attached as Appendix A here, further detailing my qualifications and experiences.

**I. Board-Level Oversight Reforms Improve Compliance Visibility and Accountability**

6.  The board-level governance reforms and revisions to the Executive Management Review ("EMR") process are likely to improve oversight by enhancing the quantity, quality, and regularity of compliance-related information available to directors. Effective board oversight depends on directors having access to timely, accurate, and sufficiently detailed information about the firm's compliance risks and operations; without such information, boards cannot fulfill their monitoring

2

obligations.[1] Corporate law has long emphasized that boards must ensure the existence of information and reporting systems designed to surface compliance issues so that directors can make informed judgments about legal compliance and risk.[2] Where such systems are absent or ineffective, boards are not merely passive recipients of information—they are unable to exercise meaningful oversight at all.

7.      These informational demands necessarily extend beyond internal reporting structures. Boards must also obtain sufficient education—both from within the organization and from external sources—to understand what risks require attention and how those risks manifest in practice.[3] This is particularly important in complex, highly regulated environments, where directors may not possess subject-matter expertise in areas such as manufacturing, safety, or regulatory compliance. As a result, modern compliance frameworks increasingly recognize that oversight requires not only access to information, but the capacity to interpret and evaluate that information in light of the firm's risk profile.[4] The reforms here respond directly to that need by structuring the flow of information through EMR and related governance processes in a way that ensures compliance issues are elevated, contextualized, and repeatedly presented to senior leadership and the Board.

8.      By improving the Board's visibility into compliance and governance issues, these reforms strengthen the Board's ability to identify and oversee "mission critical" risks, including those related to the safety of infant formula. Courts and regulators have made clear that boards must be particularly attentive to risks that are central to a company's core operations and regulatory

---

[1] See John Armour et al., *Board Compliance*, 104 Minn. L. Rev. 1191, 1196–97, 1214-15 (2020) (explaining that boards must have access to information sufficient to oversee compliance systems and respond to red flags).
[2] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996) (requiring boards to ensure systems that provide compliance information); see also Elizabeth Pollman, *Corporate Oversight and Disobedience*, 72 Vand. L. Rev. 2013, 2021–23 (2019) (describing oversight obligations tied to monitoring legal compliance).
[3] Veronica Root Martinez, *The Board's Education Through Compliance Consultants*, __ Law & Contemporary Problems (forthcoming 2026) (explaining that boards require both internal information and external education to effectively oversee compliance systems), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6229038.
[4] See id.; see also Ann M. Lipton, *Beyond Internal and External: A Taxonomy of Mechanisms for Regulating Corporate Conduct*, 2020 Wis. L. Rev. 657, 666–67 (explaining how governance structures and compliance processes shape corporate decisionmaking and the evaluation of misconduct risk).

obligations.[5] Enhanced reporting and structured engagement with compliance issues allow directors to better detect emerging risks, assess the adequacy of management's response, and intervene where necessary. In this way, the governance reforms do not merely increase the volume of information available to the Board; they improve its relevance and usability, thereby enabling more informed, active, and effective oversight of safety and compliance at the operational level.

9. These same reforms are also likely to improve the Board's familiarity with compliance issues by increasing both the frequency and substance of director engagement. Familiarity, in this context, is not merely awareness that compliance risks exist; it requires a working understanding of how those risks arise, how they are managed, and where potential gaps or failures may occur. Industry frameworks on internal control and compliance emphasize that effective oversight depends on the availability of reliable, timely, and sufficiently detailed information, enabling informed decision-making and the evaluation of compliance risks.[6] Absent such engagement, compliance risks remain abstract, and boards are less able to distinguish between routine issues and those that warrant heightened attention.

10. The EMR revisions directly support this form of familiarity by embedding compliance and quality issues into regular, structured reporting cycles. By requiring management to consistently present compliance-related information—rather than doing so on an ad hoc basis—the reforms create an iterative process through which directors can build knowledge over time. Leading governance and

---

[5] See *Marchand v. Barnhill*, 212 A.3d 805, 822–24 (Del. 2019) (emphasizing board oversight of "mission critical" risks such as food safety); see also Jennifer Arlen, *Countering Capture: A Political Theory of Corporate Criminal Liability*, 47 J. Corp. L. 861, 862 (2022) (explaining the need for effective compliance systems and enforcement structures to deter misconduct and address corporate regulatory risk).

[6] See Comm. of Sponsoring Orgs. of the Treadway Comm'n (COSO), *The Updated COSO Internal Control Framework: Frequently Asked Questions* (3d ed. 2013) (emphasizing the role of information quality and communication in supporting informed decisionmaking and the effectiveness of internal control over operations, reporting, and compliance); see also Andrew M. Good, Avia M. Dunn & Zaneta Wykowska, *Key Updates to the DOJ's Evaluation of Corporate Compliance Programs*, Harv. L. Sch. F. on Corp. Governance (Oct. 7, 2024), https://corpgov.law.harvard.edu/2024/10/07/key-updates-to-the-dojs-evaluation-of-corporate-compliance-programs.

4

risk management frameworks emphasize continuous monitoring of compliance risks, structured reporting processes, and the integration of compliance into broader enterprise risk management systems as essential components of effective oversight.[7] This repetition is important: familiarity develops through sustained engagement, comparison across reporting periods, and the ability to observe patterns, trends, and deviations. In addition, structured reporting that links compliance issues to operational realities allows directors to better understand the underlying drivers of risk, rather than viewing compliance as a discrete or siloed function.[8] This integration is particularly valuable in regulated industries, where compliance issues are often intertwined with core business activities, including product safety, manufacturing practices, and quality control.

11.     Increased familiarity, in turn, improves the Board's capacity to ask informed questions, challenge management where appropriate, and identify areas requiring further investigation or external expertise. Industry guidance consistently emphasizes that effective compliance systems depend not only on the existence of controls, but on their ongoing evaluation, testing, and refinement through active oversight and inquiry.[9] Oversight is most effective when boards are not passive recipients of

---

[7] Am. Law Inst., *Principles of the Law: Compliance and Enforcement for Organizations* §§ 4.01, 4.11, 5.18 (Tentative Draft No. 2, 2021) (describing the need for ongoing monitoring and integration of compliance risk management into enterprise risk systems); see also Am. L. Inst., *Principles of the Law: Compliance and Enforcement for Organizations* §§ 1.01, 3.01 (2025 (final version)) (confirming that compliance risk management is part of enterprise risk management and that governance structures are essential to effective oversight); World Econ. Forum, *Redefining Governance: How Leaders Can Build Anti-Fragile Organizations* 2 (2026) (highlighting the importance of integrated risk, compliance, and governance systems).

[8] World Econ. Forum, *Redefining Governance*, supra note 7, at 2 (advocating integration of governance, risk management, compliance, and control functions to support effective oversight); *Risk & Compliance* Magazine, Apr.–June 2026, at 10 (emphasizing that effective compliance and risk management depend on understanding how risks arise in practice and integrating controls across governance and operational functions); COSO, supra note 6 (emphasizing the role of information and communication systems in supporting decision-making and integrating operations, reporting, and compliance objectives).

[9] See Good et al., supra note 6 (explaining that DOJ evaluates whether compliance programs are effective in practice, supported by data, and refined over time based on ongoing assessment and lessons learned); Am. Law Inst., *Draft Principles of the Law: Compliance and Enforcement for Organizations*, supra note 7, § 6.08 (2021) (emphasizing the importance of effective internal controls and governance oversight in compliance systems); see also Jones Day, *Conducting an Effective Internal Investigation—An Overview* 2–3 (2022) (explaining that internal investigations identify compliance failures and support evaluation and remediation of compliance programs);

information but active participants in evaluating it. By enhancing both the regularity and clarity of compliance-related reporting, the reforms enable directors to move beyond surface-level awareness toward a more informed and nuanced understanding of compliance risks. This deeper familiarity is especially important in the context of infant formula safety, where regulatory, operational, and public health considerations intersect, and where effective oversight depends on the Board's ability to recognize and respond to evolving risks in a dynamic environment.[10]

12.      An additional feature of the governance reforms that is likely to improve both oversight and familiarity is the aggregation of complaints and other compliance-related information across the organization. In complex organizations, compliance failures often persist not because information is entirely absent, but because it is fragmented across departments, business units, or reporting channels. As a result, individual complaints or incidents may appear isolated when viewed on their own, but in the aggregate reveal patterns indicative of more significant compliance risk. Research on compliance systems emphasizes that information silos can impede effective detection and investigation, preventing organizations—and, critically, boards—from recognizing the scope and materiality of emerging issues.[11] The systematic aggregation of complaints, hotline reports, and other indicators of potential misconduct allows both management and the Board to identify trends, assess whether issues are recurring or systemic, and allocate attention and resources accordingly. This type of aggregation is therefore not merely an operational improvement; it is a governance mechanism that enhances visibility into risks that may otherwise remain obscured. By enabling management to escalate issues more effectively and by providing the Board with a more complete picture of compliance

---

see also Brandon L. Garrett & Gregory Mitchell, *Testing Compliance*, 83 Law & Contemp. Probs. 47, 80-81 (2020) (arguing that compliance programs should be empirically tested through performance-based methods);

[10] *Risk & Compliance* Magazine, Apr.–June 2026, at 12–14 (emphasizing the need to identify vulnerabilities, maintain visibility into operations, and adapt controls through strong governance to evolving risks).

[11] See e.g., Veronica Root Martinez, *Complex Compliance Investigations*, 120 Colum. L. Rev. 249, 272–73 (2020) (explaining that information silos in complex organizations can impede investigation and prevent firms from recognizing the scope of misconduct).

concerns, aggregation supports more informed oversight and more timely intervention in areas that require heightened attention.[12]

**II. Duration and Reinforcement Matter for Building a Culture of Compliance**

13.     Extending the provisions of the May 2022 U.S. Food and Drug Administration consent decree and related good manufacturing compliance requirements is likely to promote a sustained culture of compliance at the facility level by reinforcing compliance norms over time. Empirical research on corporate monitorships demonstrates that while external oversight can meaningfully reduce misconduct during the period of active monitoring, those gains often dissipate once the monitorship ends, with firms reverting to prior levels of violations.[13] This evidence suggests that compliance interventions must persist long enough to move beyond temporary behavioral changes and instead reshape the underlying norms that govern employee conduct. By extending compliance obligations that mirror monitorship requirements, the proposed Settlement provides a longer time horizon over which the firm can internalize compliance expectations and translate them into durable practices.

14.     This extended duration is critical because cultural change within organizations does not occur immediately; it develops through repeated exposure, reinforcement, and gradual normalization of expected behaviors.[14] Research on governance and compliance systems and organizational processes emphasizes that effective compliance depends not only on formal structures,

---

[12] Id. at 272-73, 284-86 (emphasizing that aggregating information across organizational units improves investigation and allows firms to better understand the scope and significance of misconduct).

[13] Lindsey A. Gallo, Kendall V. Lynch & Rimmy E. Tomy, *Out of Site, Out of Mind? The Role of the Government-Appointed Corporate Monitor*, 61 J. Acct. Res. 1633, 1634–35 (2023) (finding reductions in violations during monitorships that do not persist after monitors depart).

[14] Anna Canato & Davide Ravasi, *Managing Long-Lasting Cultural Changes*, 44 Org. Dynamics 75 (2015); Mary Jo Hatch, *The Dynamics of Organizational Culture*, 18 Acad. Mgmt. Rev. 657 (1993).

but on the routines and practices through which information is communicated, evaluated, and acted upon across the organization.[15]

15.     Extending compliance-related obligations—such as monitoring, testing, and reporting requirements—ensures that these routines are repeatedly enacted at the facility level, increasing the likelihood that employees and managers come to view compliance not as a temporary mandate, but as an integral part of daily operations.

16.     The proposed Settlement likewise requires Abbott to maintain across all of its domestic powdered infant formula production facilities (i) consistent sanitation and monitoring programs and (ii) enhanced testing for Cronobacter in finished product.  By extending these requirements beyond Sturgis, and by imposing other obligations at the executive management and Board level, the proposed Settlement should have an impact on the culture of compliance across Abbott's entire domestic powdered infant formula business. Empirical evidence indicates that enhanced corporate governance—particularly more robust board structures and processes—is associated with reduced firm risk.[16]

17.     The importance of culture to organizational performance further underscores the value of sustained compliance interventions. Corporate culture shapes employee behavior, influences risk-taking, and affects the firm's ability to comply with legal and regulatory requirements. Evidence from executive surveys and governance research indicates that effective corporate cultures are strongly associated with improved firm performance, including enhanced productivity, long-term focus, and regulatory compliance, while weak or misaligned cultures increase the likelihood of misconduct and

---

[15] Veronica Root Martinez, *Complex Compliance Investigations*, 120 Colum. L. Rev. 249, 284–85 (2020) (emphasizing that effective compliance depends on process-based practices through which firms communicate and analyze information, rather than structure alone).

[16] Sudha Mathew, Salma Ibrahim & Stuart Archbold, *Corporate Governance and Firm Risk*, 18 Corp. Governance 52 (2018).

organizational failure.[17] In this way, investments in compliance culture are not merely defensive; they contribute to firm value by aligning employee behavior with organizational goals and reducing the risk of costly compliance failures.

18. Finally, sustained compliance obligations help move organizations away from piecemeal compliance efforts toward a more integrated and durable culture of compliance. As prior research demonstrates, firms often respond to enforcement actions by adopting narrow, issue-specific reforms that address particular violations without correcting underlying systemic weaknesses.[18] By extending and reinforcing compliance requirements over time, the proposed Settlement encourages a more comprehensive approach—one that integrates compliance across functions and embeds it within organizational culture. This shift is particularly important at the facility level, where day-to-day operational decisions directly affect product safety and regulatory adherence. In this respect, the extended compliance provisions are likely to produce more durable improvements by fostering a culture in which compliance is consistently prioritized, rather than episodically enforced.

**Conclusion**

19. In my opinion, the governance and compliance reforms reflected in the proposed Settlement are consistent with well-established principles in corporate governance and compliance design. By improving the flow of information to the Board, enhancing Board familiarity with compliance risks, and extending compliance obligations in a manner that reinforces organizational norms over time, these reforms are reasonably likely to strengthen oversight and promote a sustained culture of compliance across Abbott's operations. Taken together, the combination of board-level

---

[17] John R. Graham et al., *Corporate Culture in a New Era: Views from the C-Suite*, 35 J. Applied Corp. Fin. 7, 4–6 (2023) (reporting that executives view culture as a key driver of firm value and compliance).

[18] Veronica Root, *Coordinating Compliance Incentives*, 102 Cornell L. Rev. 1003, 1010–11 (2017) (describing the tendency of firms to adopt piecemeal compliance responses tied to specific enforcement actions).

reforms and facility-level compliance requirements addresses both the informational and cultural dimensions of compliance, increasing the likelihood of meaningful and durable change.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of May, 2026, at Durham, North Carolina .

Veronica Root Martinez

10

# Appendix A

# VERONICA ROOT MARTINEZ

DUKE UNIVERSITY SCHOOL OF LAW
210 SCIENCE DR.
DURHAM, NC 27708
MARTINEZ@LAW.DUKE.EDU
GOOGLE SCHOLAR | ORCID

## EDUCATION

**The University of Chicago, The Law School**, Chicago, IL
Juris Doctor, June 2008

- Managing Editor, *Chicago Journal of International Law;* Hinton Moot Court, Board Member

**Georgetown University, McDonough School of Business**, Washington, D.C.
Bachelor of Science in Business Administration, May 2005, *cum laude*
Majors: Management & Marketing;   Minor: Government

- John Carroll Scholar; Patrick Healy Fellow

## ACADEMIC APPOINTMENTS

**Duke University School of Law**, Durham, NC
*Simpson Thacher & Bartlett Distinguished Professor of Law*                          July 2024 – present
*Professor of Law*                                                                   July 2022 – June 2024

- 2026 ACC Academic Leaders Network Fellow
- Teaching: Contracts; Corporate Compliance & Ethics; Ethics and Professional Responsibility; Judicial Ethics (*MJS Program*); Legal Scholarship Seminar; Securities Litigation, Enforcement, and Compliance
- Committees: University Priorities Committee, 2024 – 2027, Chair 2025-2026; University Institutional Compliance Advisory Committee, Sp 2024 – 2026; University Academic Council, 2023 – 2025; Academic Careers Committee, Chair 2023 – 2026, Member 2022 – 2023; Mentoring Committee, 2023 – 2026; Ad-Hoc Director of DEI Search Committee, 2022 – 2023; Admissions Committee, 2022 – 2023
- Awards & Special Recognition: The Top 100 Legal Scholars of 2025 (link)

**Duke Fuqua School of Business, Management & Organizations Area**, Durham, NC
*Affiliate (courtesy appointment)*                                                   2022 – present

- Teaching: Ethics in Management

**Notre Dame Law School**, Notre Dame, IN
*Robert & Marion Short Scholar and Professor of Law*                                 July 2019 – June 2022
*Director of Program on Ethics, Compliance & Inclusion*                              July 2019 – June 2022
*Associate Professor of Law*                                                         July 2014 – June 2019
*Visiting Assistant Professor of Law*                                                July 2012 – June 2014

- NDLead, Notre Dame's Leadership Training Program (2019 – 2020)
- Teaching: Contracts; Professional Responsibility; Securities Litigation, Enforcement, and Compliance; Corporate Compliance & Ethics; Global Compliance Survey; Group Directed Reading – The Ethics of Government Service
- Committees: Provost Search Committee, 2019 – 2020; Law School Appointments Committee, 2019 – 2020, Spring 2021; University Task Force on Research & Scholarship in Response to the Sexual Abuse Crisis in the Catholic Church, 2018 – 2019; Law School Colloquium Committee, 2018 – 2019, 2017 – 2018, 2016 – 2017, 2014 – 2015; University Committee on Women Faculty and Students, Fall 2017; Ad-Hoc California Committee, 2017 – 2018; Law School Clerkship Committee, 2016 – 2017
- Faculty Advisor, Black Law Students Association (2020 – 2022)
- Awards & Special Recognition: Distinguished Professor of the Year, presented by the Notre Dame Law School Graduating Class of 2022; Recipient of the 2022 and 2021 Captain William O. McLean Student Award, presented by the Notre Dame Law School Graduating Classes; Recipient of the 2020, 2019, 2017, and 2015 Charles F. Crutchfield Professorial Award, presented by the Notre Dame Black Law Students Association); Recipient of the 2020 Rebecca W. Ward Appreciation Award, presented by the Notre Dame Black Law Students Association); Member of the 2021 University of Notre Dame All Faculty Team

**Veronica Root Martinez**                                                                          **Page 2 of 7**

## ACADEMIC APPOINTMENTS CONT'D.

**University of Maryland Francis King Carey School of Law**                         March 2026
*Donald B. Tobin Visiting Scholar in Business Ethics*

**Northwestern Pritzker School of Law**, Chicago, IL
*J.B. and M.K. Pritzker Family Foundation Visiting Professor*                        September 2021

**University of Pennsylvania Carey Law School**, Philadelphia, PA
*Visiting Professor of Law*                                                                        November 2021
   - Course:  Global Compliance

**University of Alabama School of Law**
*Adjunct*                                                                                              Fall 2023
   - Business Entities

## BOOKS

   - SECURITIES LITIGATION, ENFORCEMENT & COMPLIANCE (West 5th ed. 2023) (with others)
   - PROFESSIONAL RESPONSIBILITY:  A CONTEMPORARY APPROACH (West 6th ed. 2026) (with others)
   - BUILDING AN EFFECTIVE ETHICS AND COMPLIANCE PROGRAM (Edward Elgar) (*forthcoming*)
   - REFORMING THE CORPORATION: WHY SURFACE FIXES KEEP CORPORATIONS IN CRISIS (*in progress*)

## JOURNAL PUBLICATIONS & BOOK CHAPTERS

35. *Converging on Disclosure*, __ DUKE LAW JOURNAL ONLINE __ (*forthcoming* 2026) (with Emilie A. Aguirre)

34. *Regulating Decentralized Finance*, 111 MINNESOTA LAW REVIEW __ (*forthcoming* 2026) (with Gina-Gail S. Fletcher & Steven L. Schwarcz)

33. *The Miscalculation of Corporate DEI Risk*, __ UNIVERSITY OF PENNSYLVANIA LAW REVIEW __ (*forthcoming 2026*) (with Lisa Fairfax)
      - Featured in the February 2026 Edition of the ECGI Members' Debrief

32. *Purpose-Driven Compliance*, __ TEXAS A&M LAW REVIEW __ (*forthcoming 2026*)
      - Featured interview in the Human Risk Podcast
      - Featured in the Compliance Chronicles

31. *The Board's Education Through Compliance Consultants*, __ LAW & CONTEMPORARY PROBLEMS __ (*forthcoming 2026*)

30. *Independent Monitorships* in CAMBRIDGE HANDBOOK OF ORGANIZATIONAL CULTURE AND MISCONDUCT (B. van Rooij, N. Tobsch, and N. Lord) (forthcoming 2026)

29. *Diversity & Compliance* in CONCISE ENCYCLOPEDIA OF COMPLIANCE LAW (J. Fanto ed., Edward Elgar) (forthcoming 2026)

28. *Independent Compliance Monitors* in CONCISE ENCYCLOPEDIA OF COMPLIANCE LAW (J. Fanto es., Edward Elgar) (forthcoming 2026)

27. *Supreme Impropriety?  Assessing the Justices' Conduct*, 87 LAW & CONTEMPORARY PROBLEMS 147 – 181 (2024)

26. *Public Reporting of Monitorship Outcomes*, 136 HARVARD LAW REVIEW 757 – 823 (2023)
      - Selected for reprint in the 2023-2024 CORPORATE PRACTICE COMMENTATOR
      - One of the Top Twenty Articles for the 2023 Environmental Law and Policy Annual Review (link)
      - Featured interview on Faculti.Net
      - Featured:  Avalon Zappo, *US Trial Courts Issued More Pro-Employee Harassment Rulings After #MeToo, Study Says*, National Law Journal, (Dec. 26, 2023)

## JOURNAL PUBLICATIONS & BOOK CHAPTERS (CONT'D)

25. *#MeToo & The Courts: The Impact of Social Movements on Federal Judicial Decisionmaking*, 81 Washington & Lee Law Review Online 79 – 112 (2023) (with Carol T. Li & Matthew Hall)

24. *Reframing the DEI Case*, 46 SEATTLE LAW REVIEW 399 – 419 (2023) (13th Annual Berle Symposium)

23. *The Diversity Risk Paradox*, 75 VANDERBILT LAW REVIEW EN BANC 115 – 129 (2022)
    - Featured on the *Off the Page* Podcast

22. *Toward More Robust Self-Regulation within the Legal Profession*, 69 WASHINGTON UNIVERSITY JOURNAL OF LAW & Policy 241 – 273 (with Caitlin-Jean Juricic) (2022)

21. *Equality Metrics*, 130 YALE LAW JOURNAL FORUM 869 – 915 (2021) (with Gina-Gail S. Fletcher)
    - Featured in Jotwell: The Journal of Things We Like (Lots) Corporate Law section on July 23, 2021
    - Featured in Jotwell: The Journal of Things We Like (Lots) Work Law section on April 28, 2022

20. *A More Equitable Corporate Purpose* in RESEARCH HANDBOOK ON CORPORATE PURPOSE AND PERSONHOOD (E. Pollman & R. Thompson eds., Edward Elgar) (2021)

19. *The Role of Norms in Government Ethics*, 35 JOURNAL OF LAW, ETHICS & PUBLIC POLICY 771 – 793 (2021) (symposium organizer)

18. *On Being First, On Being Only, On Being Seen, On Charting a Way Forward*, 96 NOTRE DAME LAW REVIEW REFLECTION 215-220 (2021) (symposium co-organizer with Notre Dame Law Review)

17. *Third Party and Appointed Monitorships* in CAMBRIDGE HANDBOOK OF COMPLIANCE (B. van Rooij & D. Sokol eds., Cambridge University Press) (2021)

16. *Transnational Anti-Bribery Law* in CAMBRIDGE HANDBOOK OF COMPLIANCE (B. van Rooij & D. Sokol eds., Cambridge University Press) (2021) (with Kevin E. Davis)

15. *Avoiding Judicial Discipline*, 115 NORTHWESTERN LAW REVIEW 953-986 (2020)
    - Featured in Jotwell: The Journal of Things We Like (Lots) Courts Law section on May 20, 2020

14. *Complex Compliance Investigations*, 120 COLUMBIA LAW REVIEW 249-307 (2020)
    - Discussed *Complex Compliance Investigations* as part of "The ESG Beat," a component of the Sustainable Capitalism & ESG course at Berkeley Law's Executive Education program (online link)
    - Republished as Veronica Root Martinez, *Investigações Complexas de Compliance* [*Complex Compliance Investigations*], 4(14) Revista Científica do CPJM 14 (2025)
    - Cited in *J.C. v. Horizon Medical Corp., P.C.*, No. 20 CV 1222, 2021 WL 4730410 (Pa.Com.Pl. Oct. 08, 2021)

13. *The Government's Prioritization of Information over Sanction: Implications for Compliance*, 83 LAW & CONTEMPORARY PROBLEMS 85-111 (2020)
    - Featured in CORPORATE CRIME REPORTER, Volume 34, Issue 45 (Nov. 23, 2020).

12. *More Meaningful Ethics*, UNIVERSITY OF CHICAGO LAW REVIEW ONLINE (January 7, 2020) (online symposium) (symposium organizer)

11. *Investigating Intersections of Corporate Governance & Compliance*, UNIVERSITY OF CHICAGO LAW REVIEW ONLINE (January 7, 2020) (introduction to online symposium)

10. *Combating Silence in the Profession*, 105 VIRGINIA LAW REVIEW 806-863 (2019)
    - Featured in Jotwell: The Journal of Things We Like (Lots) Legal Profession section on May 20, 2020

9. *The Compliance Process*, 94 INDIANA LAW JOURNAL 203-251 (2019)
    - Featured on the Business Scholarship Podcast

8. *The Outsized Influence of the FCPA?*, 2019 ILLINOIS LAW REVIEW 1205-1225 (2019)

7. *Coordinating Compliance Incentives*, 102 CORNELL LAW REVIEW 1003-1085 (2017)

6. *Constraining Monitors*, 85 FORDHAM LAW REVIEW 2227-2247 (2017)

**Veronica Root Martinez**                                                                                        **Page 4 of 7**

## JOURNAL PUBLICATIONS & BOOK CHAPTERS (CONT'D)

5. *Modern-Day Monitorships*, 33 YALE JOURNAL ON REGULATION 109-164 (2016)
   ▪ Featured in Jotwell: The Journal of Things We Like (Lots) Corporate Law section on June 24, 2016
   ▪ Cited in 26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd., 309 A.3d 434 (Del. Ch. 2023)
   ▪ Cited in In re Oxbow Carbon LLC Unitholder Litig.,  No. CV 12447-VCL, 2018 WL 3655257 (Del. Ch. Aug. 1, 2018), vacated sub nom. Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC, 202 A.3d 482 (Del. 2019)

4. *The Monitor-"Client" Relationship*, 100 VIRGINIA LAW REVIEW 523-585 (2014)
   ▪ Selected for reprint in the 2014-2015 CORPORATE PRACTICE COMMENTATOR
   ▪ Cited in *Tokar v. U.S. Dep't of Justice*, No. 16–2410, 2018 WL 1542320 (Mar. 29, 2018) (mem.)

3. *Retaining Color*, 47 UNIVERSITY OF MICHIGAN JOURNAL OF LAW REFORM 575-643 (2014)

2. *Somebody's Watching Me:  FCPA Monitorships and How They Can Work Better*, 13 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 321-381 (2011) (with F. Joseph Warin & Michael S. Diamant)

1. *Angelina and Madonna – Why all the Fuss? An Exploration of the Rights of the Child and Intercountry Adoption within African Nations*, 8 CHICAGO JOURNAL OF INTERNATIONAL LAW 323-354 (Summer 2007) (development)

## WORKS IN PROGRESS

- *Collaborative Compliance* (with Kevin E. Davis)
  ▪ Selected for presentation at the 2026 American Law and Economics Association (ALEA) conference
- *Profiting from Prediction* (with Emilie Aguirre & Gina-Gail S. Fletcher)
- *From Artificial to Deliberative Compliance* (with Geeyoung Min)
- *Crime and Punishment:  Corporate Criminal Prosecution and Corporate Misconduct* (with Syrena Shirley)
- *Guarding Purpose* (with Emilie Aguirre)
- *Middle Management:  A Mission Critical Risk*
- *The Corporate Trauma of Corporate Purpose* (with Elise Bernlohr Maizel)
- *Building a Culture of Ethical Inclusion*

## BLOG POSTS & OP EDS

- *Binance Probe Exemplifies the Perils of 'Surface Remediation'*, BLOOMBERG LAW (Mar. 5, 2026)
- *The Miscalculation of Corporate DEI Risk*, THE COMPLIANCE & ENFORCEMENT BLOG (March 4, 2026)
- *How Boards Can Make the Most of Compliance Consultants,* THE CLS BLUE SKY BLOG (MARCH 4, 2026)
- *Independent Monitorships, Corporate Culture, and the Limits of Compliance Reform*, THE CLS BLUE SKY BLOG (Feb. 11, 2026)
- *Purpose-Driven Compliance*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (Feb. 4, 2026)
- *Are Corporate Monitors Really "Off the Table"? Not Quite.,* THE COMPLIANCE & ENFORCEMENT BLOG (Jan. 22, 2026)
- *A Reflection on the OECD's Report (Part II): Governments' Assessments of Corporate Anti-Corruption Compliance*, THE COMPLIANCE & ENFORCEMENT BLOG (June 24, 2025) (with Liz Carrasco)
- *A Reflection on the OECD's Report (Part I): Companies' Assessments of Anti-Corruption Compliance*, THE COMPLIANCE & ENFORCEMENT BLOG (June 13, 2025) (with Liz Carrasco)
- *Do the DOJ's Sticks and Carrots Actually Work?*, THE COMPLIANCE & ENFORCEMENT BLOG (July 11, 2023)
- *How Behavioral Ethics Might Improve DEI Initiatives*, THE CLS BLUE SKY BLOG (June 26, 2023)
- *A Better Understanding of How to Improve Demographic Diversity in Federal Appellate Law Clerk Hiring*, Legal Profession section of Jotwell:  The Journal of Things We Like (Lots) (Feb. 17, 2023)

**Veronica Root Martinez**                                                                **Page 5 of 7**

## BLOG POSTS & OP EDS (CONT'D)

- *Public Reporting of Monitorship Outcomes*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (Mar. 9, 2023)
- *The Compliance Professional? An Interesting Puzzle*, Legal Profession section of Jotwell: The Journal of Things We Like (Lots) (Mar. 9, 2021)
- *Equality Metrics*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (March 19, 2021)
- *Compliance Implications of the Government's Pursuit of Information*, THE COMPLIANCE & ENFORCEMENT BLOG (March 18, 2021)
- *A Weakened Supreme Court Needs a Code of Ethics*, BLOOMBERG LAW (Nov. 5, 2020)
- *Legal Elites Serving the Poor (Or Not?)*, Legal Profession section of Jotwell: The Journal of Things We Like (Lots) (Feb. 20, 2020)
- *More Meaningful Ethics*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (Dec. 10, 2019)
- *Improving Assessments of Compliance Failures*, COMPLIANCE & ETHICS PROFESSIONAL MAGAZINE, 26Zf 31 (July 2019)
- *Teaching Compliance I, II, & III*, THE COMPLIANCE & ENFORCEMENT BLOG (Apr./May, 2019)
- *Complex Compliance Investigations*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (Apr. 29, 2019)
- *Assessing Why Compliance Programs Fail*, THE CLS BLUE SKY BLOG (Mar. 26, 2019)
- *Will This One Stick?*, THE COMPLIANCE & ENFORCEMENT BLOG (Apr. 23, 2018)
- *Repeat Corporate Misconduct*, THE COMPLIANCE & ENFORCEMENT BLOG (Apr. 20, 2018)
- *Coordinating Compliance Incentives*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (Oct. 27, 2017)
- *Corporate Monitors Need Better Regulation*, THE CLS BLUE SKY BLOG (Oct. 19, 2017)
- *What Does it Mean to be a Monitor?*, THE COMPLIANCE & ENFORCEMENT BLOG (Sept. 21, 2016)
- *Greater Transparency in Monitor Reports: An Unintentional Result?*, THE COMPLIANCE & ENFORCEMENT BLOG (June 15, 2016)
- ABA SECTION OF CRIMINAL JUSTICE, PRACTICING UNDER THE FEDERAL SENTENCING GUIDELINES, *Chapter Seven: Determining the Sentence* (5th ed. 2010) (6th ed. 2011)
- FROM FOSTER CARE TO ADULTHOOD: THE UNIVERSITY OF CHICAGO LAW SCHOOL FOSTER CARE PROJECT'S PROTOCOL FOR REFORM (2008) (with Emily Buss, Whitney A. Cox, Sarah E. Crane, Marlo M. Del Percio, Andrea C. Forton, Kathleen Hill, Anne W. King, Allison A. Lee, Alison R. Leff, Mary C. Lovejoy, Gwendolyn Baxter Morales, Heidi E. Mueller)

## INVITED PRESENTATIONS & COMMENTARY (REPRESENTATIVE LIST)

*Purpose-Driven Compliance* (March 2026)
- Public lecture on how organization can move from enforcement-driven compliance programs and toward purpose-driven compliance program at the University of Maryland Francis King Carey School of Law.

*From Reaction to Resilience: A New Vision for Corporate Ethics & Compliance* (January 2026)
- Public lecture on how organizations can build ethics and compliance programs that genuinely prevent misconduct rather than simply respond to regulatory pressure at Case Western Reserve University.

*Duke Law Alumnae Leadership Council* (March 2024)
- Panelist for session with the Duke Law Alumnae Leadership Council, an active network of Duke Law women graduates

**Veronica Root Martinez**                                                  **Page 6 of 7**

## INVITED PRESENTATIONS & COMMENTARY (REPRESENTATIVE LIST) (CONT'D)

*Judges in the 21st Century: Confidence Lost? Symposium* (December 2023)
- Discussant on potential reforms to ethics for the supreme court; Stein Center for Law and Ethics, Fordham Law

*Effective and Efficient Compliance Programs* (October 2023)
- Panelist on how to create effective compliance programs; Shinshu University & Embassy of Japan's 5th Workshop on White Collar Crime

*The Impact of Compliance on Trust within Organizations* (August 2023)
- Panelist discussing how accepting small amounts of misconduct can lead to more within organizations; Oxford University Centre for Corporate Reputation

## CONFERENCES & SYMPOSIA ORGANIZED

- The Compliance Forum (January 2026), Durham, NC
- The Limits of Compliance as a Regulatory Tool for Businesses: A Comparative Approach Across France, the EU, and the US (May 2025), Paris, France (co-organizer)
- Compliance Roundtable (January 2023), Durham, NC
- Disclosure Roundtable (August 2021), Chicago, IL
- The Ethics of Government Service (Feb. 2021), Notre Dame, IN
- Building a More Inclusive NDLS (2021), Notre Dame, IN
- Equity Roundtable (Oct. 2019), Chicago, IL
- Investigating Intersections of Corporate Governance & Compliance (Apr. 2019), London, UK
- Governance Roundtable (Sept. 2018), Chicago, IL
- The Sexual Harassment Project (May 2018), Notre Dame, IN
- Compliance & Organizational Change Workshop (Apr. 2018), Notre Dame, IN

## PROFESSIONAL EXPERIENCE

**Organisation for Economic Co-operation and Development (OECD)**
*Strengthening Compliance Assessments Initiative, Lead Consultant*                     2024
- STRENGTHENING GOVERNMENT CAPACITY TO ASSESS AND ACCOUNT FOR CORPORATE ANTI-CORRUPTION COMPLIANCE MEASURES AND PROGRAMMES (March 2024) (with OECD)
- GOVERNMENTS' ASSESSMENTS OF CORPORATE ANTI-CORRUPTION COMPLIANCE, OECD (2025)
- COMPANIES' ASSESSMENTS OF ANTI-CORRUPTION COMPLIANCE, OECD (2025)

**U.S. Court of Appeals for the Fifth Circuit**, Shreveport, LA
*Judicial Clerk to Judge Carl E. Stewart*                     2008 – 2009

**Gibson Dunn**, Washington, D.C.
*Associate*                     2009 – 2012
    Represented clients in regulatory, white collar, and appellate matters; drafted letter briefs and obtained asylum for two pro bono clients

## BAR ADMISSIONS

District of Columbia (active), Illinois (inactive), U.S. Court of Appeals for the Fifth Circuit, and the U.S. District Court for the District of Columbia.

**Veronica Root Martinez**                                                **Page 7 of 7**

## BOARD SERVICE

**Finance Committee of the Board of Trustees, Duke University**          2025 – 2026
Finance Committee Member; Capital Subcommittee Member

**Durham Center for Senior Life**                                        2023 – 2026
Board Member; Governance Committee (Chair 2024 – 2026)

**National Adjudicatory Council, Financial Industry Regulatory Authority (FINRA)**          2021 – 2024
*Member*

**Red Cross of Northern Indiana**                                        2016 – 2017
*Board Member*

**African-American Alumni Advisory Board, Georgetown University**        2010 – 2012
*Board Member*

**Patrick Healy Fellows Program, Georgetown University**                 2009 – 2012
*Board Member*

## MEMBERSHIPS & SERVICE

**American Bar Foundation (ABF),** Fellow                                2025 - present

**European Corporate Governance Institute (ECGI),** Research Member      2025 - present

**American Law Institute (ALI),** Member                                 2024 - present
Members Consultative Group, Restatement of the Law, Corporate Governance

**American Bar Association**
Standing Committee on Ethics and Professional Responsibility, Member     2024 – 2027
Center for Professional Responsibility, Member                          2013 - present

**Society of Corporate Compliance & Ethics**, Member                    2018–present

**American Association of Law Schools**                                  2012 – present
Executive Committee 2018 – 2021, AALS Section on Professional Responsibility;
AALS Section on Minority Groups; AALS Section on Business Associations

**Referee Activity**
*Duke Law Journal*, Reviewer (2024 – present); *Northwestern University Law Review*, Peer Review Board Member
(2017 – 2021); *Law & Social Inquiry*, Reviewer (2018 – 2019)

## EXPERT WITNESS ENGAGEMENTS

- *In re Abbott Laboratories Infant Formula Shareholder Derivative Litigation*, No. 1:22-cv-5513 (governance and compliance expert on behalf of the plaintiff)
- *Oklahoma Firefighters Pension & Ret. Sys. v. Calhoun*, No. 1:24-cv-01200 (LMB/LRV) (compliance expert on behalf of the plaintiff)
- *In re Facebook Inc. Derivative Litigation*, Consolidated C.A. No. 2018-0307-JTL (compliance expert on behalf of the plaintiff)
- *PennEnvironment, Inc. & Clean Air Council v. United States Steel Corporation*, No. 2:19-cv-00484 (monitor and monitorship expert on behalf of the plaintiff)
- *Newsome v. Cooper, et al*, No.: CV-2015-900190 (legal ethics expert on behalf of the plaintiff)