**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE ABBOTT LABORATORIES INFANT FORMULA SHAREHOLDER DERIVATIVE LITIGATION | ) Case No. 1:22-CV-05513<br>) Hon. Sunil R. Harjani<br>) Hon. Laura K. McNally |

**LEAD PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES**

Carol V. Gilden
COHEN MILSTEIN SELLERS & TOLL, PLLC
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Telephone: 312-357-0370
cgilden@cohenmilstein.com

Richard A. Speirs
Amy Miller
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: 212-828-7797
rspeirs@cohenmilstein.com
amiller@cohenmilstein.com

Steven J. Toll
Molly Bowen
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., NW, Eighth Floor
Washington, DC 20005
Telephone: 202-208-2600
stoll@cohenmilstein.com
mbowen@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

*[Additional counsel on signature page.]*

Justin O. Reliford
Elizabeth K. Dragovich
Karen Kam
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
222 Delaware Ave., Suite 1405
Wilmington, DE 19801
Telephone: 302-578-7345
jreliford@scott-scott.com
edragovich@scott-scott.com
kkam@scott-scott.com

Maxwell R. Huffman
SCOTT+SCOTT ATTORNEYS
AT LAW LLP
600 W. Broadway Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
mhuffman@scott-scott.com

Jing-Li Yu
Melissa May
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
jyu@scott-scott.com
mmay@scott-scott.com

Geoffrey M. Johnson
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
gjohnson@scott-scott.com

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................................1

II.    ARGUMENT .......................................................................................................................3

    A. The Common Benefit Doctrine Authorizes Attorneys' Fees for Nonmonetary Recoveries that Benefit a Group ..................................................................................................................3

    B. Lead Plaintiffs and Their Counsel Conferred a Substantial Benefit upon Abbott and Its Shareholders ...........................................................................................................................4

    C. In Common Benefit Cases, Courts Have Endorsed Various Methods to Value Nonmonetary Recoveries ...............................................................................................................6

    D. The Fee Request is Proper Under the Lodestar Method ............................................8

       1. Lead Plaintiffs' Counsel's Hourly Rates Are Reasonable ..............................................9

       2. The Time Expended Was Necessary and Drove the Results Achieved ...............................13

       3. The Requested Lodestar Multiplier Falls Within the Range Approved by Courts ..............21

III.   CONCLUSION ..................................................................................................................23

i

## TABLE OF AUTHORITIES

**Cases**

*Allison v. Oak Street Health, Inc., et al.*,
No. 1:22-cv-00149, ECF No. 189 (N.D. Ill. Nov. 7, 2024) ...........................................................22

*Allison v. Oak Street Health, Inc., et al.*,
No. 1:22-cv-00149, ECF No. 195 (N.D. Ill. Dec. 12, 2024) ..........................................................22

*City of Pontiac Gen. Emps.' Ret. Sys. v. Langone*,
No. 2006-cv-122302 (Ga. Super. Ct. Fulton Cnty. June 10, 2008) ...............................................13

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) ...........................................................................................22

*Florin v. Nationsbank of Georgia, N.A.*,
34 F.3d 560 (7th Cir. 1994) .............................................................................................................8

*Flynn v. Exelon Corp., et al.*,
No. 1:19-cv-08209, ECF No. 210 (N.D. Ill. Aug. 3, 2023) ...........................................................22

*Gastineau v. Wright*,
592 F.3d 747 (7th Cir. 2010) ...........................................................................................................8

*Hall v. Cole*,
412 U.S. 1 (1973) .............................................................................................................................3

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .........................................................................................................6

*Harman v. Lyphomed, Inc.*,
945 F.2d 969 (7th Cir. 1991) .........................................................................................................21

*Intuitive Surgical S'holder Derivative Litig.*,
No. CIV-526930 (Super. Ct. San Mateo Cnty. Sept. 20, 2017) ......................................................8

*In re Abbott-Depakote S'holder Derivative Litig.*,
No. 1:11-cv-08114, ECF No. 332 (N.D. Ill. May 22, 2014) ......................................................7, 21

*In re Abbott-Depakote S'holder Derivative Litig.*,
No. 1:11-cv-08114, ECF Nos. 322-1, 322-2 (N.D. Ill. Apr. 24, 2014).......................................7, 22

*In re Alta Mesa Res., Inc. Sec. Litig.*,
No. 4:19-cv-00957, ECF No. 1024-5 (S.D. Tex. Mar. 26, 2025) ..................................................12

*In re Altria Grp., Inc. Derivative Litig.*,
No. 3:20-cv-00772, ECF Document 179, ECF No. 180 (E.D. Va. Feb. 20, 2023) .......................12

*In re EQT Corp. Sec. Litig.*,
No. 2:19-cv-00754, ECF Nos. 557-7, 557-8 (W.D. Pa. Sep. 25, 2025)..................................................9

*In re Facebook Inc. Shareholder Litig.*,
No. 2018-0307-KSJM, Trans ID. 78978825 (Del. Ch. Apr. 7, 2026)..................................................10

*In re Facebook Inc. Shareholder Litig.*,
No. 2018-0307-KSJM, Trans. ID 78426197 (Del. Ch. Feb. 16, 2026)..................................................10

*In re Grupo Televisa Sec. Litig.*,
No. 1:18-cv-01979-LLS, ECF No. 356 (S.D.N.Y. July 3, 2023)..................................................12

*In re InnovAge Sec. Litig.*,
No. 1:21-cv-02770, ECF No. 208 (D. Colo. Dec. 17, 2025)..................................................10

*In re InnovAge Sec. Litig.*,
No. 1:21-cv-02770, ECF No. 203-6 (D. Colo. Oct. 22, 2025)..................................................10

*In re King Pharms., Inc. Deriv. Litig.*,
No. BOO19077 (Tenn. Ch. Ct., Sullivan Cnty.)..................................................13

*In re Kraft Heinz Sec. Litig.*,
No. 1:19-cv-01339, ECF No. 482-1 (N.D. Ill. Aug. 8, 2023)..................................................22

*In re Marelli Auto. Lighting USA LLC*,
No. 25-11034-CTG, ECF No. 1917 (Bankr. D. Del. Apr. 10, 2026)..................................................11

*In re Office Props. Income Tr.*,
No. 25-90530-CML, ECF No. 944 (Bankr. S.D. Tex. Mar. 11, 2026)..................................................11

*In re Pfizer Inc. S'holder Derivative Litig.*,
780 F. Supp. 2d 336 (S.D.N.Y. 2011)..................................................4, 12, 13

*In re Silvergate Cap. Corp. Sec. Litig.*,
No. 3:22-cv-01936-JES-MSB, ECF No. 145 (S.D. Cal. July 30, 2025)..................................................10

*In re TikTok, Inc. Consumer Priv. Litig.*,
617 F. Supp. 3d 904 (N.D. Ill. 2022)..................................................21

*In re Walgreen Co. Derivative Litig.*,
No. 1:13-cv-05471, ECF No. 73 (N.D. Ill. Dec. 16, 2014)..................................................22

*Jeffboat, LLC v. Dir., Off. of Workers' Comp. Programs*,
553 F.3d 487 (7th Cir. 2009)..................................................12

*Jien v. Perdue Farms, Inc.*,
No. 1:19-cv-02521, ECF No. 1012 (D. Md. June 5, 2025)..................................................10

*Jien v. Perdue Farms, Inc.*,
No. 1:19-cv-02521, ECF No. 993-3 at 4 (D. Md. May 13, 2025) ......................................................10

*Lambrecht v. Taurel*,
2010 WL 2985946, at *3 (S.D. Ind. June 8, 2010), *report and recommendation adopted*,
2010 WL 2985943 (S.D. Ind. July 27, 2010) ........................................................................21

*Leventhal v. Chegg, Inc., et al.*,
No. 5:21-cv-09953-PCP, ECF No. 195-4 (N.D. Cal. Feb. 27, 2025)......................................12

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970)....................................................................................................3, 4

*Pacific Steel Group v. Commercial Metals Co.*,
No. 4:20-cv-07683-HSG, ECF No. 562 (N.D. Cal. Sept. 29, 2025) ....................................10

*Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
No. 1:16-cv-5198, ECF No. 162 (N.D. Ill. Dec. 6, 2019)......................................................22

*Rensin Joint Tr. v. Array Digit. Infrastructure, Inc.*,
No. 1:23-cv-02764-MMR, ECF No. 82-8 (N.D. Ill. July 30, 2025)........................................9

*Rensin Joint Tr. v. Array Digit. Infrastructure, Inc.*,
No. 1:23-cv-02764-MMR, ECF No. 93 (N.D. Ill. Sep. 4, 2025)............................................9

*Rudi v. Wexner*,
No. 2:20-cv-03068, ECF No. 46 (S.D. Ohio May 16, 2022) .........................................*passim*

*Rudi v. Wexner*,
No. 2:20-cv-03068, ECF No. 25-5 (S.D. Ohio Dec. 14, 2021) ..............................................7

*Rudi v. Wexner*,
No. 2:20-cv-03068, ECF No. 26-2 (S.D. Ohio Dec. 14, 2021) ............................................11

*Russo et al. v. Walgreen Co.*,
No. 1:17-cv-02246, ECF No. 702-1 (N.D. Ill. Mar. 4, 2025) ..............................................11

*Russo et al. v. Walgreen Co.*,
No. 1:17-cv-02246, ECF No. 806 (N.D. Ill. Mar. 30, 2026)................................................11

*Seafarers Pension Plan v. Boeing*,
No. 1:19-cv-0809, ECF No. 58-2 (N.D. Ill. Nov. 15, 2022) ..................................................7

*Sheet Metal Workers' Nat'l Pension Fund v. Bayer*,
No. 3:20-cv-04737, ECF No. 270-6 (N.D. Cal. Sep. 25, 2025)............................................10

*Sheet Metal Workers' Nat'l Pension Fund v. Bayer*,
No. 3:20-cv-04737, ECF No. 279 (N.D. Cal. Oct. 31, 2025)................................................10

*Wong v. Accretive Health, Inc.*,
2014 WL 7717579 (N.D. Ill. Apr. 30, 2014) ...................................................................................22

*Wong v. Accretive Health, Inc.*,
No. 12-cv-03102, ECF No. 73 (N.D. Ill. Dec. 13, 2013).................................................................22

### Other Authorities

Becky Yerak, *Bankruptcy Lawyer Rates Top $3,000 an Hour*,
WALL STREET J. (Dec. 30, 2025) ...................................................................................................11

Debra Cassens Weiss, *Nearly $1,000 an hour is rate for second-year associates at these BigLaw firms*, ABA J. (Apr. 3, 2023)......................................................................................................11

Roy Strom, *Kirkland & Ellis Seizes New $3 Billion Business: Litigation*,
WALL STREET J. (Oct. 30, 2025) ...................................................................................................11

Sudha Mathew, Salma Ibrahim & Stuart Archbold,
*Corporate Governance and Firm Risk*, 18 Corp. Governance 52 (2018) ....................................7

## I.     INTRODUCTION

Lead Plaintiffs' Counsel respectfully submit this supplemental brief in support of their attorneys' fee request. Lead Plaintiffs' Counsel incorporate their prior briefing, exhibits, and oral argument, and provide this brief to address the particular items on which the Court requested additional information and examples.

The Settlement confers a substantial benefit on Abbott and its shareholders. This was underscored by the Court's findings in approving the Settlement, finding that the reforms and expenditures "go above and beyond the consent decree . . . to ensure that the Sturgis plant abides by the highest food safety principles, has the quality control testing and reporting up the chain along with the third-party review process." Transcript of June 4, 2026 Final Approval Hearing ("Final Approval Tr.") at 32. Defense counsel likewise acknowledged the Settlement's significance, describing "serious, meaningful changes" at Abbott that are "real in terms of commitment of both monetary sources and time by the company, its executives and also by the directors." *Id.* at 11. These results are a direct product of Lead Plaintiffs' Counsel's four-year investment of time and resources, undertaken entirely on a contingent basis while overcoming significant procedural hurdles and vigorous opposition from three leading defense firms.

Notably, the parties conducted settlement and fee negotiations under the auspices of two nationally recognized mediators, the Hon. Daniel Weinstein (Ret.) and Jed Melnick, Esq. (the "Mediators"). As the Supplemental Mediators' Declaration attests, this hard-fought litigation required high-level advocacy and mastery of complex subject matter, resulting in a settlement that is directly responsive to the allegations giving rise to the litigation. The Mediators were fully informed about the litigation's strengths and risks, the quality and vigor of the advocacy, and the benefit conferred on Abbott by the Settlement, and they concluded that "[t]he excellent result achieved was driven by the time, resources and commitment devoted by all Parties." Exhibit 1, Supplemental Joint Decl. of the

1

Hon. Daniel Weinstein (Ret.) and Jed D. Melnick in Further Support of Motion for an Award of Attorneys' Fees ("Supp. Mediators' Decl.") ¶11. After the substantive settlement terms were finalized and the parties turned to fee negotiations, the Mediators received information regarding Lead Plaintiffs' Counsel's lodestar, comparable fee awards, and the risks undertaken. Based on their knowledge of the litigation, the Settlement's benefits and the basis for each party's fee request, and after adversarial fee negotiations reached an impasse, the Mediators recommended a $15.85 million all-in sum. This Proposal reflected "the benefits of the settlement and the demonstrably difficult and time-consuming work Lead Counsel undertook to achieve it." *Id.* ¶15.

Courts in this district typically determine attorney's fees based on a percentage of the benefit, but where that proves challenging, to ease the burden on the court, it may consider a lodestar approach. Under either a percent of the settlement valuation method or a lodestar analysis, the requested fee is reasonable and should be approved.[1]

***Valuation of Non-Monetary Recovery***: To determine the value of a benefit conferred when that benefit is a non-monetary recovery, courts often analyze settlement value through a reduction-of-risk framework. As requested by the Court, this brief provides additional examples of shareholder derivative cases employing this approach.

***Lodestar***: The lodestar analysis principally considers two inputs: total hours worked and hourly rates. As detailed below, the total hours are consistent with comparable shareholder derivative cases, and the time expended at each litigation stage was appropriate and reasonable. The hourly rates are consistent with rates regularly approved in this District and in comparable cases nationally.

---

[1] As the Court has already approved the reimbursement of counsel's expenses, which totaled $446,128.97 and service awards, which total $30,000, Lead Plaintiffs' Counsel's requested attorney fee is $15,373,871. As detailed below, the requested fee award is reasonable and appropriate.

The requested fee award also falls well within the range of lodestar multiples approved in comparable derivative cases, including cases resolved for a combination of a targeted funding commitment with additional corporate governance reforms, or those resolved exclusively for non-monetary terms. The requested fee reflects a modest lodestar multiplier of only 1.22, where precedent supports substantially higher multipliers.

And despite close scrutiny of this high-profile case—including from more than 20 other investors who made shareholder demands or filed lawsuits—not a single objection was filed to the Settlement or attorneys' fee request, a testament to the Settlement's quality and the fee request's reasonableness.

For these reasons, the Court should approve the requested Attorneys' Fee Award and enter a final order and judgment as reflected in Exhibit B to the Stipulation. ECF No. 267-1, Ex. B.

## II. ARGUMENT

### A. The Common Benefit Doctrine Authorizes Attorneys' Fees for Nonmonetary Recoveries that Benefit a Group

When litigation produces a benefit to a group, the cost of that litigation may be spread across the beneficiaries. When the benefit is a collective pool of money, courts award fees under the "Common Fund" doctrine. But "a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature"—and in the case of such non-monetary recoveries, courts award fees under the "Common Benefit" doctrine.[2] *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970).

---

[2] The "Common Benefit" doctrine derives from the "Common Fund" doctrine. *See Hall v. Cole*, 412 U.S. 1, 5 n.7 (1973) (explaining the common benefit doctrine's "origins in the 'common fund' cases" and affirming award of attorneys' fees to plaintiff that obtained non-monetary relief that inured to the benefit of all members of his labor union).

"[A] substantial benefit must be something more than technical in its consequence and be one that accomplishes a result which . . . affect[s] the enjoyment or protection of an essential right to the [party's] interest." *Mills*, 396 U.S. at 396 (citation modified). Thus, courts routinely find robust corporate governance reforms, like those achieved here, to be a "substantial benefit" supporting an award of attorneys' fees. *See, e.g.*, *Rudi v. Wexner*, No. 2:20-cv-03068, ECF No. 46 at 10 (S.D. Ohio May 16, 2022) (finding "that the Settlement confers a substantial benefit on Settling Shareholders" because "the corporate governance reforms that are included in the Settlement will be meaningful in preventing any future misconduct"); *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 343 (S.D.N.Y. 2011) ("it is well-established that plaintiffs who confer a corporate benefit may be awarded attorneys' fees and expenses" and corporate governance reforms "separate and apart from any monetary award . . . will provide significant corporate benefits").

**B. Lead Plaintiffs and Their Counsel Conferred a Substantial Benefit upon Abbott and Its Shareholders**

As the Court recognized in approving the Settlement, the $40 million CapEx commitment and corporate governance reforms create "value to the shareholders." Final Approval Tr. at 11. The Court found that the reforms and expenditures:

> . . . go above and beyond the consent decree that has already been negotiated . . . are done to ensure that the Sturgis plant abides by the highest food safety principles, has the quality control testing and reporting up the chain along with the third-party review process will help ensure that shareholder value is maintained and not negatively affected as a result of issues at this particular plant.

*Id.* at 32. The Settlement directly addresses issues not covered by the Consent Decree: enhancements at the Board and Committee level to improve oversight for quality assurance and regulatory compliance for all of Abbott's products, beyond just infant formula; review of internal and external complaint procedures to ensure attention to critical whistleblower complaints; clear escalation procedures for positive *Cronobacter* findings in finished product; additional Quality Assurance presentations to the PPC on an annual basis; factory-level reform at all of Abbott's infant formula

4

manufacturing sites to ensure high quality standards at all of the facilities; strengthened Board recruitment and education requirements to emphasize the importance of quality assurance and regulatory compliance; and more.

As defense counsel acknowledged, the Settlement involves "serious, meaningful changes" at Abbott. Final Approval Tr. at 11. The settlement is "real in terms of commitment of both monetary sources and time by the company, its executives and also by the directors." *Id.* The reforms "involve considerable investments of time and money over and beyond what the consent decree required," including, among other things, the "40 million capital expenditure . . . additional testing requirements, additional training resources that are available to the board members, reporting." *Id.*

These observations are consistent with the findings of corporate governance expert Professor Veronica Root-Martinez. The Settlement "ensures compliance issues are elevated, contextualized, and repeatedly presented to senior leadership and the Board"; improves the "relevance and usability" of information provided to Abbott's Board, "thereby enabling more informed, active, and effective oversight of safety and compliance at the operational level"; "embed[s] compliance and quality issues into regular, structured reporting cycles"; and provides "systematic aggregation of complaints, hotline reports, and other indicators of potential misconduct [that] allows both management and the Board to identify trends, assess whether issues are recurring or systemic, and allocate attention and resources accordingly." Declaration of Professor Veronica Root-Martinez (ECF No. 281-4) ("Root-Martinez Decl.") ¶¶7, 8, 10, 12. As to aspects of the Consent Decree extended in duration or scope, Professor Root-Martinez found that the Settlement "is likely to promote a sustained culture of compliance at the facility level by reinforcing compliance norms over time," which "is critical because cultural change within organizations does not occur immediately; it develops through repeated exposure, reinforcement, and gradual normalization of expected behaviors." *Id.* ¶¶13-14. In sum, the "reforms are reasonably likely to strengthen oversight and promote a sustained culture of compliance across

5

Abbott's operations. Taken together, the combination of board-level reforms and facility-level compliance requirements addresses both the informational and cultural dimensions of compliance, increasing the likelihood of meaningful and durable change." *Id.* ¶19.

Based on this substantial benefit, as well as the time it took to achieve the result, the requested fee amount was proposed by the neutral Mediators who helped the parties resolve the matter. Exhibit 1, Supp. Mediators' Decl. ¶12. The Mediators were fully informed when they proposed an all-in award of $15.85 million for attorneys' fees, expenses, and service awards. As the Mediators' Supplemental Declaration reflects, they were well-informed about Lead Plaintiffs' Counsel's work in the litigation, including a rare victory on a motion to dismiss and the Special Litigation Committee ("SLC") motion for a stay. *Id.* ¶7. They witnessed vigorous negotiations for the best possible settlement, involving the most senior partners on both sides at all hours and on weekends and holidays. The Mediators also received briefing on the fee request, including comparable cases and lodestar information. *Id.* ¶¶12-13. The Mediators' fee proposal is thus the product of highly respected mediators with deep knowledge of the case, warranting deference. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (holding that it was proper for the court to rely "on the mediator as independent confirmation that the fee was not the result of collusion or a sacrifice of the interests of the class, an inquiry the court was required to make").

### C. In Common Benefit Cases, Courts Have Endorsed Various Methods to Value Nonmonetary Recoveries

In common benefit cases, courts routinely look to economic analysis as a proxy for the settlement value.[3] This analysis often considers how the settlement's corporate governance terms will

---

[3]    Some courts ground settlement valuation in a dollar figure that the nominal defendant company agrees to commit to funding a settlement. While this case does not specify a dollar figure for funding the Reforms, the Company has committed to fund whatever number is necessary to effectuate the Settlement in addition to the $40 million CapEx commitment. *See* Settlement Stipulation, ¶ 2.2, Exhibit A at 1. ECF No. 267-1.

reduce the risk the nominal defendant company faces of a similar corporate trauma reoccurring. As Professor Root-Martinez noted, "[e]mpirical evidence indicates that enhanced corporate governance—particularly more robust board structures and processes—is associated with reduced firm risk." Root-Martinez Decl. ¶16 (citing Sudha Mathew, Salma Ibrahim & Stuart Archbold, *Corporate Governance and Firm Risk*, 18 Corp. Governance 52 (2018)). Because corporate governance reforms are case-specific and tailored to address the particular conduct at issue, comparisons across cases are necessarily more nuanced than in class actions involving purely monetary recoveries. Nonetheless, courts have approved attorneys' fees using similar valuation methods as Lead Plaintiffs submitted here.

For example, in *Rudi*, the court granted the requested $21 million in attorneys' fees, finding that the corporate governance reforms were estimated to produce a $100 million increase in shareholder value. No. 20-cv-03068, ECF No. 46 at 10. The court relied on an expert declaration analyzing settlement value based on reduction in likelihood of recurrence by analyzing loss of market capitalization upon revelation of the corporate misconduct alleged in the case. *Id.*, ECF No. 25-5 (Dec. 14, 2021).

In *Abbott-Depakote Shareholder Derivative Litigation*, over a decade ago, this Court granted the $9.9 million attorneys' fee request following plaintiffs' submission of one expert declaration describing the "significant value" of the corporate governance terms and a second expert declaration providing an economic evaluation finding the terms worth over $800 million due to reduced likelihood of recurring violations. No. 1:11-cv-08114, ECF No. 332 (N.D. Ill. May 22, 2014) (order); ECF Nos. 322-1, 322-2 (Apr. 24, 2014) (expert declarations). This fee request would be considerably higher when adjusted for today's dollars, in light of inflation.

In *Seafarers Pension Plan v. Boeing*, this Court granted the requested $4.25 million fee following plaintiffs' submission of an expert declaration finding that the revised by-law achieved through the

settlement was "a significant addition to the corporate governance structure of Boeing" valued at $85 million based on decreased risk, measured against market capitalization. No. 1:19-cv-0809, ECF No. 58-2 (N.D. Ill. Nov. 15, 2022).

And in *Intuitive Surgical Shareholder Derivative Litigation*, the court relied on an expert declaration determining the value of corporate governance reforms through analyzing loss of market capitalization upon revelation of the corporate misconduct alleged in the case. The expert acknowledged that "[i]t is hard to quantify a precise percentage reduction" of risk, but the reforms achieved would "have a meaningful effect in reducing product safety and regulatory risks and thus in protecting shareholder value." No. CIV-526930, at ¶¶25, 36-39 (Super. Ct. San Mateo Cnty. Sept. 20, 2017).

Thus, the approach provided by Lead Plaintiffs' Counsel to valuing the Settlement terms here is consistent with accepted methods.

### D.    The Fee Request is Proper Under the Lodestar Method

Regardless of whether the Settlement's value can be determined with precision, the fee request is appropriate given counsel's time investment. *See Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) (holding "both the lodestar approach and the percentage approach may be appropriate in determining attorney's fee awards, depending on the circumstances"). The lodestar method evaluates the propriety of the fee by "multiplying a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010).

As detailed further below, Lead Plaintiffs' Counsel's hourly rates are regularly accepted by the Northern District of Illinois and federal courts across the country, and are well below the publicly available rates charged by the firms representing Defendants in this matter. The time expended entirely on a contingent basis is consistent with time spent in shareholder derivative cases that were resolved at a similar stage. As the Mediators found, the excellent results achieved in this matter are a direct result of the investment of time and resources by Lead Plaintiffs' Counsel, which are elaborated further

below, and their proposal for an all-in award of $15.85 million for attorneys' fees, expenses, and service awards, was based on their comprehensive understanding of the record and Lead Plaintiffs' Counsel's achievements, including a rare victory on a motion to dismiss and the SLC motion for a stay; oversight of the vigorous negotiations resulting in the best possible settlement, and involving the most senior partners on both sides who worked at all hours and on weekends and holidays; and briefing on the fee request including comparable cases, valuation, and lodestar information. Exhibit 1, Supp. Mediators' Decl. ¶¶7-13. The Mediators' fee proposal is thus the product of highly respected mediators with deep knowledge of the case, warranting deference.

Here, Lead Plaintiffs' Counsel's time, expended entirely on a contingent basis at rates well within the norm, strongly supports the fee request's fairness and reasonableness.

### 1. Lead Plaintiffs' Counsel's Hourly Rates Are Reasonable

Over approximately four years, Lead Plaintiffs' Counsel worked diligently against equally skilled and diligent defense counsel to secure a favorable resolution for Abbott. The rates submitted are the typical and customary rates for both of Lead Plaintiffs' Counsel's firms, and are routinely accepted by courts across the country.

**Cohen Milstein**: Federal courts across the country have approved fee requests at Cohen Milstein's typical and customary rates, which are adjusted in January of each year. This includes cases in the Northern District of Illinois as well as federal courts across the country. *See Rensin Joint Tr. v. Array Digit. Infrastructure, Inc.*, No. 1:23-cv-02764-MMR, ECF No. 82-8 (N.D. Ill. July 30, 2025) (Cohen Milstein partner rate of $1,425 and paralegal rate of $395), ECF No. 93 (Sep. 4, 2025) (awarding fees); *In re EQT Corp. Sec. Litig.*, No. 2:19-cv-00754, ECF Nos. 557-7 at 8, 557-8 at 8 (W.D. Pa. Sep. 25, 2025) (partner rates between $1,300 and $1,495 for Cohen Milstein and $1,700 for co-counsel, senior counsel and of counsel rates between $850 and $1,000, associate rates between $475 and $900, discovery and staff attorney rates between $275 and $545, law clerk rates between $350 and $560, case

manager and paralegal rates between $325 and $450); *Sheet Metal Workers' Nat'l Pension Fund v. Bayer*, No. 3:20-cv-04737, ECF No. 279 (N.D. Cal. Oct. 31, 2025) (order awarding attorneys' fees), ECF No. 270-6 at 9 (Sep. 25, 2025) (Cohen Milstein partner rates of $895 to $1,495 and associate rates of $550 to $750); *In re Silvergate Cap. Corp. Sec. Litig.*, No. 3:22-cv-01936-JES-MSB, ECF No. 145 (S.D. Cal. July 30, 2025) (partner rates between $1,300 and $1,495 for Cohen Milstein and $1,700 for co-counsel, senior counsel rate at $1,000, associate rates between $425 and $500, managing clerk rate at $475, and paralegal rates between $350 and $450); *In re InnovAge Sec. Litig.*, No. 1:21-cv-02770, ECF No. 208 (D. Colo. Dec. 17, 2025) (order granting attorneys' fee request at requested rates), ECF No. 203-6 at 6 (Oct. 22, 2025) (Cohen Milstein partner rates of $895 to $1,495, counsel rates of $995 to $1,425, and associate rates of $675 to $680); *Jien v. Perdue Farms, Inc.*, No. 1:19-cv-02521, ECF No. 1012 (D. Md. June 5, 2025) (order granting attorneys' fee request); ECF No. 993-3 at 4 (May 13, 2025) (Cohen Milstein partner rates of $905 to $1,335 and associate rates of $500 to $775).

Sophisticated corporate entities and institutional investors have retained Cohen Milstein and paid the Firm's typical and customary rates in non-contingent matters. For example, in *Pacific Steel Group v. Commercial Metals Co.*, Cohen Milstein along with two other firms represented a major steel company through a two-week jury trial, achieving a $110 million verdict at its hourly rates. No. 4:20-cv-07683-HSG, ECF No. 562 at 36-38 (N.D. Cal. Sept. 29, 2025) (finding "requested hourly rates are reasonable" considering partner and counsel rates between $735 and $2,169; associates, discovery counsel, and contract attorney rates between $325 and $1,278; and support staff rates between $285 and $710).

**Scott+Scott**: Similarly, Scott+Scott's rates submitted are typical and customary rates, and routinely accepted by courts across the country. For example, Scott+Scott's rates here are similar to those reported in *In re Facebook Inc. Shareholder Litig.*, No. 2018-0307-KSJM, Trans ID. 78978825 (Del. Ch. Apr. 7, 2026) (order awarding requested attorneys' fees), Trans. ID 78426197 (Feb. 16, 2026)

(declaration reflecting Scott+Scott's rates of $665 to $1,900 for partners and $525 to $750 for associates); *Rudi*, No. 2:20-cv-03068, ECF No. 46 at 11 (S.D. Ohio May 16, 2022) (order awarding requested attorneys' fees and finding the "hours incurred to be reasonable based on the location and experience of counsel"), ECF No. 26-2 at 4 (Dec. 14, 2021) (declaration reflecting Scott+Scott's rates of $875 to $1,295 for partners and $725 for associate); *Russo et al. v. Walgreen Co.*, No. 1:17-cv-02246, ECF No. 806  (N.D. Ill. Mar. 30, 2026) (order awarding requested attorneys' fees), ECF No. 702-1 (Mar. 4, 2025) (declaration reflecting Scott+Scott's rates of $900 to $1,420 for partners and $550 to $875 for associates).

Lead Plaintiffs' Counsel's rates are considerably below publicly available rates charged by Kirkland & Ellis, counsel for the Individual Defendants, and Latham & Watkins, counsel for Abbott. *See, e.g.*, *In re Marelli Auto. Lighting USA LLC*, No. 25-11034-CTG, ECF No. 1917 (Bankr. D. Del. Apr. 10, 2026) (Kirkland & Ellis LLP partner rates between $1,575 and $2,975, associate rates between $795 and $1,725, and paralegal rates between $435 and $755); *In re Office Props. Income Tr.*, No. 25-90530-CML, ECF No. 944 (Bankr. S.D. Tex. Mar. 11, 2026) (Latham & Watkins partner rates between $1,890 and $2,650, counsel rate at $1,810, associate rates between $952 and $1,635, and paralegal rates between $525 and $675).[4]

---

[4]     *See also* Becky Yerak, *Bankruptcy Lawyer Rates Top $3,000 an Hour*, WALL STREET J. (Dec. 30, 2025), https://www.wsj.com/articles/bankruptcy-lawyer-rates-top-3-000-an-hour-25298fba (in 2026 bankruptcy matters, reporting rate increases of roughly 11-15% from the prior year for Latham & Watkins and Kirkland & Ellis, with top partner rates nearing $3,000 hourly); Roy Strom, *Kirkland & Ellis Seizes New $3 Billion Business: Litigation*, BLOOMBERG LAW (Oct. 30, 2025), https://news.bloomberglaw.com/business-and-practice/kirkland-ellis-seizes-new-3-billion-business-litigation (in 2025, reporting litigation attorney rates at $1,000-$2,400 hourly for litigation attorneys at Kirkland & Ellis); Debra Cassens Weiss, *Nearly $1,000 an hour is rate for second-year associates at these BigLaw firms*, ABA J. (Apr. 3, 2023), abajournal.com/news/article/nearly-1000-an-hour-is-rate-for-second-year-associate-at-these-biglaw-firms (in 2023, reporting $1,000 hourly rates for associates with between three and five years of experience at Latham & Watkins and Kirkland & Ellis).

And Lead Plaintiffs' rates are consistent with those accepted in the Northern District of Illinois and charged in the national market for the quality and type of legal services provided here, which involve a high degree of expertise and specialization. *See Jeffboat, LLC v. Dir., Off. of Workers' Comp. Programs*, 553 F.3d 487, 490 (7th Cir. 2009) (holding that attorneys' fees are reasonable within the "community of practitioners" particularly when the subject matter is highly specialized and the market is national). *See, e.g.*, *In re Grupo Televisa Sec. Litig.*, No. 1:18-cv-01979-LLS, ECF No. 356 (S.D.N.Y. July 3, 2023) (partner rates between $1,140 and $2,110, counsel rates between $940 and $970, associate rates between $670 and $830, staff attorney rates between $380 and $460, managing clerk rate of $380, paralegal rate of $350, summer associate rate of $450); *Leventhal v. Chegg, Inc., et al.*, No. 5:21-cv-09953-PCP, ECF No. 195-4 (N.D. Cal. Feb. 27, 2025) (partner rates between $1,150 and $1,500, associate rates between $660 and $1,150, law clerk rates between $325 and $400, and paralegal rates between $275 and $425); *In re Alta Mesa Res., Inc. Sec. Litig.*, No. 4:19-cv-00957, ECF No. 1024-5 (S.D. Tex. Mar. 26, 2025) (partner rates between $835 and $1,400, of counsel rates between $460 and $1,200, associate rates between $250 and $700, staff attorney rates between $475 and $485, and paralegal rates between $350 and $410).

The request is also in line with precedent with respect to the total dollar amount requested. In *Rudi*, a derivative action brought for the benefit of *L Brands*, the parent company of Victoria's Secret, the Southern District Court of Ohio awarded $21 million in attorney's fees on fewer hours worked (7,919 hours). *Rudi*, No. 2:20-cv-03068, ECF No. 46 at 10, 12, 14, ECF No. 26. In *Altria*, the Eastern District of Virginia awarded $15 million in attorneys' fees for corporate reforms with $117 million of funding commitment over 5 years after over 19,000 total hours of attorneys' work. *In re Altria Grp., Inc. Derivative Litig.*, No. 3:20-cv-00772, ECF No. 179 at 6-7, ECF No. 180 at 12 (E.D. Va. Feb. 20, 2023). In *Pfizer*, the Southern District of New York awarded $22 million in attorneys' fees and expenses for a settlement that included establishing a Regulatory Committee and $75 million to fund

12

the Regulatory Committee's activities. *In re Pfizer*, 780 F. Supp. 2d at 339. Similar fees were also awarded in derivative actions regarding stock option backdating that achieved governance reforms, nearly two decades ago. *City of Pontiac Gen. Emps.' Ret. Sys. v. Langone*, No. 2006-cv-122302 (Ga. Super. Ct. Fulton Cnty. June 10, 2008) ($14.5 million fee award); *In re King Pharms., Inc. Deriv. Litig.*, No. BOO19077 (Tenn. Ch. Ct., Sullivan Cnty.) ($13.5 million fee award).

Accordingly, Lead Plaintiffs' Counsel's proposed rates are reasonable and appropriate for use in the lodestar analysis.

### 2. The Time Expended Was Necessary and Drove the Results Achieved

The time expended by Lead Plaintiffs' Counsel was reasonable and necessary to achieve the Settlement. Moreover, Lead Plaintiffs' Counsel spent appropriate time on tasks vital to the effective prosecution of the case and successful resolution through mediation. The work was carefully considered to advance the goals of the litigation while avoiding unnecessary duplication of effort. The total hours worked are consistent with or below comparable derivative cases at a similar stage. *See FirstEnergy Derivative Litig.*, No. 2:20-cv-04813 (S.D. Ohio) (over 23,000 hours where an SLC was formed and document discovery occurred but no depositions were taken); *see also In re McKesson Corp. Derivative Litig.*, No. 4:17-cv-01850 (N.D. Cal.) (over 26,000 hours, same posture).

The time expended reflects thoughtful staffing and allocation of responsibilities. Carol Gilden, a senior partner at Cohen Milstein based in Chicago, played a leading role throughout the entirety of the case and oversaw the litigation from the outset of the investigation and case development through overall litigation strategy, briefing, court argument, discovery, and eventually, mediation and settlement. Justin Reliford from Scott+Scott played a leading role in the litigation from the motion to dismiss through discovery and mediation and settlement. Steven Toll and Geoffrey Johnson, senior partners respectively at both firms, were particularly involved during certain stages of the matter. Steven Toll of Cohen Milstein played a critical role during the mediation and settlement process, while

Geoffrey Johnson of Scott+Scott played a critical role during the initial case development and leadership phase and then during the mediation and settlement process. Similarly, other attorneys and staff focused particularly on complaint drafting, document review, briefing, and other areas as was most efficient and effective. All of these attorneys and support personnel are highly qualified in the area of shareholder derivative litigation and greatly assisted in the prosecution of this Action for many years.

To aid the Court in its analysis, Lead Plaintiffs' Counsel has broken down the total hours worked by litigation stage. That information, with a description of the work performed at each stage and its impact on the case, is reflected in Exhibit 2 (Supplemental Declaration of Carol V. Gilden Declaration) and Exhibit 3 (Supplemental Declaration of Justin O. Reliford) as follows:

(1) **Initial Research and Complaint Drafting:**

In total, counsel spent 1,858.95 hours with a collective lodestar of $2,248,351.50 conducting a books and records investigation, initial legal and factual research, intervening in ongoing actions filed by other stockholders who failed to undertake the same pre-suit investigation, and drafting initial and amended complaints. As the Court is aware, counsel's comprehensive pre-filing books-and-records investigation resulted in the production of substantial corporate records by the Company that were utilized to craft allegations and support Lead Plaintiffs' claims. In addition to analyzing Abbott's internal books and records, the pre-filing investigations entailed (a) examining SEC filings, investor communications, news articles, press releases, analyst reports, market commentary, and scholarly publications; (b) analyzing DOJ proceedings, whistleblower reports, and other lawsuits and governmental proceedings concerning Abbott; (c) reviewing documents obtained through a Freedom of Information Act request; (d) researching applicable governmental regulations governing infant formula production, relevant Congressional records, and other publicly available information about

14

Abbott, its Board, and Defendants; and (e) consulting with experts concerning federal food safety regulations and economics.

To ensure adequate time to complete its investigation, Lead Plaintiffs' Counsel filed a Notice of Interested Party and successfully briefed a motion to intervene and stay derivative actions that had been filed without Abbott's books and records (and thus faced higher risk of dismissal). These efforts were necessary to present a comprehensive pleading capable of surviving a motion to dismiss under Rule 23.1. Lead Plaintiffs' Counsel ultimately drafted an initial 165-page complaint, followed by a 172-page consolidated amended complaint after counsel's appointment to lead the litigation.

(2) **Leadership:**

In total, Lead Plaintiffs' Counsel spent 887.98 hours with a collective lodestar of $1,053,998.75 at this stage of the case.

After Lead Plaintiffs moved to intervene in the first-filed complaint on February 24, 2023, which was opposed by two shareholders, they had to file a motion for leave to reply, which was granted, permitting the filing of the reply. Following the Court's Order that all plaintiffs and intervenors meet and confer regarding a potential proposed leadership structure, Lead Plaintiffs' Counsel led negotiations among all plaintiffs' counsel and another intervenor, the New York State and Local Retirement System, to develop a process for addressing case leadership, including preparing the joint status report on behalf of all plaintiffs and intervenors, which the Court had requested. ECF No. 43. This process established a deadline for intervenors and interested parties to file complaints, and absent a leadership structure agreed upon following the filing, contested leadership briefing. Lead Plaintiffs subsequently briefed leadership including responding to the three other leadership motions, and after being appointed, successfully briefed a post-appointment motion by another movant who attempted to alter the Court decision. These efforts were necessary to achieve the best leadership structure to move forward and obtain the best recovery for Abbott shareholders. Had Lead Plaintiffs

15

not prevailed on leadership, the court may have appointed different counsel, relying on complaints not as detailed or well-researched as Lead Plaintiffs' actions.

In addition, to preserve the efficiency goals achieved through the consolidation order and consistent with the obligations expected of lead counsel, Lead Plaintiffs' Counsel likewise tracked a parallel "demand refused" action, having the matter reassigned to ensure the efficient prosecution of the two related actions. They also tracked active proceedings by the same plaintiff in state court arising out of the same matter to ensure that action would not adversely impact the consolidated action.

(3) **Motion to Dismiss:**

In total, Lead Plaintiffs' Counsel spent 1,070.98 hours with a collective lodestar of $1,042,646.00 successfully defeating the Individual Defendants' repeated efforts to dismiss the Action at the pleading stage. Lead Plaintiffs' Counsel researched and briefed an opposition to a motion to dismiss that attached eighty exhibits and sought dismissal of every claim. Following the Court's decision granting in part and denying in part the motion, the Individual Defendants filed a motion for reconsideration, again making arguments heavily reliant on the pre-filing documentary record. Victories on both motions required extensive research and document review, more akin to summary judgment proceedings than preliminary dispositive motions. A loss on either motion would have meant no recovery for Abbott, making counsel's work absolutely necessary to achieve the Settlement's benefits.

(4) **Discovery Efforts:**

In total, counsel spent 1,411.22 hours with a collective lodestar of $1,373,406.25 at this stage of the case. After successfully opposing Defendants' Motion to Dismiss, Lead Plaintiffs' Counsel began plenary discovery efforts including: (a) negotiating a protective order and ESI protocol; (b) drafting and then engaging in multiple rounds of document requests and interrogatories and negotiating over Defendants' responses and objections; (c) engaging in extensive negotiations over

16

the parameters of document production with counsel for Abbott at Latham & Watkins and separately with counsel for the Individual Defendants at Kirkland & Ellis, including dozens of meet-and-confers and related correspondence regarding time frame, search terms, collection process, and relevance; (d) drafting, serving, and negotiating subpoenas and public records requests on non-parties including multiple state regulators; and (e) appearing and addressing ongoing discovery disputes before the magistrate judge. These discovery efforts were crucial in obtaining documents necessary to develop the case theory and strengthen the allegations in the consolidated amended complaint.

(5) **Document Review:**

In total, counsel spent 5,793.86 hours with a collective lodestar of $3,471,989.30 reviewing the massive document record Lead Plaintiffs built through their discovery efforts. This included review of: (a) over ████ documents representing ████ pages of confidential materials produced by Abbott; (b) ████████████████████████████████████████████████████ ████████████████████████████ ; (c) hundreds of documents produced by state and federal regulators; (d) Abbott's public filings with the SEC, press releases, announcements, transcripts of investor conference calls, and news articles; (e) analyst, business, and financial media reports, scholarly literature, and publications about Abbott; (f) dockets and reports of related litigation and regulatory inquiries; and (g) monitoring relevant state and federal court litigation. To ensure efficient first-level review, litigation team attorneys met regularly with staff attorneys and contract attorneys conducting the review to evaluate important documents. These meetings allowed litigation team attorneys to highlight important themes and facts requiring additional review or research. Document review continued throughout the litigation, with specific research projects testing or refuting positions taken by defense counsel, the SLC, and the Company in mediation, as well as informing expert analysis and advice on potential settlement terms.

Document review was a laborious and fruitful process that brought to light important issues at Sturgis and Abbott. These issues became focal points in mediation discussions and guided the settlement reforms that will benefit Abbott and prevent repeat failures. The successful mediation outcome was largely due to Lead Plaintiffs' Counsel's demonstrated command of facts and law necessary to create the range of available remedial approaches brought to the negotiations.

(6) **Special Litigation Committee:**

Lead Plaintiffs' Counsel devoted 372.01 hours with a combined lodestar of $373,509.50 to overcoming the Special Litigation Committee. This included defeating the SLC's effort to fully stay the litigation. As a result of Lead Plaintiffs' success on the motion to stay, Defendants continued to produce a large amount of documents in advance of the mediation. Counsel's review of those documents and investigation into the facts giving rise to the shutdown and recall directly contributed to the successful resolution of the Action. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(7) **Mediation:**

Lead Plaintiffs' Counsel devoted 2,183.77 hours with a combined lodestar of $2,619,539.25 on mediation-related matters. It took multiple internal strategy discussions, client conversations, and external conferences to begin settlement discussions with the SLC, the Individual Defendants, and the Company, including a negotiated "stay" of the litigation and the negotiation of a supplemental confidentiality agreement regarding mediation. Through vigorous negotiation, Lead Plaintiffs' Counsel obtained additional confidential information, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Lead Plaintiffs' Counsel prepared a detailed, thorough mediation statement, informed by their review and analysis of the written discovery record and additional confidential information exchanges with the SLC. Over six months, Lead Plaintiffs'

18

Counsel engaged in extensive negotiations over resolution of this Action, including an all-day, in-person mediation; seven subsequent Zoom mediation sessions; numerous internal meetings regarding strategy; and numerous email and telephone communications with defendants and the Mediators.

In connection with the mediation, Lead Plaintiffs' Counsel also vetted and retained leading experts in Food, Drug, and Cosmetic Act ("FDCA") compliance and corporate governance, in addition to the economics expert who had been consulted during the pleading stage. Throughout the mediation, Lead Plaintiffs' Counsel engaged in numerous meetings and correspondence with these experts, who were actively engaged in evaluating Defendants' settlement proposals and relevant record evidence, researching best practices and industry standards on specific issues, and providing guidance and feedback to craft Lead Plaintiffs' counter-proposals. Given the nature of the reforms being negotiated and the complexity of infant formula manufacturing, proposals and counter-proposals on both sides were detailed and granular. Lead Plaintiffs' Counsel consulted with their three experts on an ongoing basis to ensure the specific proposals had value and would benefit Abbott.

During mediation, Lead Plaintiffs' Counsel also monitored developments in parallel litigation for their potential impact on the negotiations. In this regard, on December 1, 2025, seven states intervened in a False Claims Act suit brought by the federal government against Abbott seeking to recoup funds spent on alleged tainted powder infant formula manufactured at Sturgis between 2020 and 2022. Lead Plaintiffs' Counsel necessarily spent a substantial amount of time analyzing the proceedings, consulting with their firm's respective Qui Tam lawyers and discussing the proceedings with Defense Counsel in order to evaluate the impact on the mediation discussions.

Lead Plaintiffs subsequently undertook extensive negotiations with counsel for the Company and the Individual Defendants regarding an initial term sheet and exhibits, the Settlement Stipulation and its six exhibits and "Attachment A." Lead Plaintiffs' Counsel likewise discussed the progress of

19

mediation and the final settlement terms with counsel to other Abbott stockholders, none of which ultimately objected to the Settlement.

The mediation work was intense and required many hours of discussions among Lead Plaintiffs' Counsel and their expert advisors. The negotiations required direct participation of senior attorneys who needed to understand the technical and complex issues of manufacturing compliance and corporate governance. As counsel for the Individual Defendants candidly informed the Court: "every single thing down to the level of [sic] which faucet is going to be swabbed and what time of day things are going to occur was negotiated vigorously, not for just bickering's sake, but because that had to do with the rhythms of how the FDA were involved, how the plant operated, and whether these various [] things were going to be positive and real, or whether they were going to interfere and actually be detrimental." Final Approval Tr. at 20. Counsel went on to say that "people really learned the area, its lawyers, and worked it hard. And certainly the plaintiffs did. And there were lots of late night and early morning conversations with the mediators separately with lawyers from each side about these complexities[.]" *Id.*

The mediation provided a platform to negotiate fairly and at arm's length. Through numerous discussions and negotiations, the parties reached a Settlement that Lead Plaintiffs, the Individual Defendants, the Company, and the SLC agreed would bring considerable value to Abbott and its shareholders.

(8) **Preliminary Approval**:

Lead Plaintiffs' Counsel devoted 260.90 hours with a combined lodestar of $280,304.00 preparing the preliminary approval motion (as required by the Settlement Stipulation) and securing preliminary approval of the proposed Settlement. Working to meet the Court's deadline for settlement approval, this work happened in tandem with the negotiation of the Stipulation of Settlement and its accompanying exhibits. Litigation attorneys at all levels were involved in drafting and editing, with

20

numerous discussions and conferences with defense counsel as the parties negotiated how every term of the settlement would be disclosed and described in the preliminary approval motion. Lead Plaintiffs' Counsel also prepared for the preliminary approval hearing. Throughout this process and following preliminary approval, counsel engaged with other shareholder counsel regarding the settlement terms. Ultimately, no stockholders objected at either the preliminary or final approval stage. The work compiling the settlement documentation and preliminary approval motion was necessary to secure final approval.

(9)     **Case Management**: Lead Plaintiffs' Counsel recorded 121.80 hours with a combined lodestar of $78,730.50 for tasks best described as "case management."  This includes time spent on, among other things, file management and other case administrative work that does not fit squarely within the other categories enumerated above.

### 3. The Requested Lodestar Multiplier Falls Within the Range Approved by Courts

The hourly rates submitted multiplied by the hours worked by each timekeeper yields a lodestar multiplier. The multiplier compensates and incentivizes counsel to take on challenging representative cases and provide excellent, vigorous advocacy. "In practice, most multipliers fall between one and four." *In re TikTok, Inc. Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 943 (N.D. Ill. 2022); *see also Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) (holding that multipliers typically fall between one and four and noting that the multiplier is "designed to reflect the fact that, no matter how many hours were invested, there was, at the outset, the possibility of no recovery").

Lead Plaintiffs' Counsel requests a modest multiplier of 1.22, at the low end of the typical range. As the following examples reflect, this multiplier is consistent with derivative cases involving analogous contingent risk and robust corporate governance settlements. In *Lambrecht v. Taurel* (Eli Lilly), a derivative case with a lodestar multiplier of 1.25, the court found "[p]laintiffs' counsel provided high-quality services in obtaining a result that was not guaranteed" and the requested multiplier was

21

"within the range of multipliers awarded in comparable cases." 2010 WL 2985946, at *3 (S.D. Ind. June 8, 2010), *report and recommendation adopted*, 2010 WL 2985943 (S.D. Ind. July 27, 2010). In an earlier derivative case against Abbott, this Court approved a 3.5 multiplier in connection with corporate governance reforms. *In re Abbott-Depakote S'holder Derivative Litig.*, No. 1:11-cv-08114, ECF No. 332 ¶7 (N.D. Ill. May 22, 2014), ECF No. 322 at 38 (Apr. 24, 2014). In *In re Walgreen Co. Derivative Litigation*, this Court approved a multiplier of approximately 2.267x relating to corporate governance reforms strengthening Board oversight of Walgreens' compliance. No. 1:13-cv-05471 (N.D. Ill.), ECF No. 64-1 at 34, ECF No. 66, ECF No. 73.[5]

This multiplier is also consistent with shareholder derivative cases outside this Circuit. In *Rudi*, the Southern District of Ohio awarded a 2.75x multiplier on a lodestar for corporate reforms backed by a $90 million funding commitment, finding that 2.75 falls at the low end of the reasonable range "because of the inherent risks of litigation, courts in [that] district award multipliers of 'between approximately 2.0 and 5.0.'" No. 2:20-cv-03068, ECF No. 46. *See also Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) (collecting cases and stating: "[i]n shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation").

Lead Plaintiffs' Counsel's request for a modest lodestar multiplier for high-quality services resulting in an excellent settlement supports approval of the requested attorneys' fees.

---

[5]     *See also Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, No. 1:16-cv-5198, ECF No. 162 at 2-3 (N.D. Ill. Dec. 6, 2019) (awarding 2.1 multiplier); *In re Kraft Heinz Sec. Litig.*, No. 1:19-cv-01339, ECF No. 482-1 at 3 (N.D. Ill. Aug. 8, 2023)(attorney's fee request constitutes a 1.7 multiplier), ECF No. 493 (granting request); *Flynn v. Exelon Corp., et al.*, No. 1:19-cv-08209, ECF No. 210 ¶5 (N.D. Ill. Aug. 3, 2023) (attorney's fee request constituted a 2.7 multiplier, based on the request for 26% of a $173 million settlement and total lodestar of $16,398,099), ECF No. 219 (granting request); *Allison v. Oak Street Health, Inc., et al.*, No. 1:22-cv-00149, ECF No. 189 at 27 (attorney's fee request constituted a multiplier of 1.26, based on the request for 29% of a $60 million settlement and total lodestar of $13,804,468), ECF No. 195 (granting request); *Wong v. Accretive Health, Inc.*, 2014 WL 7717579, at *1 (N.D. Ill. Apr. 30, 2014) and *Wong v. Accretive Health, Inc.*, No. 12-cv-03102, ECF No. 73 (Decl.) at 22 (N.D. Ill. Dec. 13, 2013) (awarding 4.7 multiplier).

## III.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs and their counsel respectfully request that this

Court grant final approval of the requested fee award.


DATED: June 26, 2026                                      Respectfully submitted,


___/s/ Carol V. Gilden___                            ___/s/ Justin O. Reliford___
Carol V. Gilden                                      Justin O. Reliford
COHEN MILSTEIN SELLERS & TOLL,                       Elizabeth K. Dragovich
PLLC                                                 Karen Kam
200 S. Wacker Drive, Suite 2375                      SCOTT+SCOTT
Chicago, IL 60606                                    ATTORNEYS AT LAW LLP
Telephone: 312-357-0370                              222 Delaware Ave., Suite 1405
cgilden@cohenmilstein.com                            Wilmington, DE 19801
                                                     Telephone: 302-578-7345
Richard Speirs                                       jreliford@scott-scott.com
COHEN MILSTEIN SELLERS & TOLL,                       edragovich@scott-scott.com
PLLC                                                 kkam@scott-scott.com
88 Pine Street, 14th Floor
New York, NY 10005                                   Maxwell R. Huffman
Telephone: 212-828-7797                              SCOTT+SCOTT ATTORNEYS
rspeirs@cohenmilstein.com                            AT LAW LLP
amiller@cohenmilstein.com                            600 W. Broadway Suite 3300
                                                     San Diego, CA 92101
Steven J. Toll                                       Telephone: 619-233-4565
Molly Bowen                                          mhuffman@scott-scott.com
COHEN MILSTEIN SELLERS & TOLL,
PLLC
1100 New York Ave., NW, Eighth Floor                 Jing-Li Yu
Washington, DC 20005                                 Melissa May
Telephone: 202-208-2600                              SCOTT+SCOTT
stoll@cohenmilstein.com                              ATTORNEYS AT LAW LLP
mbowen@cohenmilstein.com                             The Helmsley Building
                                                     230 Park Avenue, 24th Floor
*Co-Lead Counsel for Plaintiffs*                     New York, NY 10169
                                                     Telephone: 212-223-6444
                                                     jyu@scott-scott.com
                                                     mmay@scott-scott.com

                                                     Geoffrey M. Johnson
                                                     SCOTT+SCOTT

23

ATTORNEYS AT LAW LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
gjohnson@scott-scott.com

*Co-Lead Counsel for Plaintiffs*


John A. Kehoe
KEHOE LAW FIRM, P.C.
2001 Market Street, Suite 2500
Philadelphia, PA 19103Tel: 215-792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Plaintiff SEPTA*